**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

MICHAEL GIBSON MUIR,

      Plaintiff,


      v.


UNITED STATES TRANSPORTATION
SECURITY ADMINISTRATION; DAVID P.
PEKOSKE, Administrator, United States
Transportation Security Administration, in his
individual capacity; L3HARRIS
TECHNOLOGIES, INC., a Delaware for-profit
corporation; ALLEGIANT AIR, LLC, a Nevada
company; CHAD F. WOLF, Secretary, United
States Department of Homeland Security, in his
official capacity,


      Defendants.

Case No. 1:20-cv-01280-JBM-JEH

<u>**COMBINED MOTION AND BRIEF IN SUPPORT OF MOTION TO DISMISS
DEFENDANT DAVID P. PEKOSKE IN HIS INDIVIDUAL CAPACITY**</u>

      Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant David P. Pekoske,

Administrator of the Transportation Security Administration ("TSA"), respectfully submits the

foregoing Motion to Dismiss Plaintiff's Amended Complaint against David P. Pekoske in his

individual capacity.

## I.      INTRODUCTION

      "On September 11, 2001, terrorists breached this Nation's civil air transportation system.

Masquerading as civilian air travelers, they carried box cutter knives aboard commercial airplanes

without detection by airport security. They used the knives to hijack four commercial planes, three

of which they managed to convert into guided missiles to attack New York City and Washington, D.C." Springs v. Stone, 362 F. Supp. 2d 686, 690 (E.D. Va. 2005). As part of its response, Congress enacted the Aviation and Transportation Security Act (ATSA), Pub. L. No. 107–71, 115 Stat. 597 (Nov. 19, 2001) (codified in 49 U.S.C. §§ 114, et seq.), to "strengthen national security through the federalization of the civil transportation system." Springs, 362 F. Supp. 2d at 690. "The cornerstone of the ATSA is the creation of the Transportation Security Administration ('TSA'), a federal agency charged with overseeing every aspect of civil transportation security in this country. The most essential aspect of civil transportation security addressed by the ATSA, and for which TSA is accountable, is improving airport security to prevent a reprise of the tragic events of September 11, 2001." Id. By statute, TSA is responsible for the "day-to-day Federal security screening operations for passenger air transportation," 49 U.S.C. § 114(e)(1). Among other things, TSA must "provide for the screening of all passengers" and aircraft-bound "property," 49 U.S.C. § 44901(a); see 49 C.F.R. § 1540.107(a). TSA employees who screen passengers pursuant to this congressional mandate "are tasked with assisting in a critical aspect of national security—securing our nation's airports and air traffic." Vanderklok v. United States, 868 F.3d 189, 207 (3d Cir. 2017).

This case arises from two of the millions of TSA's daily efforts to perform that critical function. Unidentified TSA personnel screened Plaintiff Michael Muir once at Phoenix Mesa Airport in Phoenix, Arizona, and again at the Peoria International Airport in Peoria, Illinois. Both screenings, Plaintiff contends, violated the United States Constitution. During the relevant time, Defendant David P. Pekoske served as the Administrator for the TSA ("ADM Pekoske"), the highest level position at TSA.[1] ADM Pekoske did not participate in the challenged screenings, and Plaintiff does

---

[1] David Pekoske was confirmed by the U.S. Senate as the Transportation Security Administration's seventh administrator in August 2017. He leads a workforce of approximately 60,000 employees, including the Federal Air Marshal Service, and is responsible for security operations at nearly 450 airports throughout the United States and shared security for highways, railroads, ports, mass transit systems and pipelines. www.tsa.gov/leader-bios/adminstrator.

not allege facts plausibly suggesting otherwise. Nevertheless, Plaintiff seeks to recover money damages from ADM Pekoske personally.

Plaintiff's claims against ADM Pekoske may not proceed. No federal statute gives Plaintiff a remedy in damages against ADM Pekoske personally, and, in this sensitive context—involving TSA's critical national-security mission and clear signs from Congress that it does not favor the damages remedy Plaintiff seeks—the Court ought not create one for Plaintiff under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), particularly in light of Ziglar v. Abbasi, 137 S. Ct. 1843 (2017). Any Bivens claim is barred by qualified immunity in any event, as Plaintiff's general and conclusory allegations do not plausibly suggest that ADM Pekoske personally participated in a clearly established statutory or constitutional violation. As a matter of law, then, ADM Pekoske should be dismissed with prejudice from this lawsuit.

## II.  STANDARD OF REVIEW

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. When deciding a Rule 12(b)b(6) motion, the court must "construe the complaint in the 'light most favorable to the' [plaintiff.]" Zahn v. N. Am. Power & Gas, LLC, 847 F.3d 875, 877 (7th Cir. 2017) (quoting Bell v. City of Chicago, 835 F.3d 736, 738 (7th Cir. 2016)). The court also assumes that all of the well-pleaded facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. See Iqbal, 556 U.S. at 678; Collins v. Vill. of Palatine, 875 F.3d 839, 842 (7th Cir. 2017) (citing McCauley v. City of Chicago, 671 F.3d 611, 615-16 (7th Cir. 2011)); Tagami v. City of Chicago, 875 F.3d 375, 377 (7th Cir. 2017) (citing United Cent. Bank v. Davenport Estate LLC, 815

F.3d 315, 318 (7th Cir. 2016)).

Because Plaintiff is proceeding pro se, his complaint must be construed liberally. See Beal v. Beller, 847 F.3d 897, 902 (7th Cir. 2017) ("'[a] document filed pro se is to be liberally construed, . . . and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'" (quoting Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam))). That being said, as the Court stated in Iqbal, the Rule 8 pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." 556 U.S. at 678. The Seventh Circuit has held that "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Yeftich v. Navistar, Inc., 722 F.3d 911, 915 (7th Cir. 2013) (quoting Twombly, 550 U.S. at 557 (internal quotation marks omitted)).

### III. PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that he is a thirty-nine year-old married United States citizen residing in Bloomington, Illinois. Am. Cmplt. ¶ 10. Plaintiff avers that on August 9, 2018, he was present at the Phoenix-Mesa Gateway Airport in Mesa, Arizona (airport code IWA) about two hours before his scheduled 1:31 p.m. Allegiant Air flight. Am. Cmplt. ¶¶ 16, 20. Prior to his flight, Plaintiff experienced an "unpredictable, uncontrollable and potentially life-threatening health emergency at his right groin due to his hidden disorder" and to his "private marital healthcare choices" regarding that disorder. Am. Cmplt. ¶ 17. Plaintiff states that he presented himself for mandatory passenger screening. Am Cmplt. ¶ 19. Plaintiff asserts that TSA failed to give him fair notice of the security screening process and failed to sufficiently warn him about that process. Am. Cmplt. ¶ 21. Plaintiff states that his body was scanned in the required "hands-up" position, by L3 ATR software, and that the scan revealed his "hidden, beneath the skin physical disorder at his right groin as a foreign material object on the surface of his skin at his right groin." Am. Cmplt. ¶¶ 24-26.

After the scan revealed this anomaly at his right groin, unidentified TSA personnel informed

Plaintiff that additional screening was required, and that he would need a pat-down to resolve the alarm. Am. Cmplt. ¶31. Plaintiff believes that he was singled out for a pat-down because of his congenital physical disorder. Am. Cmplt. ¶ 27. Plaintiff states that he informed TSA that he was experiencing a serious (but otherwise unspecified) medical emergency and he ordered TSA not to touch him at his right groin. Am. Cmplt. ¶ 32. Plaintiff claims that he was desperate to reunite with his wife in the sterile area, so that she could help him with the symptoms of his medical emergency, as she had done for years. Am. Cmplt. ¶ 34. Plaintiff avers that TSA disregarded his serious medical needs, and, as a result, he was permanently damaged and suffers severe ongoing psychological distress and disturbing physical manifestations.  Am. Cmplt. ¶ 35.

