E-FILED
Wednesday, 18 November, 2020  02:20:35 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL GIBSON MUIR, | ) | |
| | ) | 1:20-cv-01280 |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | District Judge: |
| UNITED STATES TRANSPORTATION | ) | Hon. Billy Joe McDade |
| SECURITY ADMINISTRATION; DAVID | ) | |
| P. PEKOSKI; L3HARRIS TECHNOLOGIES, | ) | |
| INC.; ALLEGIANT AIR, LLC; CHAD E. | ) | Magistrate Judge: |
| WOLF, Secretary, United States Department | ) | Jonathan E. Hawley |
| of Homeland Security. | ) | |
| | ) | |
| *Defendants*. | ) | |

## L3HARRIS TECHNOLOGIES, INC.'S
## MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
## AND MEMORANDUM OF LAW IN SUPPORT

Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3"), by and through its attorneys, ADLER MURPHY & McQUILLEN LLP, hereby moves to dismiss Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and in support submits this incorporated Memorandum of Law.

### INTRODUCTION

Plaintiff previously sued L3 in the United States District Court for the District of Arizona. The original Arizona complaint was brought solely against L3 and was based on an <u>August 9, 2018</u> occurrence at the Phoenix-Mesa Gateway Airport (the "Phoenix Occurrence"). Plaintiff *attempted* to amend his complaint to allege an <u>August 12, 2018</u> occurrence at the General Wayne A. Downing Peoria International Airport (the "Peoria Occurrence"), but the Arizona District Court struck the amended complaint and denied Plaintiff leave to file it. The Arizona District Court's ruling

constituted a final judgment on the merits of the part excluded from the Arizona action, namely, the allegations and claims based on the Peoria Occurrence.

While Plaintiff's lawsuit based solely on the Phoenix Occurrence was still pending in the Arizona District Court, and with the clock ticking on the two-year statute of limitations, Plaintiff filed a new action in this Court based solely on the Peoria Occurrence. Thereafter, he voluntarily dismissed his Arizona action and filed his First Amended Complaint ("FAC") in this Court, wherein he added back the allegations of the Phoenix Occurrence.

Thus, in his attempt to avoid the consequences of the Arizona District Court's adverse ruling, Plaintiff placed one foot in Illinois while the other was still back in Arizona. This maneuvering violated the basic rule against claim splitting and left Plaintiff without a legal leg to stand on. His allegations of the Peoria Occurrence are barred as res judicata and his allegations of the Phoenix Occurrence are time barred. For these reasons, the Court should dismiss Plaintiff's claims against L3 with prejudice.

Alternatively, the Court should dismiss Plaintiff's claims against L3 pursuant to the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 ("SAFETY Act") (6 U.S.C. § 441 *et seq.* (2018)). Plaintiff alleges he was injured by airport security screening equipment that was manufactured by L3. However, the Department of Homeland Security ("DHS") certified L3's screening equipment for use under the SAFETY Act. As a result, L3 is entitled to a rebuttable presumption of a government contractor defense, and Plaintiff has failed to rebut this presumption with allegations that L3 submitted fraudulent information to the DHS.

Finally, and also in the alternative, the Court should dismiss Plaintiff's claims against L3 because, according to Plaintiff's allegations, the injuries he allegedly suffered were caused exclusively by the United States Transportation Security Administration ("TSA").

## PLAINTIFF'S ARIZONA LAWSUIT

On December 2, 2019, Plaintiff filed a *pro se* complaint against L3 in the Superior Court of Arizona in Maricopa County. L3 removed the complaint to the United States District Court for the District of Arizona. Certain pleadings and Orders from the Arizona litigation are attached below as exhibits. The others can be viewed on the Electronic Docket for Case No: 2:19-cv-05887.

After L3 moved to dismiss Plaintiff's original complaint, Plaintiff filed his first amended complaint in the Arizona District Court. **See Exhibit A**. Plaintiff eliminated certain purported causes of action and relabeled others, but his allegations were duplicative of those raised in the original complaint. Plaintiff alleged that he was in the Phoenix-Mesa Gateway Airport on August 9, 2018, when he purportedly was subjected to an illegal security screening process. He asserted that Congress did not authorize the use of airport passenger screening technology capable of detecting objects directly beneath the surface of the skin. He claimed his privacy was violated when L3's screening equipment[1] unlawfully detected an "underneath the skin congenital disability." *Id*. at ¶¶ 19-21. Plaintiff further claimed that L3 "instigated creation of 'The Shadow,' a menacing presence now constantly inhabiting [his] waking psyche." *Id*. at ¶ 40.

Plaintiff acknowledged that L3's screening equipment was sold commercially and used by the TSA. *Id*. at ¶55. However, despite L3's undisputed lack of control over the equipment, Plaintiff nonetheless claimed L3's conduct was "the direct cause of his damages." *Id*. at ¶ 100. His purported causes of action included intentional infliction of emotional distress, intrusion upon seclusion, and false imprisonment. He sought $250,000,000 in damages and injunctive relief seeking the return of his "scan code."

