Case 2:19-cv-05887-DGC Document 15 Filed 02/12/20 Page 1 of 17

1:20-cv-01280-JBM-JEH # 37-1 Filed 11/18/20 Page 1 of 17    E-FILED
Wednesday, 18 November, 2020 02:20:35 PM
Clerk, U.S. District Court, ILCD

Michael Gibson Muir
3255 S. Dorsey Ln. APT 1036
Tempe, AZ 85282
712-309-6121

FILED ☒ LODGED ☐
RECEIVED ☐ COPY ☐
FEB 1 2 2020
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Michael Gibson Muir )
    Plaintiff, )
    v. )
L3Harris Technologies, Inc., a Delaware )
for-profit corporation )
    Defendant. )

Case No. 2:19-cv-05887-DGC

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

JURY TRIAL DEMANDED

## INTRODUCTION

1. Plaintiff Michael Gibson Muir ("Muir"), a United States citizen with a congenital physical disability, was a ticketed passenger attempting to travel through Phoenix-Mesa Gateway Airport ("IWA") in Mesa, Arizona on August 9, 2018.

2. While at IWA, Muir experienced an unpredictable and uncontrollable health emergency at his right groin due to his disability.

3. In order to access IWA's sterile area, Muir was required to submit to security screening in accordance with 14 C.F.R. § 382.55 and 49 C.F.R. § 1540.107.

4. During security screening, Defendant discriminated against Muir solely because of his disability in violation of Rehabilitation Act of 1973 Section 504.

5. Defendant's discriminatory conduct directly caused Muir harm beyond the bounds of human decency.

## JURY TRIAL

6. Muir demands a trial by jury on all issues so triable.

## PARTIES

7. Plaintiff Muir is a natural person living in Tempe, Arizona and a qualified individual under 29 U.S.C. § 705(20) and 42 U.S.C. § 12102.

8. Defendant L3Harris Technologies, Inc. ("L3") is a Delaware for-profit corporation, a Title IV organization, a United States government contractor and manufacturer of the proprietary Automatic Target Recognition ("ATR") software used in passenger screening at IWA on August 9, 2018.

## JURISDICTION & VENUE

9. Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(a).

10. Venue is proper under 28 U.S.C. §§ 1391(b)(2).

## ALLEGATIONS OF FACT

11. Muir arrived at IWA on August 9, 2018 around two hours before his scheduled flight time of 1:31 p.m.

12. Prior to his flight, Muir experienced an unpredictable and uncontrollable health emergency at his right groin due to his congenital disability.

13. Muir's decision to accept certain serious health risks related to his congenital disability is a protected matter of faith between him and the Creator.

14. Muir was within his statutory right to travel by air because his unpredictable,

2

uncontrollable, disability-caused health emergency was a danger only to him.

15. Muir presented himself for mandatory passenger screening.

16. Muir's passenger screening data was processed by L3's proprietary ATR software product in order to "search" Muir for anomalies and threats *on* his body in accordance with 49 U.S.C. § 44901(l)(A)(i) and 49 C.F.R. § 1540.107(d)(1)(i).

17. L3's proprietary ATR software invaded Muir's privacy and illegally and recklessly revealed Muir's private health information regarding his completely human tissue congenital disorder beneath his skin at his right groin when it returned a discriminatory false threat alarm at Muir's right groin that misidentified Muir's beneath the skin, human tissue congenital disability as a foreign material object on the *surface* of his skin at his right groin.

18. The discriminatory false threat alarm at Muir's right groin was a direct violation of Rehabilitation Act of 1973 Section 504, by which L3 is bound as a Title IV organization, because it was based solely on Muir's congenital disability.

19. A threat alarm is not created at Muir's right groin by L3's proprietary ATR software when he is not symptomatic due to his disability (as occurred on June 6, 2019) and the false threat alarm leading to Muir's mandatory additional interrogation was *only* created on August 9, 2018 because Muir was, at that exact moment, uncontrollably symptomatic directly due to his congenital disability.

20. Muir's congenital disability at his right groin is entirely human tissue, entirely beneath his skin, entirely consistent with his expected reproductive anatomy and

3

therefore not subject to "search" by L3's proprietary ATR software because passenger searches are limited by Congress to the surface of the skin.