In a nearly identical presentation of facts, Plaintiff alleges that three days after the incident at IWA, on August 12, 2018, he arrived at the Peoria International Airport (airport code PIA) in Peoria, Illinois.  Am. Cmplt. ¶ 36. Plaintiff alleges that, again, prior to this flight, he experienced an "unpredictable, uncontrollable and potentially life-threatening health emergency at his right groin due to his hidden physical disorder and his private marital healthcare choices." Am. Cmplt. ¶ 37. Despite having just been through TSA security screening at IWA three days prior, Plaintiff asserts that TSA failed to give him fair notice of the security screening process and failed to sufficiently warn him about that process. Am Cmplt. ¶ 41. Plaintiff states that his body was scanned in the required "hands-up" position, by L3 ATR software, and that the scan revealed his "physical disorder at his right groin as a foreign material object on the surface of his skin at his right groin." Am. Cmplt. ¶¶ 44, 46.

After the AIT indicated an alarm in his groin, an unidentified TSA screener informed Plaintiff that he would need to undergo a pat-down to resolve the alarm. Am. Cmplt. ¶ 50. Plaintiff again responded by ordering TSA not to touch his right groin, and informed TSA that physical contact at that location would result in immediate and extreme physical pain for him. Am. Cmplt. ¶ 51. Once Plaintiff was escorted to a private area for screening, Plaintiff "offered to lower his pants and underwear to show TSA the completely beneath the skin hernia at his right groin." Am. Cmplt. ¶ 55.

Plaintiff asserts that TSA refused this offer, and, "as a matter of strict policy, consciously and deliberately disregarded [Plaintiff's] serious medical needs and refused what [he] believed was a reasonable alternative" to the screening process. Am. Cmplt. ¶ 57. Plaintiff believes that TSA coerced him to act against his will in order to "secure his release from TSA control." Am. Cmplt. ¶ 60. Plaintiff claims that the incident at PIA caused permanent damage and severe ongoing psychological distress and disturbing physical manifestations, which resulted from being impermissibly singled out and coerced to act against his will. Am. Cmplt. ¶ 61.

Based on these allegations, Plaintiff sues TSA, Department of Homeland Security Acting Secretary Chad Wolf in his official capacity, L3Harris Technologies, and Allegient Air, LLC. He seeks declaratory and injunctive relief, and $200 million in damages from the Federal Defendants under the Federal Tort Claims Act (FTCA) and under the Rehabilitation Act.[2] Plaintiff also seeks $500 million in damages, plus punitive damages, from ADM Pekoske "in his individual capacity" for alleged violations of the Fourth and Fifth Amendments to the Constitution. Am. Cmplt. ¶¶ 78-85 (Counts Five - Eight). Aside from bare assertions that ADM Pekoske violated the Constitution, Plaintiff, however, does not say what ADM Pekoske did to violate those provisions. As the highest-ranking TSA official, ADM Pekoske oversees the entirety of TSA's security operations, supervising a TSA workforce of nearly 60,000. That authority is exercised through several layers of personnel responsible for implementing the TSA policy initiatives directed by ADM Pekoske, both at TSA's headquarters in Arlington, Virginia, and at airports nationwide. As a result, ADM Pekoske did not personally screen passengers at IWA or PIA and is not even alleged to have been physically present for Plaintiff's screenings; Plaintiff makes no contention to the contrary. All he offers against ADM Pekoske is the sort of formulaic boilerplate insufficient to expose a federal official to the risk of a damages award and other burdens of litigation in a constitutional-tort lawsuit.

---

[2] See Am. Compl. at pp. 13-15 (Counts One – Four), pp. 24 – 26 (Count 21); Prayer for Relief, Parts (F)-(G)). The Federal Defendants have filed a separate motion to dismiss. Additionally, the private-entity defendants are separately represented.

# IV.  DISCUSSION

Beyond Plaintiff's threshold failure to allege any personal involvement by ADM Pekoske in

Plaintiff's security screening at IWA and PIA, Plaintiff wants ADM Pekoske to pay money

damages—out of his own pocket—pursuant to Bivens as redress for the alleged violations of the

Fourth Amendment protections against unreasonable search and seizure and Fifth Amendment due

process guarantees. But the U.S. Supreme Court has significantly cabined Bivens, most recently in

Abbasi. This Court, therefore, should decline Plaintiff's request to imply Bivens remedies for

Plaintiff's claims. Those claims, in any event, are barred by qualified immunity.

## A.    ADM PEKOSKE HAD NO PERSONAL INVOLVEMENT IN PLAINTIFF'S CLAIMS.

It is axiomatic that to be liable in a Bivens claim, a defendant must have been personally

involved in the deprivation of a constitutional right, and a causal connection between that involvement

and the deprivation must be shown. Zatler v. Wainright, 802 F.2d 397, 401 (11th Cir. 1986); see also

Del Raine v. Williford, 32 F.3d 1024, 1047 (7th Cir. 1994) (in general, the individual participation

requirement for a Bivens action parallels the requirements of 28 U.S.C. § 1983). Moreover, because

"vicarious liability is inapplicable to Bivens . . . suits, a plaintiff must plead that each Government-

official defendant, through the official's own individual actions, has violated the Constitution."

Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (emphasis added). Likewise, a plaintiff cannot simply claim

that a proposed Bivens defendant was the "'principal architect'" of an allegedly invidious policy or

"'instrumental'" in its adoption and execution, as those are "formulaic recitations" that are unworthy

of being assumed to be true. Id. at 681. Without more specific allegations of direct involvement, there

can be no recovery. Burks v. Raemisch, 555 F.3d 592, 593-94 (7th Cir. 2009) ("Liability depends on

each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise. . .

.").

In this case, Plaintiff fails to allege any direct personal involvement on the part of ADM

Pekoske; his alleged injuries were inflicted – if at all – by individuals well-removed from ADM Pekoske's direct supervision.  Undaunted, Plaintiff appears to propose that because ADM Pekoske is the head of TSA, then he must necessarily be responsible for the conduct of TSA personnel and, on that basis, personally liable to Plaintiff for any claimed misdeed.  As indicated above, however, Bivens liability does not flow upward to a defendant based on the "knowledge or actions of persons they supervise."  Burks, 555 F.3d at 593-94. A defendant will not be liable for a constitutional violation unless he was personally involved or acquiesced in the alleged constitutional violation. Id.; Gossmeyer v. McDonald, 128 F.3d 481, 494 (7th Cir. 1997).  There is no respondeat superior liability for supervisory officials due to the allegedly unconstitutional acts of their subordinates.  Rizzo v. Goode, 423 U.S. 362, 377 (1976).  Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official.  Rascon v. Hardiman, 803 F.2d 269, 273 (7th Cir. 1986). As a result, Plaintiff's claims are founded on a flawed premise.  On this basis alone, ADM Pekoske should be dismissed from this action with prejudice.