---

[1] As explained below in further detail, Plaintiff's allegations refer to L3's ProvisionTM ATD and ProvisionTM 2 products. These products operate to highlight anomalies appearing on a three-dimensional image of a generic human mannequin.

3

On June 24, 2020, Plaintiff *attempted* to file his second amended complaint in the Arizona District Court. **See Exhibit B**. The second amended complaint was markedly different from the original and first amended complaints. Plaintiff added the TSA and its administrator as defendants, and, for the first time, added allegations of the Peoria Occurrence. *Id*. at ¶ 1. Plaintiff also attempted to bring new causes of action for negligence and negligent infliction of emotional distress, neither of which were included in the earlier versions of the complaint. *Id*. at ¶¶ 107-139.

On July 23, 2020, the Arizona District Court entered an order striking Plaintiff's second amended complaint on grounds that it violated Fed. R. Civ. P. 15(a)(2), because Plaintiff had obtained neither leave of the court nor consent from L3. **See Exhibit C.** The court recognized, however, that leave to amend "shall be freely given" under Rule 15(a)(2), which is consistent with the Ninth Circuit's policy of allowing amendments with "extreme liberality." *Id.* (quoting *Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987)).

The Ninth Circuit's liberal policy on amendments notwithstanding, the Arizona District Court denied Plaintiff leave to file his second amended complaint. This decision was critical. The Court ruled that the additional claims and allegations contained in the second amended complaint (based solely on the Peoria Occurrence) **"clearly are without merit"** and that Plaintiff **"provided no basis for adding defendants and expanding the scope and nature of his claims."** (Emphasis added) Ex. C at pg. 2. The Court further noted that L3 had twice moved to dismiss Plaintiff's claims and concluded that requiring L3 to file a third motion to dismiss would be **"unfair and unduly prejudicial."** (Emphasis added) *Id*. at pg. 3.

Accordingly, the Arizona District Court ordered Plaintiff to file a response to L3's motion to dismiss the first amended complaint by August 7, 2020. *Id*.

4

## PLAINTIFF FILES SUIT IN ILLINOIS

On July 31, 2020, just eight days after the Arizona District Court's adverse ruling, Plaintiff filed his initial complaint in this Court, alleging precisely what the Arizona District Court had stricken and denied him leave to amend. Plaintiff named L3, the TSA, and the TSA administrator as defendants, and his claims were based entirely on the Peoria Occurrence, which had taken place just shy of two years earlier, on August 12, 2018. See ECF Doc 1.

On August 4, 2020, back in the Arizona District Court, Plaintiff filed a "Notice of Voluntary Dismissal Pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(i)." L3 objected to the voluntary dismissal and notified the Arizona District Court of Plaintiff's newly filed complaint in the Central District of Illinois. L3 argued that Plaintiff was forum shopping and had split his claims in an improper attempt to circumvent the Arizona District Court's adverse ruling. However, on August 6, 2020, the Arizona District Court terminated the action on grounds that it lost jurisdiction once Plaintiff filed his voluntary dismissal. **See Exhibit D.**

On September 4, 2020, Plaintiff filed the FAC in this Court, wherein he added back his allegations of the Phoenix occurrence, which had taken place more than two years earlier, on August 9, 2018. See ECF Doc. 12. Plaintiff also added Allegiant Air, LLC, and Chad F. Wolf, the DHS Secretary, as defendants. With respect to L3, although Plaintiff changed the labels of certain claims, the allegations in the FAC are substantively the same as what he alleged and attempted to allege in the Arizona District Court. Plaintiff alleges that during both the Phoenix and Peoria Occurrences, his rights were violated when "L3's proprietary ATR software returned a false threat alarm at Muir's right groin that misidentified the uncontrollable symptom manifestation of Muir's hidden, beneath the skin physical disorder at his right groin as a foreign material object on the surface of his skin at his right groin." Compare FAC, ¶ 26 with Ex. B, ¶ 25.

## THE SAFETY ACT

Congress passed the SAFETY Act in recognition of the vital role played by technology in defending against terrorist threats. Alison M. Levin, *The Safety Act of 2003: Implications for the Government Contractor Defense*, 34 PUB. CONT. L.J. 175, 176 (2004). Congress also recognized that the "Nation's product liability system threatens to keep important new technologies from the market where they could protect our citizens." *Id.* (quoting the House Select Committee on Homeland Security). Accordingly, Congress enacted a set of liability reforms to ensure that manufacturers would not be deterred from developing critical anti-terrorism technologies. *Id.*

To become eligible for the "system of risk management" established by the SAFETY Act, the manufacturer (or "Seller") of anti-terrorism technology must first submit a "SAFETY Act Application Kit." 6 U.S.C. § 441(b) (2018); 6 CFR §§ 25.2, 25.6 (2018). There are broad nondisclosure protections for the materials submitted to the DHS during the application process; all such materials are deemed "SAFETY Act Confidential Information." 6 CFR §§ 25.2, 25.10 (2018). The liability protections available under the SAFETY Act are triggered if the Under Secretary for Science and Technology of the DHS certifies and designates the "Qualifying Anti-Terrorism Technology" ("QATT"). 6 U.S.C. § 441(b) (2018); 6 CFR § 25.3 (2018).