21. What began as a lawful administrative search for *objects* on the *surface* of Muir's skin became an unconstitutional, unreasonable and illegal invasion of privacy when Muir's passenger screening data "image" was "searched" by L3's proprietary ATR software and the ATR software unlawfully disclosed Muir's private health information regarding his entirely human tissue, entirely beneath his skin, entirely consistent with his expected reproductive anatomy congenital disability as a false threat alarm on the *surface* of his skin requiring a physical pat-down to resolve in direct violation of Arizona and federal law and Muir's clearly established Constitutional rights.

22. Based solely on the discriminatory false right groin threat alarm generated by L3's proprietary ATR software, Muir was falsely seized for mandatory additional interrogation which resulted in severe, unnecessary and lasting harm.

## CLAIMS FOR RELIEF

### COUNT 1 – United States Code - Rehabilitation Act of 1973 Section 504

23. Rehabilitation Act of 1973 Section 504, codified as 29 U.S.C. § 794, states in part:

> "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency."

24. L3's "commercial aviation" division includes its "Airline Academy".

25. L3's "Airline Academy" is in direct receipt of U.S. Department of Education Title IV

4

"federal financial assistance", therefore, L3 is a "Title IV organization".

26. L3's "commercial aviation" division also includes "security and detection systems".

27. L3's proprietary ATR software is a "security and detection systems" product.

28. L3's "commercial aviation" division (and by extension, L3 itself) is, as a "Title IV organization", therefore, "on notice" and bound by Rehabilitation Act of 1973 Section 504.

29. L3 violated Rehabilitation Act of 1973 Section 504 when it discriminated against Muir solely because of his disability at IWA on August 9, 2018 when its proprietary ATR software unlawfully invaded his privacy solely because of his congenital disability and set off a chain of unstoppable events that interfered with his personal liberty and caused him unnecessary, severe and lasting harm.

30. United States Constitution Amendment V states in part:

> "No person shall… be deprived of life, liberty, or property, without due process of law."

31. Mr. Justice Harlan stated in *Katz v. United States*, 389 U.S. 347, 361 (1967) that:

> "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."

32. <u>The "Reasonable Expectation of Privacy" Test</u> – The "Katz" test is applicable.

33. Muir exhibited an actual expectation of privacy in wanting to keep his congenital disability private.

34. Therefore, the first prong of the "Katz" test is satisfied.

35. Society recognized that Muir's expectation of privacy with regards to his private health information was "reasonable" as Congress has recognized "Full face photographic images and any comparable images" as "Protected Health Information" in laws including "HIPAA" and "HITECH".

36. Therefore, the second prong of the "Katz" test is satisfied.

37. Both prongs of the "Katz" test are satisfied, therefore, Muir had a reasonable expectation of privacy with regards to keeping his congenital disability private.

38. Muir's injuries would not have happened were it not for L3's unlawful invasion of his privacy with its proprietary ATR software at IWA on August 9, 2018.

39. L3's conduct directly interfered in Muir's personal relationship with the Creator.

40. L3 instigated creation of "The Shadow", a menacing presence now constantly inhabiting Muir's waking psyche.

41. L3's conduct directly caused Muir to suffer post-traumatic stress, traumatic-bonding-induced paranoia and painful physical manifestations including: involuntary movements, throat constriction, muscle spasms, shortness of breath and groin pain.

42. L3's conduct continues to cause Muir anxiety and the loss of enjoyment of life as he can no longer exercise his statutory right to travel between the several states by air because L3's discrimination creates an unlawful "checkpoint purgatory" situation where Muir cannot know if L3 will unlawfully discriminate against him solely because of his disability during passenger screening until *after* his data "image" has already been "searched" by L3's proprietary ATR software as Muir cannot control the symptoms his disability causes and he cannot know what level of disability-related symptom

manifestation is required for L3's proprietary ATR software to return a false threat alarm at his right groin solely because of his disability.

### COUNT 2 – Arizona - A.R.S. § 47-2318 – Third Party Beneficiaries of Warranties Express or Implied

43. § 47-2318 states:

> "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."

44. § 47-2318 implied warranties of merchantability and fitness for a particular purpose extend to L3's proprietary ATR software (the "goods") because Muir is a "natural person" who was a "guest" (ticketed passenger) at DHS's "home" (IWA security checkpoint) and it was "reasonable" to expect that Muir would be "affected" by the goods because federal law requires all passengers be "searched" by L3's proprietary ATR software before entering the sterile area and Muir was injured when the implied warranties were breached by L3 when its proprietary ATR software failed to perform as required by federal law.