### B.     THE COURT SHOULD NOT EXTEND BIVENS TO PLAINTIFF'S CLAIMS.

In order to fully dispel any suggestion of liability on the part of ADM Pekoske in this action, it is beneficial to further explain why Plaintiff's theory must fail.  Constitutional-tort suits against state or local officials are governed by 28 U.S.C. § 1983. But ADM Pekoske, a federal official, acted solely under color of federal law. As § 1983 does not apply to ADM Pekoske, and "Congress did not create an analogous statute for federal officials," Abbasi, 137 S. Ct. at 1854, Plaintiff has no statutory claim against ADM Pekoske. Instead, he invokes Bivens, which, in very limited circumstances, may provide a judicially implied, non-statutory damages remedy against a federal official who violates the Constitution. A Bivens remedy, however, "is not an automatic entitlement," Wilkie v. Robbins, 551 U.S. 537, 550 (2007), and, indeed, it is "disfavored," Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009); accord Abbasi, 137 S. Ct. at 1857. The "antecedent" question here, then, as in any Bivens case, is whether the Court should create a non- statutory remedy, on its own, directly under the Constitution. Hernandez v.

Mesa, 137 S. Ct. 2003, 2006 (2017) (per curiam).

For "the past 30 years" and counting, the Supreme Court's answer to that question has been an emphatic "no." See Abbasi, 137 S. Ct. at 1857 (collecting cases in which the Court has "refused" or "declined to create an implied damages remedy"). Even before the landmark Abbasi decision, the Court of Appeals for the Seventh Circuit cogently observed that "Bivens is under a cloud," Robinson v. Sherrod, 631 F.3d 839, 842 (7th Cir. 2011), and "[w]hatever presumption in favor of a Bivens-like remedy may once have existed has long since been abrogated." Vance v. Rumsfeld, 701 F.3d 193, 198 (7th Cir. 2012) (en banc). Indeed, the "presumption" runs the other way and is "'against judicial recognition of direct actions for violations of the Constitution by federal officials or employees,'" Neb. Beef, Ltd. v. Greening, 398 F.3d 1080, 1084 (8th Cir. 2005) (citations omitted). As this case presents no reason for the Court to depart from that presumption, and many factors counsel against recognition of a Bivens remedy here, the Court should decline to create one against ADM Pekoske and should dismiss him from the action with prejudice.

1.    **The Supreme Court Has Retreated From Implied Damages Remedies.**

In 1971, the Supreme Court decided Bivens and, for the first time, created a damages remedy, "even absent statutory authorization," against federal officials based on their allegedly unconstitutional conduct. Abbasi, 137 S. Ct. at 1854. The "limited holding" of Bivens, Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001), was that the plaintiff could seek damages from federal law-enforcement officers who allegedly violated the Fourth Amendment when they entered and searched his home without a warrant and, while there, handcuffed and arrested him for narcotics violations. Bivens, 403 U.S. at 390, 397. Since then, the Supreme Court has extended Bivens only twice—for (1) a Fifth Amendment equal-protection, gender-discrimination claim brought against a Congressman who admitted firing a staffer because she was a woman, Davis v. Passman, 442 U.S. 228, 230-31, 234-35 (1979); and (2) an Eighth Amendment claim asserted against federal prison officials for failing to provide vital medical treatment for an inmate's asthma, resulting in his death.

Carlson v. Green, 446 U.S. 14, 18-19 (1980). In each case, the Court created an implied damages remedy only after finding no "special factors counselling hesitation in the absence of affirmative action by Congress." Bivens, 403 U.S. at 396; Davis, 442 U.S. at 245-49; Carlson, 446 U.S. at 18-19. "These three cases—Bivens, Davis, and Carlson—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." Abbasi, 137 S. Ct. at 1855. In every other case where the issue was before it, the Court has "'consistently refused to extend Bivens to any new context or new category of defendants.'" Id. at 1857 (quoting Malesko, 534 U.S. at 68); accord Vance, 701 F.3d at 198.

Although the Abbasi Court stopped short of overruling Bivens, it stated that the arguments supporting Bivens have "los[t] their force," and its "three Bivens cases"—Bivens, Davis, and Carlson—"might have been different if they were decided today." 137 S. Ct. at 1855-57. Bivens was the product of an "'ancien regime'" when the Court would routinely "imply causes of action" from statutes that were "not explicit in the statutory text itself." Id. at 1855 (citation omitted). "These statutory decisions were in place," and "the prevailing law," when Bivens, Davis, and Carlson "were decided" (and, indeed, were "cases Bivens itself relief upon"). Id. But thereafter, "the Court adopted a far more cautious course before finding implied causes of action" in statutes. Id. That course correction naturally "led to similar caution with respect to actions in the Bivens context, where the action is implied to enforce the Constitution itself." Id. at 1856. The Court's evolution away from Bivens, then, was no accident but a principled return to basics: respect for "separation of powers" means that the creation of personal-liability claims should be "committed to those who write the laws rather than those who interpret them." Id. at 1857 (citations and internal quotation marks omitted). As the Court's "precedents now instruct," Congress is in a "better position" than the Judiciary "to consider if the public interest would be served by imposing a new substantive legal liability." Id.

After Abbasi, a court confronted with a Bivens claim must determine if it arises in a "new

context." If so, then "a special factors analysis [is] required" before a court may allow the claim to proceed. Id. at 1857-60. "[A] Bivens remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" Id. at 1857 (certain internal quotation marks and citations omitted). This case unquestionably presents a new context, and multiple factors strongly counsel against the Court creating the damages remedy Plaintiff seeks.

## 2.       Plaintiff's Claims Present A New Context.

"The proper test for determining whether a case presents a new Bivens context is as follows. If the case is different in a meaningful way from previous Bivens cases decided by this Court"— Bivens, Davis, and Carlson—"then the context is new." Id. at 1859. The non-"exhaustive list of differences that are meaningful enough to make a given context a new one" includes:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Id. at 1859-60; accord id. at 1864-65. Even if a case "has significant parallels to one of the [Supreme] Court's [three] previous Bivens cases," it still may "seek to extend" one of those cases "to a new context," as "even a modest extension is still an extension." Id. at 1864.

This case "is different in a meaningful way" from Bivens, Davis, and Carlson. Id. at 1859. It bears no "resemblance" at all to Carlson (an inmate's Eighth Amendment denial of medical care). Id. at 1860. Plaintiff's challenges under the Fourth Amendment's protections against unreasonable search and seizure and the Fifth Amendment's due process protections involve the same broad sources of the Bivens and Davis claims. But that commonality, alone, does not entitle Plaintiff to a Bivens remedy. The Supreme Court's "recognition of a cause of action under a constitutional amendment does not mean that such an action can vindicate every violation of the rights afforded by that particular amendment," Vanderklok, 868 F.3d at 199; see Abbasi, 137 S. Ct. at 1859. This case is far afield from

11

Bivens and Davis—involving "meaningful" differences and certainly more than "modest" ones—and so it "arises in a new Bivens context" under Abbasi. Id. at 1859, 1864-65.