The DHS awarded Certification and Designation to L3 for the QATT identified in the materials attached hereto as **Group Exhibit E**. L-3 Communications Security and Detection Systems, Inc., and L3 Communications Corporation are identified as the "Sellers" of the QATT. Within the materials, "Exhibit A" reflects that the QATT label applies to L3's ProvisionTM ATD and ProvisionTM 2 products which use millimeter-wave scanning technology to produce three-dimensional images. More specifically, the products utilize "Automatic Target Detection"

6

("ATD") software which "analyzes scanned data and highlights threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation."

Attached hereto as **Exhibit F** is a Declaration from George Salimbas, formerly the Vice President of Contracts of L3 Security & Detection Systems, Inc., which is the corporate successor of L-3 Communications Security and Detection Systems, Inc. Salimbas states that: (1) L3 was formerly the parent company of L-3 Communications Security and Detection Systems, Inc., and L3 Communications Corporation; (2) the SAFETY Act materials attached hereto as Grp. Ex. E are true and accurate copies of the authentic documents provided by the DHS Deputy Under Secretary for Science and Technology; (3) L3's ProvisionTM ATD and ProvisionTM 2 are the only models of millimeter wave scanners that L3 has sold to the TSA for airport passenger security screening at the Phoenix-Mesa Gateway Airport and General Wayne A. Downing Peoria International Airport; and (4) L3 exercised no control over the QATT after it was sold to the TSA.

### APPLICABLE LEGAL STANDARDS

This motion is brought under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is "plausible on its face." *Ashcroft v.Iqbal*, 556 U.S. 662, 678 (2009). It is not enough to allege a "sheer possibility that a defendant has acted unlawfully." *Id*. While a court must generally accept a plaintiff's factual allegations as true, it does not accept a plaintiff's legal conclusions that are merely couched as factual allegations. *Id*. In determining whether a complaint states a plausible claim for relief, a court must draw on its own judicial experience and common sense. *Id*. at 679.

A claim can also be dismissed under Rule 12(b)(6) based on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). This applies with respect to res judicata and a

statute-of-limitations defense, both of which are properly raised within a Rule 12(b)(6) motion for failure to state a claim. *Ennenga v. Starns*, 677 F.3d 766, 776 n.6 (7th Cir. 2012). In ruling on such a motion, it is appropriate for a court to take judicial notice of public court documents. *Collins v. Village of Palatine*, 875 F.3d 839, 842 (7th Cir. 2017).

**ARGUMENT**

**I.     Plaintiff's Claims Arising from the Peoria Occurrence are Barred as Res Judicata and His Claims Arising from the Phoenix Occurrence are Time Barred**

In *Arrigo v. Link*, 836 F.3d 787 (7th Cir. 2016), the Seventh Circuit joined other jurisdictions in holding that the denial of leave to amend a complaint constitutes a final order for purposes of res judicata. Pursuant to *Arrigo*, Plaintiff is barred from refiling the portion of his complaint that was excluded from the Arizona action. As a result, Plaintiff's original complaint in this Court was a procedural nullity that did nothing to preserve his claims under the statute of limitations. See *Henderson v. Bolanda*, 253 F.3d 928, 932 (7th Cir. 2001) (plaintiff's original complaint was a "nullity" that could not act as a "life-line" to save additional claims filed after the limitations period expired). The additional allegations and claims raised in the FAC, which was filed after the limitations period expired, are therefore time-barred.

**A. Res Judicata – Peoria Occurrence**

The doctrine of res judicata bars claims that were litigated or could have been litigated in a previous proceeding when three elements are met: (1) identity of the parties or their privies between the two actions; (2) a final judgment on the merits in the earlier proceeding; and (3) identity of the causes of action. *Arrigo*, 836 F.3d at 799.

The focus here is on the part that was excluded from Plaintiff's Arizona action, which amounts to his allegations and claims based on the Peoria Occurrence. The Peoria Occurrence formed the sum and substance of Plaintiff's original Illinois complaint. Hence, there is no question

8

that the original Illinois complaint shares an identity of the same parties and causes of action with those that were excluded from the Arizona action. See *Rooding v. Peters*, 92 F.3d 578, 580 (7th Cir. 1996) ("The test for determining the identity of causes of action for res judicata purposes is whether the evidence needed to sustain the subsequent action would have sustained the original action."). The only question left unanswered is whether the Arizona District Court's ruling constituted a final judgment on the merits for purposes of res judicata.