45. L3 breached its implied warranties of merchantability and fitness for a particular purpose at IWA on August 9, 2018 when its proprietary ATR software failed to perform as required by federal law and unconstitutionally "searched" data representing a human tissue disability underneath Muir's skin and returned a false threat alarm at his right groin on the *surface* of his skin requiring a physical pat-down to resolve.

7

46. L3 had substantial knowledge that Muir was likely to be affected by its proprietary ATR software at IWA because federal code requires all air passengers to submit to passenger screening in order to access sterile areas of the airport (49 C.F.R. § 1540.107).

47. L3's conduct was directly responsible for Muir's injuries and they could not have happened without L3's breach of its implied warranties.

48. The "Boyle" Test - *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) is applicable.

49. Airport checkpoint security screening is a uniquely federal interest. Therefore, the first prong of the "Boyle Test" is satisfied.

50. There is no significant conflict between relevant federal statute, federal code, DHS policy and Arizona state law. Therefore, the second prong of the "Boyle Test" is not satisfied.

51. Both prongs of the "Boyle Test" are not satisfied as required to displace state law, therefore, Arizona state law is not displaced.

52. The "Yearsley" Test - *Yearsley v. W. A. Ross Construction Co.*, 309 U.S. 18 (1940) is applicable.

53. L3 exceeded its authority when it violated 29 U.S.C. § 794(a) and Muir's Constitutional rights at IWA on August 9, 2018.

54. And because failure to warn of a known danger created by L3 is a matter of safety and not public policy, the "discretionary function exception" does not apply and L3 is not entitled to "Yearsley" immunity.

55. The Government Contractor Test - L3's proprietary ATR software is not "high

technology military equipment" because it is used in a civilian setting by TSA, a non-military sub-agency of the non-military Department of Homeland Security, within the borders of Arizona during peacetime and sold commercially by L3 on the open market on six continents.

56. And because civilian air passenger screening inside the borders of the United States for domestic air travel is not "wartime activity", L3 is not entitled to the "government contractor defense" or derivative sovereign immunity.

57. The "SAFETY Act" Test - L3 is not entitled to the "SAFETY Act" "government contractor defense" codified in 6 U.S.C. § 442(d)(1) unless the technology in question has been designated or certified "QATT" by DHS.

58. L3's proprietary ATR software has not been designated or certified "QATT" by DHS.

59. Therefore, defenses embodied in the "SAFETY Act", including the "government contractor defense" are not applicable to L3's proprietary ATR software.

**COUNT 3 – Arizona - Common Law Intentional Infliction of Emotional Distress**

60. The Court held in *Marbury v. Madison*, 5 U.S. 1 Cranch 137 137 (1803) that:

> "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection."

61. The Court stated in *Boyd v. United States*, 116 U.S. 616, 635 (1886) that:

> "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

62. Arizona Constitution Article II Section 8 states:

9

"No person shall be disturbed in his private affairs… without authority of law."

63. 29 U.S.C. § 701 states in part:

"Congress finds that - millions of Americans have one or more physical or mental disabilities and the number of Americans with such disabilities is increasing [and] individuals with disabilities constitute one of the most disadvantaged groups in society [and] disability is a natural part of the human experience and in no way diminishes the right of individuals to - live independently; enjoy self-determination; make choices; and enjoy full inclusion and integration in the economic, social, [and] cultural mainstream of American society."

64. L3's conduct was extreme and outrageous in disregarding federal law, invading Muir's privacy and illegally discriminating against him solely because of his congenital disability, especially in light of 29 U.S.C. § 701, of which L3 must have been aware as a Title IV organization and a federal government contractor responsible for the software "screening" of more than two million passengers per day.

65. L3 recklessly disregarded the certain knowledge that its illegal and unconstitutional conduct would result in psychological injury and severe emotional distress for Muir when it violated federal law and Muir's constitutional rights when its ATR software invaded Muir's privacy and "searched" data regarding Muir's internal organs and publicly disclosed his most private ailment at IWA on August 9, 2018.