The differences begin with an obvious difference of subject matter. At issue in this case is not an in-home raid by law-enforcement officers (Bivens) or a Congressman's gender-based employment discrimination (Davis). Rather, this case concerns a wholly different factual context—i.e., an airplane-passenger screening, in the sensitive, national-security setting of an airport, that was performed by TSA screeners (i.e., Transportation Security Officers or TSOs), acting under the ATSA—a different "statutory or other legal mandate," Id. at 1860. That detail underscores an important difference between this case and Bivens, and shows that ADM Pekoske (and those involved in airport screenings) present a "new category of defendants" for Bivens purposes. Id. at 1857. In Bivens, the defendants were traditional federal law-enforcement officers, 403 U.S. at 389, but that is not true of ADM Pekoske or the unidentified TSA personnel who may be involved in this case. Although Congress conferred general law-enforcement authority on the TSA Administrator, 49 U.S.C. §§ 114(p), 44903, he is not a law enforcement officer.  Nor has that authority has not been delegated to TSO, who do not receive the sort of training provided to federal law-enforcement officers.[3]  This case simply does not arise in the "sphere" of federal "law enforcement" where, as Abbasi says, there "are powerful reasons to retain" Bivens. 137 S. Ct. at 1857. And given the national-security purpose underlying TSA's screening mission, a Bivens extension into this arena would pose a particular "risk of disruptive intrusion by the Judiciary into" a most critical "functioning of other branches," Id. at 1860.

Moreover, there is a significant difference in "the rank of the officers involved" in this case

---

[3] See Vanderklok, 868 F.3d at 208 ("TSA employees typically are not law enforcement officers and do not act as such"); accord Pellegrino, 2018 WL 3371699, at *5-6; Corbett v. T.S.A., 568 F. App'x 690, 700-02 (11th Cir. 2014) (per curiam); Tobey v. Napolitano, 808 F. Supp. 2d 830, 850 (E.D. Va. 2011), aff'd sub nom., Tobey v. Jones, 706 F.3d 379 (4th Cir. 2013).

versus those in the relevant Supreme Court cases; the <u>Bivens</u> defendants' personal involvement in the underlying events; and "the extent of judicial guidance" as to how they should have acted. <u>Id.</u> at 1860, 1864-65. <u>Bivens</u> involved line law-enforcement officers—and <u>Davis</u> a Congressman—all of whom were allegedly the primary tortfeasors who personally violated the Constitution. But here, Plaintiff sues the TSA Administrator who had no specified involvement in the challenged screenings.  That alone makes this context new. <u>See</u> <u>Jangjoo v. Sieg</u>, 319 F. Supp. 3d 207, 215-217 (D.D.C. 2018) (declining to extend <u>Bivens</u> to defendant, who was the Director for the Persian News Network component of the Broadcasting Board of Governors, given defendant's "lack of participation" in the challenged conduct and plaintiff's "dependency on a <u>respondeat superior</u> theory"). And "the judicial guidance available to" ADM Pekoske—"with respect to his supervisory duties" over screenings conducted by staff many levels below him—was certainly "less developed" and "less clear under the Court's precedents." 137 S. Ct. at 1864-65. Lastly, <u>Abbasi</u> specifically recognized that the presence "of potential special factors that previous <u>Bivens</u> cases did not consider" warrants a "new context" finding. <u>Id.</u> at 1859-60, 1864-65.

As explained below, this case involves at least <u>seven</u> potential special factors that <u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u> did not consider and, thus, distinguish that precedent from this case. Consequently, this Court should undertake a special-factors analysis before allowing Plaintiff's <u>Bivens</u> claims to proceed against ADM Pekoske.

**3.  <u>Bivens</u> Should Not Be Extended To The New Context Of This Case.**

Although <u>any</u> expansion of <u>Bivens</u> is disfavored, <u>Abbasi</u> reiterated that the test for potentially minting a <u>Bivens</u> remedy in a new context is two-fold. <u>Id.</u> at 1858, 1865. The first question is whether there is "any alternative, existing process for protecting" Plaintiff's asserted "interest" that counsels against "providing a new and freestanding remedy in damages"; the second is whether other special factors counsel judicial restraint. <u>Wilkie</u>, 551 U.S. at 550. Plaintiff's claims fail at both steps.

13

### a.     Alternative, Existing Processes Preclude Plaintiff's Claims.

If "there is an alternative remedial structure present," that "alone may limit the power of the Judiciary to infer a new Bivens cause of action." Abbasi, 137 S. Ct. at 1858; see id. at 1863 ("when alternative methods of relief are available, a Bivens remedy usually is not"); accord id. at 1865. Here, Plaintiff has "some procedure to defend and make good on his position" outside the Bivens arena. Wilkie, 551 U.S. at 552 (emphasis added). Passengers may potentially seek injunctive relief for ongoing constitutional violations,[4] and, for those seeking relief from TSA policies, Congress has provided for, and channeled, such relief through a petition for review in the appropriate federal court of appeals, 49 U.S.C. § 46110, of which Plaintiff is well-aware, Am. Cmplt. ¶ 69.  And as the Court of Appeals for the Third Circuit recognized in Vanderklok, an injured passenger may have a state-law tort claim against a TSO whose actions exceed the scope of employment, and an FTCA suit against the United States may be available in appropriate circumstances. 868 F.3d at 204.[5]

Apart from federal-court avenues, an "alternative remedial structure" under Abbasi, 137 S. Ct. at 1858, "can take many forms, including administrative, statutory, equitable, and state law

---

[4] Indeed, as mentioned, Plaintiff seeks equitable relief in this lawsuit.  See Abbasi, 137 S. Ct. at 1862-63, 1865 (injunctive relief was an alternative process in new-context and special-factors analyses); Vance, 701 F.3d at 205 ("[T]he normal means to handle defective policies and regulations is a suit under the [APA] or an equivalent statute, not an award of damages against the policy's author.") (citation omitted); Zavala v. Rios, 721 F. App'x 720, 722 (9th Cir. 2018) (no Bivens remedy for inmate challenging interference with mail as "[i]njunctive and declaratory relief would prevent future constitutional harm"); W. Radio Servs. Co. v. United States Forest Serv., 578 F.3d 1116, 1123 (9th Cir. 2009) ("the APA leaves no room for Bivens claims based on agency action or inaction"); Rager v. Augustine, 2017 WL 6627416, *18 (N.D. Fla. Nov. 8, 2017) (M.J. Rec.) (inmate "could have filed a civil rights complaint seeking injunctive relief enjoining the unconstitutional conduct"), adopted, 2017 WL 6627784 (N.D. Fla. Dec. 28, 2017).

[5] Plaintiff is also pursuing FTCA relief. See Andrews v. Miner, 301 F. Supp. 3d 1128, 1134-35 (N.D. Ala. 2017) (acknowledging that, under Carlson, "[t]he FTCA remedy is not a substitute for a Bivens action," but still considering "an effective and available [FTCA] remedy"—whose "administrative prerequisites" the plaintiff "failed to follow"—in the mix with other "special factors"); accord Abdoulaye v. Cimaglia, 2018 WL 1890488, *7 (S.D.N.Y. Mar. 30, 2018); Morgan v. Shivers, 2018 WL 618451, *5-6 (S.D.N.Y. Jan. 29, 2018).

remedies." <u>Vega v. United States</u>, 881 F.3d 1146, 1154 (9th Cir. 2018) (emphasis added). Congress has required TSA's parent agency, the Department of Homeland Security (DHS), to "establish a timely and fair redress process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat." 49 U.S.C. § 44926; 49 U.S.C. § 44903(j)(2)(G)(i) (similar). Under that authority, TSA administers the DHS Traveler Redress Inquiry Program ("TRIP") to address these concerns.[6] Additionally, within DHS, Congress established the Office for Civil Rights and Civil Liberties to investigate, among other things, allegations of civil-rights abuses and "profiling on the basis of race, ethnicity, or religion, by employees and officials of the Department," including TSA employees. 6 U.S.C. § 345(a)(1) & (a)(6).[7] DHS also employs a TSA-specific Ombudsman whose duties include ensuring that "TSA employees and the traveling public are treated in a fair and lawful manner, consistent with federal laws and regulations protecting privacy and individuals' rights, governing freedom of information, and prohibiting discrimination and reprisal while promoting diversity and inclusion."

https://www.tsa.gov/leader-bios/office-civil-rights-and- liberties-ombudsman-and-travel-engagement (last visited October 27, 2020, as with all websites cited herein).