The plaintiff in *Arrigo* filed a federal lawsuit against her former employer, claiming she was fired for taking leave under the Family and Medical Leave Act. Six months later, she moved for leave to amend her complaint to add pregnancy and disability claims under Title VII and the Americans with Disabilities Act. The District Court denied the motion as untimely. Undeterred, the plaintiff filed a *second* federal action alleging *the same* Title VII and ADA claims that were excluded from her first action. The District Court dismissed the second action on res judicata grounds, and the plaintiff appealed. *Arrigo*, 836 F.3d at 793.

In affirming the District Court's ruling, the Court of Appeals observed: "While our circuit has not yet decided whether the denial of a motion to amend constitutes a decision on the merits for res judicata purposes, other circuits have uniformly found that res judicata applies in such a situation." *Id*. at 799. In support, the *Arrigo* court cited *Hatch v. Trail King Indus., Inc.*, 699 F.3d 38, 45-46 (1st Cir. 2012), and *King v. Hoover Grp., Inc.*, 958 F.2d 219, 222-23 (8th Cir. 1992), both of which held: "It is well settled that denial of leave to amend constitutes res judicata on the merits of the claims which were the subject of the proposed amended pleading."

The principles underlying the majority rule, which the Seventh Circuit adopted in *Arrigo*, were stated as follows:

"An order that denies leave to amend the pleadings to advance an additional part of a claim partially asserted might seem to fall within the principle that a plaintiff should be free to bring a second action on a theory that could not be advanced in the first action. **It appears well-settled, however, that claim preclusion bars a second action on the part excluded from the first action**. This result is sound. The abstract theory that amendment should be freely allowed is widely honored in practice. **There is likely to be good reason when the court that has control of the first action concludes that a party should not be allowed to advance matters so closely related to the action as to be part of a single claim**." (Emphasis added) *Arrigo*, 836 F.3d at 799 (quoting 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4412 (2d ed. 2016)).

"Most importantly," the *Arrigo* court held, "allowing Arrigo to proceed here would result in the very prejudice and inefficiency that the denial of the untimely amendment, which we upheld, was intended to avoid. To rule otherwise would undermine the principles animating the doctrines of res judicata and claim splitting, as well as our decision upholding on appeal the denial of the motion for leave to amend." *Arrigo*, 836 F.3d at 800.

*Arrigo* leaves no doubt that the Arizona District Court's ruling was a final judgment on the merits for purposes of res judicata. See also *Nwoke v. University of Chicago Medical Center*, No. 19 C 358, 2020 U.S. Dist. LEXIS 99130, at *9 (N.D. Ill. June 4, 2020) (following *Arrigo* and holding, "[t]he *Nwoke I* judgment also is final as to the claims for which Nwoke sought and was denied leave to amend"). The Arizona District Court recognized that amendments are to be freely allowed, but articulated sound reasons for rejecting Plaintiff's amended allegations and claims.

Thus, as was the case in *Arrigo*, allowing Plaintiff to proceed in such a fashion here would result in the very prejudice and inefficiency that the Arizona District Court's ruling was intended

to avoid. To hold otherwise would violate the basic rule against claim splitting. See *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 340 (1996) ("The rule against claim-splitting, which is an aspect of the law of preclusion, prohibits a plaintiff from suing for part of a claim in one action and then suing for the remainder in another action."). Following *Arrigo*, this Court should hold that Plaintiff's original Illinois complaint was barred as res judicata.

### B. Statute of Limitations – Phoenix Occurrence

Illinois and Arizona both have two-year statutes of limitations for personal injury actions. See *Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016) (applying 735 ILCS 5/13-202); and *Ellis v. Salt River Project*, 432 F. Supp. 3d 1070, 1087 (D. Ariz. 2020) (applying A.R.S. § 12-542). Regardless of this commonality, a statute of limitations is generally considered part of the forum state's substantive law. *Evans v. Lederle Laboratories*, 167 F.3d 1106, 1112 (7th Cir. 1999). Illinois courts presume that the Illinois statute of limitations will apply, even when the substantive law of a non-forum state applies, because a statute of limitations fixes the time in which a remedy may be sought and does not typically alter any substantive rights. *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012).

Here, the Phoenix Occurrence allegedly took place on August 9, 2018, and the Peoria Occurrence allegedly took place on August 12, 2018. Plaintiff filed his original complaint in the Central District of Illinois on July 31, 2020, alleging only the Peoria Occurrence. However, as explained above, the original Illinois complaint was barred as res judicata and was therefore a nullity which did nothing to anchor Plaintiff's claims within the limitations period. This precludes Plaintiff from arguing that the FAC relates back to the date of his original Illinois complaint under the Illinois statute on amended pleadings. See 735 ILCS 5/2-616(b) (West 2018).