66. Muir experienced severe emotional distress beyond the bounds of human decency as a direct result of L3's reckless and unlawful conduct.

**COUNT 4 – Arizona - Common Law Product Liability Manufacturing Defect**

67. DHS acknowledges at https://www.dhs.gov/science-and-technology/apex-screening-

speed that:

> "False alarms are frequent, causing inconvenient and intrusive pat-downs and searches."

68. United States Constitution Amendment IV states in part:

> "The right of the people to be secure in their persons… against unreasonable searches… shall not be violated."

69. Mr. Justice Field stated in *In re Pacific Railway Commission,* 32 F. 241, 250:

> "of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves not merely protection of his person from assault, but exemption of his private affairs… from the inspection and scrutiny of others."

70. The Court stated in *Warden v. Hayden*, 387 U.S. 294, 304 (1967):

> "We have recognized that the principal object of the Fourth Amendment is the protection of privacy"

71. The Fourth Amendment prohibition against unreasonable search is a clearly established Constitutional right beyond debate.

72. Passenger screening is limited to the surface of Muir's skin and objects *on* his body. - 49 U.S.C. § 44901(l)(A)(i).

73. In Defendant's Exhibit A (F-26-E) (Defendant's Motion to Dismiss, Document 14-1), DHS defines ATD software as:

> "A software solution that analyzes scanned data and highlights threats and anomalies"

11

74. It is undisputed that L3's non-"QATT" proprietary ATR software performs the "search" of Muir when it "analyzes scanned data and highlights threats and anomalies".

75. L3's proprietary ATR software is unreasonably dangerous due to manufacturing defect as L3 could not have intended its ATR software to "search" Muir's private, under the skin health information and generate a false alarm at the site of his congenital disability solely due to that disability because it was an obvious violation of clearly established law, federal policy and Muir's Constitutional rights.

76. L3's proprietary ATR software was defective in condition when it left the hands of L3 because it failed to achieve the most basic, legally-mandated function of distinguishing between human tissue and foreign objects, and between human tissue beneath Muir's skin and foreign objects on the *surface* of his skin.

77. This defect made L3's proprietary ATR software unreasonably dangerous because passenger searches are limited to the surface of the skin and the defect was the sole reason Muir was required to submit to a mandatory pat-down at the site of his painful disability/health emergency and Muir is not required to submit to a mandatory pat-down of his right groin unless L3's ATR software unlawfully discloses his disability at his right groin as a false threat alarm solely because of his disability.

78. L3's proprietary ATR software was flawed because of mistakes during the creation and modification of its source code, which L3 exclusively controlled.

79. L3's proprietary ATR software was not "QATT" and the software conclusively did not perform to DHS specifications on August 9, 2018 at IWA as required by law and Muir's injuries are definitive proof of the software's manufacturing defect.

12

80. The defect in L3's proprietary ATR software was the proximate cause of Muir's injuries and his injuries could not and would not have happened without the defect.

81. Muir's injuries also provide additional confirmation of the necessity for DHS to step in to correct the plague of high false alarm rates by authorizing the "Passenger Screening Algorithm Challenge" contest, which used $1.5 million in taxpayer funds as prize money to fix L3's unreasonably dangerous and defective product and take monopoly control over the ATR software away from L3 and give it to the broader data science community as it plans to do with its next generation of passenger screening algorithms.

**COUNT 5 – Arizona - Common Law Product Liability Information Defect**

82. The Ninth Circuit held in *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) that:

> "matters of scientific and professional judgment, particularly judgments concerning safety, are rarely considered to be susceptible to social, economic, or political policy."

83. L3 undertook responsibility for the passenger screening "search" of Muir at IWA on August 9, 2018 when it sold its non-"QATT" proprietary ATR software to DHS.

84. Therefore, L3's full execution of that responsibility with regards to matters of safety is not subject to any form of immunity rooted in the "discretionary function exception".

85. Therefore, L3 had a duty to warn Muir that its proprietary ATR software would illegally "search" data representing a human tissue congenital disability beneath his skin because this was a known danger created by L3 and L3 had no right to exercise

13

"discretion" in disclosing the known danger to Muir.

86. L3's failure to warn Muir that its proprietary ATR software would invade Muir's privacy and illegally and unconstitutionally disclose private health information regarding his beneath the skin congenital disability at his right groin made the product so unreasonably dangerous that it is the sole reason that Muir was discriminated against, the sole reason Muir was injured and the sole reason Muir can no longer exercise his statutory right to travel by air.