Post-<u>Abbasi</u>, several courts have declined to create <u>Bivens</u> remedies relying on the availability of comparable administrative review, whether alone or in combination with other processes or special factors. <u>See</u>, <u>e.g.</u>, <u>Liff v. Office of Inspector Gen.</u>, 881 F.3d 912, 920-21 (D.C. Cir. 2018) (finding no <u>Bivens</u> remedy for government contractor where a "constellation of statutes and regulations . . . provide a remedy" for "contracting-related disputes," including "myriad" administrative processes);[8]

---

[6] <u>See Vanderklok</u>, 868 F.3d at 204-05; <u>Shearson v. Holder</u>, 725 F.3d 588, 590-91 (6th Cir. 2013). Indeed, as Plaintiff notes in his Amended Complaint, he filed a complaint with DHS TRIP. Am. Cmplt. ¶ 62.

[7] Plaintiff has also filed a complaint with the DHS Office of Civil Rights and Civil Liberties. Am. Cmplt. ¶ 62.

[8] <u>Accord Doe H. v. Haskell Indian Nations Univ.</u>, 266 F. Supp. 3d 1277, 1285-86 (D. Kan.) (no <u>Bivens</u>

see also Vega, 881 F.3d at 1154 & n.4 (finding no Bivens remedy for inmate, in part, because BOP

Administrative Remedy Program "provide[d] an adequate, and more appropriate, remedy to vindicate

[his] rights"); Muhammad v. Gehrke, 2018 WL 1334936, *4 (S.D. Ind. Mar. 15, 2018) (rejecting

Bivens remedy for inmate who could challenge "retaliation" through BOP administrative- remedy

process, the FTCA, and habeas). "Taken together," Chappell v. Wallace, 462 U.S. 296, 304 (1983), the

"existence" of such alternative processes, here, confirms that "this is not a case . . . in which 'it is

damages or nothing,'" Abbasi, 137 S. Ct. at 1862-63, 1865 (certain internal quotation marks omitted),

and they counsel against the Bivens extension Plaintiff seeks.

Plaintiff's allegation that ADM Pekoske violated his Fifth Amendment due process rights, is

even less tenable under Bivens.  Abbasi suggests that the only valid contexts for constitutional claims

against federal officers are those previously recognized by the Court under the Fourth, Fifth,

and Eighth Amendments. See Bivens, 403 U.S. at 397 (Fourth Amendment unreasonable search and

seizure); Davis v. Passman, 442 U.S. 228, 99 (Fifth Amendment gender discrimination); Carlson v.

Green, 446 U.S. 14 (1980) (Eighth Amendment deliberate indifference to medical needs).  Similarly,

the Seventh Circuit has recently declined to recognize an entirely new theory of relief in

a Bivens action premised on due process violations as the prisoner had alternative remedies through

the BOP's administrative remedies program. See Goree v. Serio, 735 F. Appx. 894, 895 (7th Cir.

2018).

### b.    Other Special Factors Preclude Plaintiff's Claims.

Even if no alternative processes existed for Plaintiff, which they plainly do, that would "not

conclude the analysis because, 'even in the absence of an alternative, a Bivens remedy is a subject of

judgment,'" Vanderklok, 868 F.3d at 205 (citations omitted). The Court still must "weigh[] reasons

for and against the creation of a new cause of action," Wilkie, 551 U.S. at 554. "[T]he inquiry must

---

remedy for former student, alleging discrimination by officials at federally owned university, given
availability of administrative process mandated by presidential Executive Order).

concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." <u>Abbasi</u>, 137 S. Ct. at 1857-58. "[S]eparation-of-powers principles are or should be central to the analysis. The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts? The answer most often will be Congress." <u>Id.</u> at 1857 (citations omitted). Against that backdrop, several additional factors counsel against a <u>Bivens</u> extension in this case.

> **(i).  Despite its "frequent and intense" interest in TSA screening, Congress has never created a damages remedy against TSA employees.** Congressional intent is of paramount importance to the special-factors inquiry.[9] "Sometimes there will be doubt because the case arises in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere." <u>Id.</u> at 1858. But "if there are sound reasons to think Congress <u>might</u> doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts <u>must</u> refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal- court jurisdiction under Article III." <u>Id.</u> (emphasis added). "[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." <u>Id.</u> at 1865.

Legislative <u>inaction</u> as to the creation of a damages remedy likewise counsels hesitation, especially where, as here, "Congressional interest" in an issue like TSA screening "has been frequent and intense." <u>Id.</u> at 1862 (citations omitted). Congress created the TSA in 2001, and has frequently amended the legislation governing it.[10] In none of that extensive legislation, however, has Congress

---

[9] <u>See Abbasi</u>, 137 S. Ct. at 1862 (describing special-factors "inquiry [as] respecting the likely or probable intent of Congress"); <u>Id.</u> at 1858 (the question is whether "Congress would want the Judiciary to entertain a damages suit in a given case").

[10] <u>See</u>, <u>e.g.</u>, <u>Ruskai v. Pistole</u>, 775 F.3d 61, 63-64 (1st Cir. 2014); <u>Corbett v. T.S.A.</u>, 767 F.3d 1171, 1175 (11th Cir. 2014); and <u>Elec. Privacy Info. Ctr. [EPIC] v. U.S. D.H.S.</u>, 653 F.3d 1, 3 (D.C. Cir. 2011) (each discussing legislation enacted post-ATSA in 2004 and 2012, to improve TSA's airport-

authorized a damages action against TSA employees for their passenger screening. Instead, "Congress chose to <u>limit</u> the scope of judicial review of TSA actions. In creating the TSA, Congress restricted judicial review to affirming, amending, modifying, or setting aside orders of the agency." <u>Vanderklok</u>, 868 F.3d at 208 (emphasis added) (citing 49 U.S.C. § 46110(c)). Moreover, when it legislated with respect to passenger grievances arising from TSA screening, Congress chose to establish only an <u>administrative</u> procedure, not a federal-court damages claim.[11] Additionally, Congress affirmatively provided a remedy for travelers claiming property damage as a result of TSA screening, by permitting the agency to "settle a claim for not more than $1,000 for damage to, or loss of, privately owned property." 31 U.S.C. § 3723. Such disputes proceed according to TSA's administrative-claims process. 28 U.S.C. § 2675(a). The same is true of claims that TSA screeners inflicted personal injury, including emotional distress, on a passenger.[12]

Moreover, Congress has considered bills that would provide additional or alternative procedures.[13] None, however, would provide a monetary remedy. In fact, the only time <u>that</u> was

---

screening procedures).

[11] <u>See Vanderklok</u>, 868 F.3d at 208 ("we cannot ignore that remedies in the airport security context are <u>circumscribed</u> as a direct result of Congressional decisions," and "Congress allowed the creation of an <u>administrative</u> mechanism by which to adjudicate certain TSA complaints") (emphasis added).