On August 4, 2020, Plaintiff filed his Notice of Voluntary Dismissal under Rule 41(a)(1) in the Arizona District Court, causing the Arizona District Court to lose jurisdiction over Plaintiff's remaining claims based on the Phoenix Occurrence. This left Plaintiff without any active claims in either jurisdiction. On August 9, 2020, the two-year limitations period expired on any claims arising from the Phoenix Occurrence.

Admittedly, Illinois plaintiffs can find safe harbor from statute-of-limitations defenses under the Illinois savings statute (735 ILCS 5/13-217), which generally allows a plaintiff who voluntarily dismisses a case to commence a new action within one year or within the remaining period of limitation, whichever is greater. See *Jenkins v. Village of Maywood*, 506 F.3d 622, 623 (7th Cir. 2007). The purpose underlying the Illinois savings statute is to facilitate litigation on the merits and avoid frustration upon grounds unrelated thereto. *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 44.

However, the only party in this case to frustrate litigation on the merits has been Plaintiff. L3 has filed multiple motions to dismiss and has now appeared in two separate forums. Each time L3 has answered the bell, Plaintiff has stepped out of the ring. The Illinois savings statute was never intended to remedy self-initiated delay or to be used as a weapon against another party. *Kutnick v. Grant*, 33 Ill. App. 3d 37, 39 (1975). Moreover, the Illinois Supreme Court has held that the savings statute does not immunize a plaintiff against "legitimate defenses" such as the bar of res judicata. *Rein*, 172 Ill. 2d at 342.

Illinois has no interest in extending the limitations period under these circumstances. The remaining matter deals with injuries that were allegedly suffered in Arizona, a lawsuit that was originally filed in an Arizona court, and claims that were originally brought under Arizona and Federal law. (see Ex. A). Even if there was some theory under which Plaintiff could avail himself

12

of the Illinois savings statute to save these claims, the Supreme Court in *Rein* spoke to the policy reasons undercutting any such theory:

> "If [the] plaintiffs were permitted to proceed on their common law counts, any plaintiff could file an action with multiple counts, dismiss some but not all of the counts, obtain a final judgment on the undismissed counts, and if unsuccessful on the counts not dismissed, refile the previously dismissed counts. Such a practice would impair judicial economy and would effectively defeat the public policy underlying res judicata, which is to protect the defendant from harassment and the public from multiple litigation." *Rein*, 172 Ill. 2d at 343.

In sum, Plaintiff's original complaint in this Court was barred as res judicata, and there is no basis for allowing the additional claims he raised in the FAC to artificially extend the statute of limitations. Plaintiff's actions were likely born out of the requirement that he exhaust his remedies against the TSA and also file his suit against L3 within the two-year limitations period. The solution to this quandary was to file suit against L3 and then request a stay of the proceedings until the exhaustion requirements were satisfied for the TSA. See, e.g., *Arrigo*, 836 F.3d at 798.

But rather than openly addressing his procedural dilemma and seeking a practical solution, Plaintiff used L3 as a placeholder and staggered his claims to manipulate the limitations period. He had no basis for holding back his allegations of the Peoria Occurrence, which the Arizona District Court recognized in denying his amendments. Ever recalcitrant, Plaintiff went forum shopping in an effort to dodge the adverse ruling and bundle his allegations within a single action against the many defendants named herein. This entire exercise has been conducted at L3's expense. The only just outcome is for his claims against L3 to be dismissed with prejudice.

## II.    The SAFETY Act

The SAFETY Act provides a rebuttable presumption of a government contractor defense to be asserted by a "Seller" of QATT. This presumption applies against product liability lawsuits "arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies approved by the Secretary … have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller." 6 U.S.C. § 442(d)(1) (2018). The government contractor defense typically available under the common law operates to shield contractors from tort liability if they manufacture products for the government in accordance with precise government specifications. See *Betzner v. Boeing Co.*, 910 F.3d 1010, 1016 (7th Cir. 2018). However, the government contractor defense codified under the Safety Act applies regardless of whether the claim against arises from the sale of a product to the Federal Government or to non-Federal Government customers. 6 U.S.C. § 442(d)(1) (2018).

To establish the rebuttable presumption of the government contractor defense, the Seller of QATT must produce a Certification of a Technology as an Approved Product for Homeland Security. 6 CFR § 25.8 (2018). (See, e.g., Group Exhibit E.) To overcome the presumption of dismissal, a plaintiff must show that the "Seller acted fraudulently or with willful misconduct in submitting information to the Secretary during the course of the Secretary's consideration of such technology under this subsection." 6 U.S.C. § 442(c) (2018).