87. L3 knew that Muir's human tissue beneath his skin was not subject to "search" using its proprietary ATR software and as an "on notice" Title IV organization, knew it was illegal to discriminate against Muir solely because of his disability and also knew it had a duty to warn Muir that he could be injured by its product solely because of his disability.

### COUNT 6 – Arizona - Common Law Intrusion Upon Seclusion

88. The Court stated in *Boyd v. United States*, 116 U.S. 616, 635 (1886) that:

> "Illegitimate and unconstitutional practices get their first footing… by silent approaches and slight deviations from legal modes of procedure."

89. The Court in *Miranda v. Arizona*, 384 U.S. 436, 491 (1966) stated:

> "Where rights secured by the Constitution are involved, there can be no rulemaking or legislation which would abrogate them."

90. The Court in *Johnson v. United States*, 333 U.S. 10, 14 (1948) stated:

> "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

91. L3 intentionally invaded Muir's privacy at IWA on August 9, 2018 when its proprietary ATR software recklessly and unlawfully "searched" Muir's private health information and returned a false threat alarm on the surface of his skin at his right groin, which was actually the site of his beneath the skin congenital disability which was Muir's most painful and debilitating of ailments that he had rightfully expected to keep private.

92. L3's conduct would be considered highly offensive to a reasonable person because at the moment it illegally "searched" Muir's private health information, L3 had *more* knowledge about Muir's congenital disability than Muir ever did because it is dangerous and impossible (Muir cannot predict or control the symptoms of his disability) for Muir to be scanned by conventional medical imaging technology during the type of health emergency he experienced while being scanned at IWA.

93. Muir considers it highly offensive that a for-profit corporation contracted by DHS to manufacture equipment and software for airport checkpoint security screening had *more* private health information about Muir's congenital disability than he or *anybody*, including medical professionals, ever did.

94. A reasonable person would agree with Muir that private health information is amongst the most private and valuable information a person has and that to be discriminated against solely because of the unlawful revelation of that private information is highly offensive and cannot be tolerated in a civilized society.

### COUNT 7 – Arizona - Common Law False Imprisonment

95. The Court stated in *Terry v. Ohio,* 392 U.S. 1, 16 (1968) that:

"It is quite plain that the Fourth Amendment governs "seizures" of the

15

person which do not eventuate in a trip to the stationhouse and prosecution for crime -- "arrests" in traditional terminology."

96. The Court held in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) that:

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

97. The Fourth Amendment prohibition against unreasonable seizure is a clearly established Constitutional right beyond debate.

98. L3 instigated Muir's false imprisonment at IWA on August 9, 2018 when its proprietary ATR software unlawfully and recklessly "searched" data representing Muir's private, beneath the skin health information and returned a false threat alarm on the *surface* of his skin at his right groin which directly instigated the mandatory unconstitutional and unlawful seizure of Muir within pre-established boundaries fixed by L3 (L3's proprietary ATR software requires physical pat-downs to resolve threat alarms in order to achieve a minimum level of security) for further interrogation.

99. L3's unlawful "search" of Muir's private, beneath the skin health information was directly responsible for Muir's unlawful and unconstitutional false imprisonment at IWA on August 9, 2018 and it could not have happened (and did not happen at IWA on June 6, 2019 when Muir was not symptomatic due to his disability) without L3's reckless actions.

100. L3's conduct was the direct cause of Muir's injuries and they would not have occurred without the failure of L3's proprietary ATR software and its reckless disregard

for Muir's Constitutional rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Muir prays for the following relief:

i. Injunctive relief requiring L3 to stop discriminating against Muir solely because of his disability.

ii. Injunctive relief requiring L3 to stop denying Muir his statutory right to travel by air.

iii. $250,000,000.00 in damages for physical violation of the person leading to severe emotional distress beyond the bounds of human decency.

iv. Punitive damages, in an amount to be determined by a jury, as damages in this case do not interfere with sensitive functions of the executive branch.

v. Cost of the action.

vi. Any other such relief as the Court deems appropriate.

Dated: this 12th day of February, 2020

Respectfully submitted,

_____

MICHAEL GIBSON MUIR