[12] <u>See Hernandez v. TSA</u>, 2014 WL 60048, *1 (D.N.J. Jan. 7, 2014) (passenger alleged "jewelry was stolen from her checked luggage"); <u>Weinraub v. United States</u>, 927 F. Supp. 2d 258, 260 (E.D.N.C. 2012) (passenger alleged "mental anguish and emotional distress over his treatment by the TSA screeners"). TSA makes claim forms "for damage, injury, or death" available to the public on-line. https://www.tsa.gov/sites/default/files/sf95cover_packagerevised07-08-15-508.pdf.

[13] <u>See</u> S. 2207 § 2, 112th Cong. (2012) (proposing a TSA Ombudsman's Office to "record complaints from the general public regarding [TSA] screening practices" and "resolve passenger complaints at airports accusing TSA employees of mistreatment"); S. 3302 §§ 3, 11, 112th Cong. (2012) (considering an "Air Travelers' Bill of Rights" that would be incorporated into TSA policies and practices and displayed in TSA screening areas); H.R. 1583 § 2, 113th Cong. (2013) (considering an administrative appeals system for passengers who believe they were "wrongly delayed" or "denied a right, benefit, or privilege" because they were "wrongly identified as a threat when screening against the terrorist watchlist").

considered in a remotely similar context—the remedial scheme available to passengers aggrieved by their placement on the "No Fly List"—Congress considered, but voted against, an amendment that would have given such passengers a damages remedy against the government. H.R. Rep. No. 108-724, pt. 5, at 270-71 (2004).[14]

Lastly, when Congress partially waived the United States' sovereign immunity in the FTCA, allowing claims for certain intentional torts of its law-enforcement officers, 28 U.S.C. § 2680(h), it barred intentional-tort liability as to non-law-enforcement employees (whether TSA's screeners or, by extension, its Administrator). See supra n.5, & Doc. 14 (U.S. Br.), at 16-18 (upper-margin page numbers). This further demonstrates congressional intent to foreclose liability of the sort Plaintiff seeks here and counsels against a Bivens extension in this context.[15]

Despite Congress's clear recognition that disputes might arise over the propriety of TSA conduct, it has not provided the remedy Plaintiff seeks. The Court should respect that decision and not augment the processes Congress provided. See Abbasi, 137 S. Ct. at 1862 (congressional "silence" with respect to a damages remedy "is relevant . . . and . . . telling"). Like the Third Circuit in Vanderklok, this Court "should hesitate to create" additional remedies under Bivens "when it

---

[14] See Tanvir v. Lynch, 128 F. Supp. 3d 756, 773 n.15 (S.D.N.Y. 2015) ("Congress considered the question of what remedies would be appropriate in the context of the No Fly List and specifically rejected the option of a civil remedy"), rev'd on other grounds sub nom., Tanvir v. Tanzin, 894 F.3d 449 (2d Cir. 2018), cert. granted, 140 S.Ct. 550 (Mem) (Nov. 22, 2019).

[15] See United States v. Norwood, 602 F.3d 830, 835-36 (7th Cir. 2010) (allowing criminal defendant to amend pleading to state Bivens claim challenging loss of property, even though such "[a] Bivens suit may fail . . . because of the exclusion" in § 2680(c), barring FTCA liability against the United States "for a property loss caused by law enforcement officers," and recognizing such a Bivens suit "might be thought an end run around the statutory exclusion of such claims when filed against the government itself"); Hernandez v. Mesa, 885 F.3d 811, 820-21 (5th Cir. 2018) (en banc) (citing FTCA's "foreign country" exception at § 2680(k), as among the special factors counseling against creation of Bivens remedy for Mexican citizen fatally wounded in Mexico when CBP Agent in Texas shot decedent across the border), affirmed, 140 S.Ct. 735 (2020); accord Meshal v. Higginbotham, 804 F.3d 417, 430 (D.C. Cir. 2015) (Kavanaugh, J., concurring); cf. Lee v. Hughes, 145 F.3d 1272, 1276 (11th Cir. 1998) ("[C]ourts should be hesitant to provide an aggrieved plaintiff with a remedy where Congress intentionally has withheld one.").

appears that the available ones are limited by Congressional design," as is the case with airport screening. 868 F.3d at 208.[16]

    **(ii).    The national-security interests in TSA screening also counsel hesitation.** As mentioned, TSA was created as a <u>direct</u> response to the national-security threat posed by terrorists.[17] Congress charged TSA with providing a safe and secure civil air-transportation system, and TSOs perform critical duties necessary to TSA fulfilling its mission. A central part of their work consists of screening all passengers before they board an airplane. 49 U.S.C. § 44901(a); 49 C.F.R. § 1540.107(a). In doing so, TSOs must make "decisions about safety and security in a fast-moving environment, with little margin for error."[18] "Matters intimately related to … national security" are "rarely proper subjects for judicial intervention," <u>Haig v. Agee</u>, 453 U.S. 280, 292 (1981), because "[n]ational-security policy is the prerogative of the Congress and President," <u>Abbasi</u>, 137 S. Ct. at 1861. "These concerns are even more pronounced when the judicial inquiry comes in the context" of a money-damages claim, because "[t]he risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy." <u>Id.</u>; <u>see</u> <u>Vanderklok</u>, 868 F.3d at 208 (noting the "particularly pronounced" "hesitancy to imply a <u>Bivens</u> remedy in a case with national security implications"). "[E]lements of the Government's whole

---

[16] <u>Cf. Gorden v. Kreul</u>, 77 F.3d 152, 155 (7th Cir. 1996) ("People must use remedial systems designed for their claims and may not appeal [under <u>Bivens</u>] to what is effectively a system of federal constitutional common law in an effort to bypass the express remedies or sidestep limitations deliberately crafted.").

[17] <u>See supra</u> p. 1; H.R. Conf. Rep. No. 107–296, at 53 (2001); <u>Air Wis. Airlines v. Hoeper</u>, 571 U.S. 237, 241 (2014) (Congress created TSA "to assess and manage threats against air travel"); <u>Joren v. Napolitano</u>, 633 F.3d 1144, 1146 (7th Cir. 2011) (<u>per curiam</u>) ("In the immediate aftermath of the terrorist attacks of September 11, 2001, Congress passed the ATSA, which established the TSA as the federal agency responsible for airport security screening."); <u>Springs</u>, 362 F. Supp. 2d at 699, 703, 705 (ATSA was "concerned with enhancing the security of our Homeland" and was "promulgated . . . to addresses national security and passenger safety," which "was Congress's paramount concern").

[18] Airline Security: Special Joint Hr'g before H. & S. Comms. on Appropriations, 107th Cong. 2 (2001) (opening statement of Sen. Murray).

response to the September 11 attacks," Abbasi, 137 S. Ct. at 1861—including TSA screening policies at airport checkpoints with a "particularly acute" security interest, City of Indianapolis v. Edmond, 531 U.S. 32, 47-48 (2000)—plainly implicate "sensitive issues of national security," Abbasi, 137 S. Ct. at 1861; see Vanderklok, 868 F.3d at 206. Given these sensitivities, TSA's role "in securing public safety is so significant that we ought not create a damages remedy in this context." Id. at 209; accord Pellegrino, 2018 WL 3371697, at *17.