Admittedly, no case has determined whether the presumption of a government contractor defense under the SAFETY Act applies to a particular Seller of QATT. It could be argued that the incident described in Plaintiff's Complaint did not arise from an act of terrorism, but there is no question that L3's QATT was deployed in defense against or response to or recovery from such an act. It is noteworthy that the SAFETY Act defines QATT as:

"any product, equipment, service (including support services), device, or technology (including information technology) designed, developed, modified, or procured **for the**

**specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause**, that is designated as such by the Secretary." (Emphasis added.) 6 U.S.C. § 444 (2018).

The technology contained in the L3 product targeted by Plaintiff evolved as a direct result of the terrorist attacks of 9/11. The security needs at commercial airports became significantly more complex following those attacks. There is no question that Plaintiff's lawsuit arises out of or relates to the performance of L3's QATT for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause.

"It is hard to overestimate the need to search air travelers for weapons and explosives before they are allowed to board the aircraft. As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous." *United States v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005). To hold L3 liable for damages on the basis that its QATT invaded a passenger's privacy would deal a tremendous blow to our Nation's anti-terrorism defense apparatus and would also render the SAFETY Act virtually meaningless.

For these reasons, the Court should hold that L3 is entitled to the rebuttable presumption of a government contractor defense under 6 U.S.C. § 442(d)(1) (2018). Because Plaintiff has not alleged that L3 acted fraudulently in submitting information to the DHS in its application for SAFETY Act protections (see 6 U.S.C. § 442(c) (2018)), and because no set of facts exists under which Plaintiff can prove the same, the Court should dismiss Plaintiff's Complaint with prejudice under Rule 12(b)(6).

## III.    Failure to State a Claim

Plaintiff purports to state six causes of action against L3, each involving a combination of state and federal constitutional violations. He theorizes that L3 violated his rights to privacy and due process, as well as his right to be "free from unreasonable search." He claims these violations

15

constitute (1) ordinary negligence, (2) negligent infliction of emotional distress, and (3) intentional infliction of emotional distress. Each claim is brought once under Arizona law and once under Illinois law. Plaintiff asks for an award from L3 of $500,000,000 in damages. (See FAC at pg. 27, seeking $250,000,000 for Counts 9-11 and $250,000,000 in for Counts 12-14.)

### A.    Negligence

To establish a claim for ordinary negligence, whether in Arizona or Illinois, Plaintiff must show that: (1) L3 owed him a duty; (2) L3 breached the duty owed; (3) Plaintiff suffered an injury that was proximately caused by L3's breach; and (4) Plaintiff suffered resulting damages. See *Ryan v. Napier*, 245 Ariz. 54, 59 (2018); *Doe v. Coe*, 2019 IL 123521, ¶ 34. In the FAC, Plaintiff failed to properly allege any of these elements, claimed L3's screening technology performed the exact way it was intended, and admitted that any injuries he suffered were caused by the TSA.

### 1.    Duty

The FAC includes no mention of any duty allegedly owed to Plaintiff by L3. In his general factual allegations, and in the bodies of Counts 9 and 12, Plaintiff alleges the following:

- "L3's proprietary ATR software processed Muir's passenger screening data image in order to search Muir for anomalies and threats on his body in accordance with 49 U.S.C. § 44901(l)(A)(i) and 49 C.F.R. § 1540.107(d)(l)(i)." FAC at ¶¶ 25, 45.

- "L3's proprietary ATR software returned a false threat alarm at Muir's right groin that misidentified the uncontrollable symptom manifestation of Muir's <u>hidden,</u> beneath the skin physical disorder at his right groin as a foreign material object on the surface of his skin at his right groin." FAC at ¶¶ 26, 46 (underlined language found only at ¶ 26).

- "L3's proprietary ATR software singled-out Muir as compared to other similarly-situated travelers and returned a false threat alarm at Muir's right groin solely because of his congenital physical disorder at his right groin and his private marital healthcare decisions regarding that disorder." FAC at ¶¶ 27, 47.

- "Muir's hidden physical disorder at his right groin is entirely human tissue, entirely underneath his skin and entirely consistent with his expected reproductive anatomy." FAC at ¶¶ 28, 48.

16

- "Based solely on the false right groin threat alarm generated by L3's proprietary ATR software, TSA moved Muir for mandatory additional interrogation and separated him from his personal property, which was cleared to enter the sterile area." FAC at ¶¶ 29, 49.

- "[t]he actions of L3 described herein… constitute negligence through L3's failure to reasonably address known problems with its proprietary ATR software that L3 knew or should have known could violate Muir's reasonable expectation of privacy and Muir's due process rights while his freedom of movement was restricted." FAC at Counts 9, 12.