(iii).    **Plaintiff cannot challenge TSA "policy" through Bivens claims.** Although Plaintiff may purport to bring his Bivens claims against ADM Pekoske because Pekoske is a "domestic federal officer enforcing federal law," his claims still "call into question the formulation and implementation of a general policy." Abbasi, 137 S. Ct. at 1860. Indeed, he expressly challenges TSA screening policies and practices repeatedly throughout his complaint, asserting that, "TSA, as a matter of strict policy, consciously and deliberately disregarded [his] serious medical needs." See, e.g., Am. Compl. ¶ 57. Plaintiff cannot do this through the guise of a Bivens action. See Abbasi, 137 S. Ct. at 1860 ("With respect to the claims against the Executive Officials, it must be noted that a Bivens action is not 'a proper vehicle for altering an entity's policy.'") (quoting Malesko, 534 U.S. at 74).[19]

(iv).    **Multiple practical considerations also counsel hesitation**. Before allowing Bivens claims in the context of airport screening, the Court must assess the "impact" of such litigation "on governmental operations systemwide." Abbasi, 137 S. Ct. at 1858. TSA employs approximately 50,000 TSOs and "screens more than 2 million passengers daily and over 750 million every year."[20]

---

[19] See also Malesko, 534 U.S. at 71 (even if "an agency policy . . . led to . . . [a] constitutional deprivation," it is not "the purpose of Bivens" to "deter[] the conduct of a policymaking entity"); accord F.D.I.C. v. Meyer, 510 U.S. 471, 484-86 (1994).

[20] https://www.tsa.gov/sites/default/files/resources/tsabythenumbers_factsheet.pdf ("TSA by the Numbers Factsheet").

Given the sheer volume of TSA's interactions with the public, it stands to reason that many passengers may often find something to fault with the TSA screeners they encounter at an airport.[21] Given the requirement that an individual be personally involved in the alleged deprivation of a constitutional right, it is unusual for a <u>Bivens</u> claim to be filed against the TSA Administrator. But if a <u>Bivens</u> damages remedy were available to all passengers—all 750 million of them annually—for grievances arising from their screening experience, then it is easy to see how such litigation could seriously hinder TSA operations.[22] There is an obvious concern that such "a new species of litigation," <u>Wilkie</u>, 551 U.S. at 562, might have a chilling effect on the Agency's TSOs. If they "face liability for damages," they "might refrain from taking urgent and lawful action in a time of crisis," <u>Abbasi</u>, 137 S. Ct. at 1863, to the detriment of the flying public and with profound implications for national security. All 50,000 of the nation's TSOs perform "one of the most essential functions in our post-9/11 age: protecting air passengers from the threat of terrorism." <u>Tobey</u>, 706 F.3d at 394 (Wilkinson, J., dissenting). It should be up to Congress, then, to decide if airport-security screenings should give rise to damages liability against TSA personnel, including whether the TSA Administrator should be answerable in damages for screenings performed by any one of the thousands of TSOs he oversees.

  For this Court's inquiry, the "relevant threshold—that a factor 'counsels hesitation'—is

---

[21] <u>See Ruskai</u>, 775 F.3d at 69 ("Many of us have at some point found ourselves subject to a TSA pat-down—including the standard pat-down challenged here. Accepted as mildly annoying or uncomfortable for some, the standard pat-down is experienced as quite an intrusive indignity by many others.........."); <u>Tobey</u>, 706 F.3d at 405 (Wilkinson, J., dissenting) ("No one enjoys having to endure the inconvenience of airport security screening."); <u>cf. Cameron v. IRS</u>, 773 F.2d 126, 128- 29 (7th Cir. 1985) (no <u>Bivens</u> remedy against IRS officials, sued in connection with tax-return processing, as "many taxpayers.........feel intense irritation at the federal tax authorities, and the courts would be flooded with frivolous cases if the unavoidable frictions generated by tax collection gave rise to potential damage claims against internal revenue agents").

[22] <u>Cf.</u> <u>Hernandez v. United States</u>, 34 F. Supp. 3d 1168, 1181-82 (D. Colo. 2014) (doubting whether Congress intended to permit FTCA lawsuits "arising from the TSA's millions of daily screenings").

remarkably low ...........Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. 'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider." Arar v. Ashcroft, 585 F.3d 559, 574 (2d Cir. 2009) (en banc). This case presents a context both novel for Bivens purposes and ill-suited to a personal-capacity damages remedy. The "special factors" are compelling, especially if considered in the aggregate as the Supreme Court directs. Abbasi, 137 S. Ct. at 1857-58, 1860-63; Chappell, 462 U.S. at 304. And they warrant dismissal of Plaintiff's constitutional claims against ADM Pekoske.

## C.    QUALIFIED IMMUNITY BARS ALL OF PLAINTIFF'S CLAIMS.

"In the limited settings where Bivens does apply," Iqbal, 556 U.S. at 675, any Bivens claim is still "subject to the defense of qualified immunity." Malesko, 534 U.S. at 72. Qualified immunity shields federal employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). There is "a two-step sequence for resolving government officials' qualified immunity claims," and the Court may address the steps in either order. Pearson v. Callahan, 555 U.S. 223, 232, 237-42 (2009). It may decide, first, "whether the facts that [Plaintiff] has alleged . . . make out a violation of a constitutional right" by FSD ADM Pekoske and, if they do, the Court "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 232 (citations omitted). A government official "violates clearly established law" if,

> at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (emphasis added). "This requires a high 'degree of specificity.'" D.C. v. Wesby, 138 S. Ct. 577, 590 (2018) (citation omitted). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Mullenix v. Luna, 136

S. Ct. 305, 308 (2015) (<u>per curiam</u>) (citation omitted). If "a reasonable officer <u>might</u> not have known

<u>for</u> <u>certain</u>" that the particular conduct ascribed to him "was unlawful," then he "is immune from

liability." <u>Abbasi</u>, 137 S. Ct. at 1867 (emphasis added).

  Setting aside Plaintiff's "legal conclusions" that "are not entitled to the assumption of truth,"

and focusing instead on his (few) "well-pleaded factual allegations," <u>Iqbal</u>, 556 U.S. at 679, it is clear

that he fails to allege that ADM Pekoske personally participated in "the deprivation of an actual

constitutional right at all," <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999); <u>see</u> <u>Siegert v. Gilley</u>, 500 U.S.

226, 23 (1991) (initial "determination" in qualified-immunity analysis is "whether the plaintiff has

asserted a violation of a constitutional right at all"). Other than naming ADM Pekoske in the caption

and identifying his TSA position and status as an individual-capacity defendant, Am. Cmplt. at ¶ 12,

the entirety of Plaintiff's allegations about ADM Pekoske consists of his legal conclusions that

"Pekoske, like FBN officers, is a domestic federal officer enforcing federal law," Am. Cmplt. ¶¶ 79,

83, and that "Pekoske is a powerful United States policymaker sworn to defend the United States

Constitution, similar in rank to a member of Congress as in Davis." Am. Cmplt. ¶¶ 81, 85.  At best,

Plaintiff's Amended Complaint shows that TSA seeks to further its statutory mission by screening all

individuals who fly on passenger aircraft.  He would need to allege considerably more factual content

to push his claim of purposeful discrimination into the realm of a plausible claim.  This falls woefully

short of stating a constitutional violation given the pleading standards enunciated by the Supreme

Court in <u>Iqbal</u> and <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007).