Notwithstanding Plaintiff's failure to allege any duty owed to him by L3, the notion that L3 breached any such duty is belied by Plaintiff's acknowledgment that "L3's proprietary ATR software processed [Plaintiff's] passenger screening data image in order to search for anomalies and threats on his body in accordance with 49 U.S.C § 44901(l)(A)(i) and 49 C.F.R. § 1540.107(d)(1)(i)." FAC at ¶¶ 25, 45.

The provisions referenced by Plaintiff cover the use of "Advanced Imaging Technology" for use in screening airport passengers. "Advanced Imaging Technology" means "a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body." 49 U.S.C § 44901(l)(1)(A) (2018); 49 CFR § 1540.107(d)(1) (2018). This "may include devices using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." *Id*. "Automatic Target Recognition software" means "software installed on an advanced imaging technology that produces a generic image of the individual being screened that is the same as the images produced for all other screened individuals." 49 U.S.C § 44901(l)(1)(C) (2018); 49 CFR § 1540.107(d)(2) (2018).

Plaintiff suggests that L3 violated these provisions when its screening equipment "misidentified" his "beneath the skin physical disorder at his right groin" as a "foreign material object" on the surface of his skin. FAC at ¶¶ 26, 46. Plaintiff later reveals that his "beneath the skin physical disorder" is, in fact, a hernia. FAC at ¶ 55. Thus, Plaintiff's claims against L3 rest

17

on the premise that L3's screening equipment must be capable of distinguishing between objects located on the surface of the skin and objects located immediately beneath the surface of the skin.

However, in addition to revealing objects "on the body," backscatter x-rays can reveal matter "underneath and near the surface of the skin," such as medical implants. Millimeter wave technology generates images based on the energy reflected from the body. These technologies are used to detect anomalies appearing on an image of a generic figure. See DHS Privacy Impact Assessment Update for TSA Advanced Imaging Technology, pgs. 3-6 (Jan. 25, 2011) (available at http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-tsa-ait.pdf). This is consistent with the DHS Certification and Designation of L3's QATT, which is designed to highlight "threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation." In other words, Plaintiff has alleged that L3's screening equipment performed precisely to the standards and specifications set out by Congress and the DHS. Thus, he cannot show that L3 breached any duty owed to him.

## 2.      Causation

Further, Plaintiff cannot establish that L3's actions (if any) were the proximate cause of his alleged injuries. A proximate cause produces an injury through a natural and continuous sequence of events unbroken by any intervening causes. *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 441-42 (7th Cir. 2009). A plaintiff generally cannot recover if the sequence of events is broken by an intervening event which the defendant could not reasonably foresee. *See id.*

Here, Plaintiff's allegations make it clear that his purported injuries were caused by the TSA. At the very least, Plaintiff alleges that the TSA's actions were an intervening cause. Plaintiff alleges that the TSA refused his pleas for an "alternative to a physical pat-down" and instead "coerced" him to "act against his will" so he could secure his "lawful release from TSA control."

18

FAC at ¶¶ 55-60. Even if it was determined that L3 was somehow negligent in manufacturing the ProvisionTM ATD and ProvisionTM 2 products, which L3 expressly denies, Plaintiff's allegations establish a series of intervening events which broke any resulting causal chain. Therefore, Plaintiff cannot establish the required element of proximate causation, and his negligence claims against L3 should be dismissed with prejudice.

### B.  Negligent Infliction of Emotional Distress

In Illinois, the same elements needed for a showing of ordinary negligence are generally required to show negligent infliction of emotional distress. See *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702-703 (7th Cir. 2009). The difference between the two claims is that a plaintiff claiming negligent infliction of emotional distress can recover for an injury that was solely emotional, rather than physical. *Id*. However, a plaintiff claiming negligent infliction of emotional distress must show injuries which surpass a "threshold severity" to be cognizable. *Id*. at 707. For example, the *Lewis* court held that the plaintiff did not satisfy the threshold for recovery, because her "mild anxiety" only minimally interfered with her everyday life, and she did not seek any treatment. *Id*. at 708.

In Arizona, the tort of negligent infliction of emotional distress typically requires a showing that: (1) the plaintiff witnessed an injury to a closely related person; (2) suffered mental anguish manifested as physical injury; and (3) was within the zone of danger so as to be subjected to an unreasonable risk of bodily harm created by the defendant. *Rodriguez v. Fox News Network, L.L.C.*, 238 Ariz. 36, 39 (Ct. App. 2015). In the context of a direct claim, a successful plaintiff must still show that the tortfeasor's negligence "caused the plaintiff to such *severe* emotional distress that physical injury results." (Emphasis added) *State Farm Mutual Automobile Insurance Co. v. Connolly*, 212 Ariz. 417, 423 (Ct. App. 2006).