  Plaintiff cannot subject ADM Pekoske to suit on the bare assertion that that he is a federal

officer and a powerful policy maker. As mentioned, Plaintiff does not say that ADM Pekoske was

present for his screenings; that ADM Pekoske physically took part in any aspect of them or instructed

a subordinate to carry them out; or even that ADM Pekoske was ever informed by a subordinate of

any aspect of the screenings. Plaintiff's implications that ADM Pekoske oversees all TSA operations

is unavailing. These are "only boilerplate conclusions" and "conclusory allegations," "not well-pleaded facts," and that is not enough to plead a constitutional violation and "carry" the claims against ADM Pekoske "past the pleading stage." Mikolon v. City of Chicago, 2014 WL 7005257, *2–4 (N.D. Ill. Dec. 11, 2014). Indeed, the "knew or should have known" allegation is no better than what Iqbal and Vance rejected. Compare Iqbal, 556 U.S. at 677, 680-81; Vance, 701 F.3d at 203 (stating that even a federal supervisor's "knowledge of a subordinate's misconduct is not enough for liability. The supervisor can be liable only if he wants the unconstitutional or illegal conduct to occur."); accord id. at 204-05. Plaintiff does not even allege facts plausibly suggesting "knowledge," let alone that ADM Pekoske "wanted [Plaintiff] to be mistreated," id. at 203.

TSA screening policies and procedures are set forth in a Standard Operation Procedure (SOP) approved by the TSA Administrator himself. See, e.g., Blitz v. Napolitano, 700 F.3d 733, 736 (4th Cir. 2012). Although TSA has not published the SOP in the public domain,[23] the agency has confirmed on its website that "Pat-down procedures are used to determine whether prohibited items or other threats to transportation security are concealed on the person." www.tsa.gov/travel/security-screening.  Plaintiff cannot plausibly ascribe his pat-down screening to ADM Pekoske, and the allegation, in any event, does not satisfy Iqbal. Compare 556 U.S. at 680-81 (rejecting as "conclusory," and "bald" or "bare assertions," the plaintiffs' allegations that Attorney General "was the 'principal architect'" of challenged detention "policy" and FBI Director "was 'instrumental' in adopting and executing it").  As Plaintiff himself notes, once the screening process identified an anomaly at his right groin, he was required to undergo a pat-down to resolve that alarm. Am. Cmplt. ¶ 51.

---

[23] See EPIC, 653 F.3d at 3 ("The Congress generally has left it to the agency to prescribe the details of the screening process, which the TSA has documented in a set of Standard Operating Procedures not available to the public."); Ventura v. Napolitano, 828 F. Supp. 2d 1039, 1041 n.1 (D. Minn. 2011) (SOP "is considered to be secret for reasons of national security").

In sum, Plaintiff has pleaded no facts to support his claims against ADM Pekoske. As ADM Pekoske is not otherwise subject to suit under Bivens on the basis of respondeat superior, see Abbasi, 137 S. Ct. at 1860; Iqbal, 556 U.S. at 676-77; see Vance, 701 F.3d at 203 ("liability under a Bivens-like remedy is personal," and supervisors "are not vicariously liable for what their subordinates do"), Plaintiff has not satisfied the first prong of the qualified-immunity analysis. His claims, therefore, should be dismissed.

Although the Court need proceed no further, it could, in its Pearson discretion, also dismiss ADM Pekoske at the second step of the qualified-immunity analysis. Whatever his hypothetical (and unspecified) role might have been in the creation or implementation of any TSA pat-down policy, ADM Pekoske could "not have known for certain" that such a policy "was unlawful," Abbasi, 137 S. Ct. at 1867. No court has invalidated the "policy," or even questioned its constitutionality, and so ADM Pekoske could have reasonably relied on it to the extent that he allowed his subordinates to perform pat-downs pursuant to it.[24] Wilson v. Layne, 526 U.S. 603, 617 (1999); see Barrios v. City of Chicago, 2016 WL 164414, *15 (N.D. Ill. Jan. 14, 2016) ("if 'the state of the law . . . [is] at best undeveloped,' it can be reasonable for a law enforcement officer to rely on a policy") (citation omitted).[25] Lastly, although the Court need not reach the point for present purposes, Plaintiff has

---

[24] Indeed, a search of passengers at an airport is, as a matter of law, consistent with a "reasonable administrative search" under the Fourth Amendment. Corbett v. Transp. Sec.Admin. 767 F.3d 1171, 1182 (11th Cir. 2014) ("[T]he pat-down procedure . . . as a secondary screening technique is a reasonable administrative search. The pat-downs also promote the governmental interest in airport security because security officers physically touch most areas of passengers' bodies."); see also Aukai, 497 F.3d 958 (9th Cir. 2007). Indeed, "[a]irport screening is a permissible administrative search; security officers search all passengers . . . and passengers elect to travel by air knowing that they must undergo a search." Corbett, 767 F.3d at 1182. While some passengers find the pat-down procedure subjectively objectionable, it is nevertheless a permissible part of airport screening. See, e.g., Ruskai v. Pistole, 775 F.3d 61, 64-65 (1st Cir. 2014) (noting petitioner was "not unusual" in portraying pat-down as invasive and disturbing, but rejecting her Fourth Amendment challenge nevertheless).

[25] Accord Marcavage v. City of Chicago, 659 F.3d 626, 636 (7th Cir. 2011); Gonzalez v. Tilmer, 775 F. Supp. 256, 265–66 (N.D. Ill. 1991); see Brown v. Ray, 695 F. Supp. 2d 292, 305 (W.D. Va. 2010) (where no case law had held prison policy "improper," court could not "find that the defendants should have known that their actions in accordance with that policy were unlawful").

not even alleged a clearly established constitutional violation against any unidentified line TSO who screened him, thus making the case against ADM Pekoske all the more untenable.[26]  For all of the forgoing reasons, all <u>Bivens</u> claims against ADM Pekoske should be dismissed because, on the pleadings, he violated no "clearly established" law.

## V.   CONCLUSION

For the foregoing reasons, Defendant ADM Pekoske respectfully requests that he be dismissed from this action with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

JOHN C. MILHISER
*United States Attorney*

By:      s/ Kimberly A. Klein
_____

Kimberly A. Klein
Assistant United States Attorney
United States Attorney's Office
211 Fulton Street
Peoria, IL  61202
Telephone:  309-671-7050
Fax:  309-671-7259
Email:  kimberly.klein@usdoj.gov

---

[26] <u>See</u>, <u>e.g.</u>, <u>Marin v. King</u>, 720 F. App'x 923, 942 (10th Cir. 2018) ("a supervisor cannot be liable if the subordinate did not commit a violation"); <u>accord</u> <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28-29 (1st Cir. 2000); <u>Seekamp v. Michaud</u>, 109 F.3d 802, 808 (1st Cir. 1997).

## CERTIFICATE OF SERVICE

The following parties were served with a true and accurate copy of the foregoing *Combined Motion and Brief in Support of Motion to Dismiss Defendant David P. Pekoske in his Individual Capacity* electronically or by mailing them a copy via postage prepaid United States Mail on November 12, 2020.

Michael Gibson Muir
19 Inglewood Lane
Bloomington, IL  61704
PRO SE Plaintiff

Christopher J. Raistrick
Michael G. McQuillen
Richard C. Harris
CADLER, MURPHY, & MCQUILLEN, LLP
20 S. Clark Street, Ste. 2500
Chicago, IL 60063
For the Defendant L3 Harris Technologies, Inc.

Keith A. Yamaguchi
Marnie Holtz
Thomas Sokol
KMA ZUCKERT, LLC
200 W. Madison St., Ste. 1600
Chicago, IL 60606
For the Defendant Allegiant Air, LLC


Date:_____
      November 13, 2020

s/ Kimberly A. Klein
_____
Kimberly A. Klein
Assistant United States Attorney