19

Here, for the Phoenix Occurrence, Plaintiff alleges that he:

- "informed TSA that he was experiencing a serious medical emergency and that nobody, including his doctor, had ever touched him at his right groin during a disorder related medical emergency and that being touched at his right groin would result in extreme physical pain and could endanger his life and he ordered TSA not to touch him at his right groin"

- and that he "was permanently damaged and suffers severe ongoing psychological distress and disturbing physical manifestations as a direct result of (1) being impermissibly singled-out as compared to other similarly-situated travelers, (2) being publicly humiliated in front of many people at the TSA security checkpoint, and (3) being coerced to act against his will in order to secure his lawful release from TSA control solely because of his private marital choices regarding his hidden congenital physical Disorder, which was his most private of ailments that he had rightfully expected to keep private." FAC at ¶¶ 32, 37

For the Peoria Occurrence, Plaintiff alleges that he:

- "informed TSA that, due to his physical disorder and current medical condition, being touched at the right groin could potentially endanger his life and he ordered TSA not to touch his right groin and he informed TSA that physical contact at his right groin would result in immediate and extreme physical pain for him."

- and that he: "was permanently damaged and suffers severe ongoing psychological distress and disturbing physical manifestations as a direct result of being impermissibly singled-out and coerced to act against his will in order to secure his lawful release from TSA control so that he could regain the freedom to properly attend to his serious medical needs." FAC at ¶¶ 52, 61.

For the same reasons discussed above, Plaintiff cannot establish a claim for negligent infliction of emotional distress against L3. In terms of causation, his allegations implicate the TSA rather than L3. Moreover, even if Plaintiff could satisfy the ordinary elements of duty, breach, and causation, he has not properly alleged any injuries that would surpass the requisite threshold for severity, as the allegations above are wholly conclusory in that respect. Plaintiff cannot establish this element by simply claiming he told the TSA that anyone touching his groin would endanger his life, and that the TSA's alleged defiance caused him to suffer permanent damage and psychological distress with physical manifestations.

### C.     Intentional Infliction of Emotional Distress

In both Illinois and Arizona, a plaintiff claiming intentional infliction of emotional distress must plead and prove that: (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that emotional distress would result; and (3) the plaintiff indeed suffered severe emotional distress as a result of the defendant's conduct. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 50; *Rodriguez v. Fox News Network, L.L.C.*, 238 Ariz. 36, 39 (Ct. App. 2015).

L3 needs not belabor the point any further. The only allegations of extreme and outrageous conduct in the FAC are directed at the TSA, not at L3, and they are woefully insufficient in that regard. *See Marquez*, 410 F.3d at 618 (TSA's challenged screening procedures were reasonable and "geared towards detection and deterrence of airborne terrorism").

## CONCLUSION

Plaintiff engaged in blatant claim splitting in an effort to manipulate the limitations period and avoid the consequences of the Arizona District Court's adverse ruling. This is a classic example of a plaintiff pleading himself out of court. His claims arising from the Peoria Occurrence are barred as res judicata, and his claims arising from the Phoenix Occurrence are barred under the statute of limitations.

Plaintiff's claims are also barred because L3 is entitled to government contractor immunity under the SAFETY Act, and Plaintiff has made no effort to show that L3 acted fraudulently in submitting information to the DHS in its application for SAFETY Act protections. Not to take anyone's physical disorder lightly, but our nation's national security concerns cannot give way to Plaintiff's concerns about his "congenital physical disorder at his right groin and his private marital healthcare decisions regarding that disorder." See FAC at ¶47.

21

Finally, Plaintiff failed to properly allege any of the required elements within his six purported causes of action against L3, he claimed that L3's screening technology performed the exact way it was intended, and he admitted that any injuries he purportedly suffered were caused exclusively by the TSA. For all of these reasons, the Court should dismiss Plaintiff's claims against L3 with prejudice.

WHEREFORE, for the foregoing reasons, Defendant, L3HARRIS TECHNOLOGIES, INC., respectfully requests that this Court dismiss Plaintiff's First Amended Complaint in its entirety with prejudice, and for such further relief as the Court may deem just.

Respectfully submitted,

ADLER MURPHY & McQUILLEN LLP

*/s/ Richard C. Harris*_____
One of the Attorneys for Defendant,
L3HARRIS TECHNOLOGIES, INC.

Michael G. McQuillen
Christopher J. Raistrick
Richard C. Harris
ADLER MURPHY & McQUILLEN LLP
20 S. Clark Street, Suite 2500
Chicago, Illinois 60603
Telephone: (312) 345-0700
Facsimile: (312) 345-9860
mmcquillen@amm-law.com
craistrick@amm-law.com
rharris@amm-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.


With a copy sent via U.S. Mail and email to:

Michael Gibson Muir
19 Inglewood Ln
Bloomington, IL 61704
blaxwan@yahoo.com
*Plaintiff Pro se*

<u>/s/  Richard C. Harris</u>