1  Michael Gibson Muir
   19 Inglewood Lane
2  Bloomington, IL 61704
   (712) 309-6121
3

4

5

6        **IN THE UNITED STATES DISTRICT COURT**

7        **FOR THE DISTRICT OF ARIZONA**

8

9  (1) Michael Gibson Muir                          )
                                                     )
10                                                   )
        Plaintiff,                                   )   Case No. 2:19-cv-05887-DGC
11                                                   )
                                                     )
12     v.                                            )
                                                     )
13  (2) United States Transportation Security       )   **PLAINTIFF'S SECOND**
        Administration                               )   **AMENDED COMPLAINT**
14                                                   )
    (3) David P. Pekoske, Administrator, U.S.        )
15      Transportation Security Administration       )
    (4) L3Harris Technologies, Inc., a Delaware      )
16      for-profit corporation                       )   JURY TRIAL DEMANDED
                                                     )
17                                                   )
        Defendants.                                  )
18

19                          **INTRODUCTION**

20  1. Plaintiff Michael Gibson Muir ("Muir"), a natural married man and United States

21
    citizen with a congenital physical disability, was a ticketed passenger attempting to travel
22

23  through Phoenix-Mesa Gateway Airport ("IWA") in Mesa, Arizona on August 9, 2018

24  and General Wayne A. Downing Peoria International Airport ("PIA") in Peoria County,

25
    Illinois on August 12, 2018.
26

27  2. While at IWA on August 9, 2018 and at PIA on August 12, 2018, Muir experienced an

28  unpredictable and uncontrollable health emergency at his right groin due to his physical

disability and his private marital and religious choices regarding that disability.

3. In order to access IWA and PIA sterile areas, Muir was required to submit to security screening in accordance with 14 C.F.R. § 382.55 and 49 C.F.R. § 1540.107.

4. During security screening at IWA on August 9, 2018 and at PIA on August 12, 2018, Defendants; (1) violated Muir's reasonable expectation of privacy, (2) violated Muir's right to marital privacy, (3) violated Muir's right to religious freedom, (4) impermissibly singled out Muir, as compared to other similarly-situated travelers, based only on his congenital physical disability and his private marital and religious decisions regarding that disability, (5) violated Muir's well-established right to due legal process by condemning him without the lawful judgment of his peers, and (6) violated Muir's well-established right to due legal process by coercing him to choose, without due legal process, a guaranteed punishment in order to secure his lawful release from TSA control.

5. Defendants' incompetent and negligent conduct directly caused Muir psychological harm beyond the bounds of human decency when Defendants directly caused a significant part of Muir's psyche to be left in limbo at the security checkpoints, compelled to endlessly replay and second-guess the guaranteed-to-lose-choices Muir was coerced to make because; (1) L3 negligently violated its "DeShaney" State-power "Special Relationship" duty and its corresponding "due legal process" duties and negligently failed to reasonably address its certain knowledge of the outrageous false alarm rate of its proprietary ATR software, (2) TSA negligently failed to warn Muir that it had knowingly created an unavoidable environment where Muir's hidden disability, which he had rightfully expected to keep private, could, through no fault of his own, be

2

1    revealed by advanced technology during checkpoint security screening, and (3) Pekoske

2    incompetently violated Muir's well-established right to due legal process and Muir's

3    well-established right to have his serious medical needs acknowledged while he was

4

5    prohibited from acting on his own behalf when Pekoske, in his role as policymaker and

6    an officer sworn to defend the U.S. Constitution, negligently failed to reasonably address

7    known matters of traveler safety with regards to advanced passenger screening

8

9    technology that fell outside of authority granted by 28 U.S.C. § 2680(a) discretionary

10    function exception because matters of safety with regards to state created dangers that

11    cannot be unilaterally avoided are not subject to public policy analysis.

12

13    6. Defendants TSA and Pekoske continue to impermissibly single-out and discriminate

14    against Muir because of his private marital and religious decisions regarding his

15    congenital disability, which unlawfully prevents Muir from exercising his statutory right

16    to travel between the several states by air as granted in 49 U.S.C. § 40103(a)(2) because

17

18    Muir cannot willingly subject himself to the TSA checkpoint "Snake Pit" now that he

19    knows; (1) that it exists, (2) how it functions, (3) how the unavoidable situation it creates

20    has already irreparably damaged him, (4) how his damages were foreseeable and

21

22    preventable, and (5) that something must change before Muir can approach a TSA

23    security checkpoint ever again, and because Muir has followed all laws, rules, procedures

24    and commands in order to fully enjoy his right to fly, it is clear that both the problems to

25    be fixed and the solutions to those problems lie solely with TSA and Pekoske.

26

27                            **JURY TRIAL**

28    7. Muir demands a trial by jury on COUNTS 6-13 and on all other issues so triable.

3

**PARTIES**

8. Plaintiff Muir is a natural married man and U.S. citizen living in Bloomington, Illinois and a qualified individual under 29 U.S.C. § 705(20) and 42 U.S.C. § 12102.

9. Defendant United States Transportation Security Administration ("TSA") is a sub-agency of United States Department of Homeland Security.

10. Defendant David P. Pekoske ("Pekoske") is TSA Administrator and a United States officer.

11. Defendant L3Harris Technologies, Inc. ("L3") is a Delaware for-profit corporation, a United States government contractor and manufacturer of the proprietary Automatic Target Recognition ("ATR") software used in passenger screening at IWA on August 9, 2018 and at PIA on August 12, 2018.

**JURISDICTION & VENUE**

12. Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(a), 1346(b)(1).

13. Venue is proper under 28 U.S.C. § 1391(b)(2), (e)(1)(B) and United States Constitution Article 1, Section 8, Clause 3 (the "commerce clause").

**ALLEGATIONS OF FACT**

14. Muir was lawfully present at IWA on August 9, 2018 around two hours before his scheduled flight time of 1:31 p.m.

15. Prior to his flight, Muir experienced an unpredictable and uncontrollable health emergency at his right groin due to his physical disability and his private marital and religious choices regarding that disability.

16. Muir's choice to repeatedly forgo both emergency and elective surgery to address the

4

symptom manifestations of his congenital physical disability at his right groin is; (1) a constitutionally protected private marital decision, (2) a constitutionally protected matter of religious faith between Muir and the Creator, (3) the sole reason Muir was impermissibly singled out as compared to other similarly-situated travelers, and (4) the well-established, constitutionally protected factor impermissible to discrimination that distinguishes Muir from the rest of his similarly-situated cohort of men with right groin hernias who, unlike Muir, have chosen a surgical option and achieved success to the extent that any symptom manifestations at the right groin do not trigger ATR software false threat alarms at the right groin because of their private healthcare decisions to pursue a surgical option.

17. Muir was within his statutory right to travel by air because his unpredictable, uncontrollable, disability-caused health emergency was a danger only to him.

18. Muir presented himself for mandatory passenger screening.

19. TSA failed to warn Muir; (1) that his reasonable expectation of privacy could be violated during the security screening process, (2) that his hidden congenital physical disability and his private marital and religious choices regarding his disability, which he rightfully intended to keep private, could be revealed by advanced checkpoint screening technology, (3) that he could be singled out as compared to other similarly–situated travelers because of his private marital and religious choices regarding his congenital disability, or (4) that he would be forced to submit to a physical "pat-down" in order to resolve a threat alarm, regardless of the reason for the alarm, even if the sole reason for the alarm was a serious medical emergency due to a private marital and religious decision

5

with regards to the unpredictable and uncontrollable symptom manifestations of a completely human tissue congenital disability beneath his skin and even if his desire to keep his hidden disability and his choices regarding his disability private was recognized and protected by the United States Constitution and the Arizona Constitution and federal and Arizona law.

20. TSA scanned Muir's valid Allegiant Air flight #104 boarding pass and verified his identity using his "REAL ID" state-issued identification.

21. TSA scanned Muir's personal property using x-ray machine.

22. TSA had, at this point, established physical control of Muir as he was prevented by federal law from disobeying TSA personnel or leaving the checkpoint without TSA permission and he could not unilaterally end the screening process without facing punishment, which included civil fines up to $10,000, criminal fines up to $250,000, criminal prosecution and up to ten years imprisonment (18 U.S.C. § 3571, 49 U.S.C. §§ 46301, 46503).

23. TSA scanned Muir's full body in required "hands-up" position.

24. L3's proprietary ATR software processed Muir's passenger screening data image in order to search Muir for anomalies and threats on his body in accordance with 49 U.S.C. § 44901(l)(A)(i) and 49 C.F.R. § 1540.107(d)(1)(i).

25. L3's proprietary ATR software returned a false threat alarm at Muir's right groin that misidentified the uncontrollable symptom manifestations of Muir's congenital physical disability at his right groin as a foreign material object on the surface of his skin at his right groin.

26. Muir's congenital disability at his right groin is entirely human tissue, entirely underneath his skin and entirely consistent with his expected reproductive anatomy.

27. L3's proprietary ATR software singled out Muir as compared to other similarly-situated travelers and returned a false threat alarm at Muir's right groin because of his private marital and religious decision regarding his congenital disability at his right groin.

28. Based solely on the false right groin threat alarm generated by L3's proprietary ATR software, TSA moved Muir for mandatory additional interrogation and separated him from his personal property, which was cleared to enter the sterile area.

29. TSA informed Muir that a physical screening of his right groin was required.

30. Muir was never previously informed that a physical "pat-down" was required by TSA policy to resolve an ATR software threat alarm and that no other options were available to clear ATR software threat alarms and that TSA agents had no discretion to make exceptions or deviate from official TSA policy for any reason.

31. Muir informed TSA that he was experiencing a serious medical emergency and that nobody, including his doctor, had ever touched him at his right groin during a disability-related medical emergency and that being touched at his right groin would result in extreme physical pain and could endanger his life and he ordered TSA not to touch him at his right groin.

32. TSA, as a matter of strict policy, consciously and deliberately disregarded Muir's serious medical needs, informed Muir that a physical screening of his right groin was mandatory and coerced Muir to choose a punishment, without due legal process, in order to secure his lawful release from TSA.

33. Muir had no criminal record and had never been arrested or charged with any crime or offense and strongly desired to keep his reputation intact and to not be arrested and sent to jail, especially considering he had followed all laws, rules, procedures and TSA personnel instructions and was desperate to reunite with his wife in the sterile area so that she could help him with the symptoms of his medical emergency, as she had done for years.

34. Muir was permanently damaged and suffers severe ongoing psychological distress and disturbing physical manifestations as a direct result of being impermissibly singled out and coerced to make the unconstitutional, unlawful and unethical choice to, while experiencing the altered and diminished mental capacity that accompanies a painful medical emergency, make a guaranteed-to-lose choice and decide his own punishment, without due legal process, in order to secure his lawful release from TSA control because of his private marital and religious choice regarding his hidden physical disability, which was his most private of ailments that he had rightfully expected to keep private.

35. Muir was lawfully present at PIA on August 12, 2018 around two hours before his scheduled flight time of 7:15 p.m.

36. Prior to his flight, Muir experienced an unpredictable and uncontrollable health emergency at his right groin due to his congenital disability and his private marital and religious choices regarding his disability.

37. Muir presented himself for mandatory passenger screening.

38. TSA failed to warn Muir; (1) that his reasonable expectation of privacy could be violated during the security screening process, (2) that his hidden congenital physical

8

1   disability and his private marital and religious choices regarding his disability, which he
2   rightfully intended to keep private, could be revealed by advanced checkpoint screening
3
4   technology, (3) that he could be singled out as compared to other similarly–situated
5   travelers because of his private marital and religious choices regarding his congenital
6   disability, or (4) that he would be forced to submit to a physical "pat–down" in order to
7   resolve a threat alarm, regardless of the reason for the alarm, even if the sole reason for
8
9   the alarm was a serious medical emergency due to a private marital and religious decision
10  with regards to the unpredictable and uncontrollable symptom manifestations of a
11  completely human tissue congenital disability beneath his skin and even if his desire to
12
13  keep his hidden disability and his choices regarding his disability private was recognized
14  and protected by the United States Constitution, the Constitution of the State of Illinois
15  federal law and Illinois state law.

16  39. TSA scanned Muir's valid Allegiant Air flight #105 boarding pass and verified his
17
18  identity using his "REAL ID" state-issued identification.

19  40. TSA scanned Muir's personal property using x-ray machine.

20  41. TSA had, at this point, established physical control of Muir as he was prevented by
21
22  federal law from disobeying TSA personnel or leaving the checkpoint without TSA
23  permission and he could not unilaterally end the screening process without facing
24  punishment, which included civil fines up to $10,000, criminal fines up to $250,000,
25
26  criminal prosecution and up to ten years imprisonment (18 U.S.C. § 3571, 49 U.S.C. §§
27  46301, 46503).

28  42. TSA scanned Muir's full body in required "hands-up" position.

9

43. L3's proprietary ATR software processed Muir's passenger screening data image in order to search Muir for anomalies and threats on his body in accordance with 49 U.S.C. § 44901(l)(A)(i) and 49 C.F.R. § 1540.107(d)(1)(i).

44. L3's proprietary ATR software returned a false threat alarm at Muir's right groin that misidentified the uncontrollable symptom manifestation of Muir's congenital physical disability at his right groin as a foreign material object on the surface of his skin at his right groin.

45. L3's proprietary ATR software singled out Muir as compared to other similarly-situated travelers and returned a false threat alarm at Muir's right groin because of his private marital and religious decision regarding his congenital disability at his right groin.

46. Muir's congenital disability at his right groin is entirely human tissue, entirely underneath his skin and entirely consistent with his expected reproductive anatomy.

47. Based solely on the false right groin threat alarm generated by L3's proprietary ATR software, TSA moved Muir for mandatory additional interrogation and separated him from his personal property, which was cleared to enter the sterile area.

48. TSA informed Muir that a physical screening of his right groin was required.

49. Muir was not aware at the time that his physical disability at his right groin and his private marital and religious choices regarding that disability were the reasons that; (1) a false ATR software threat alarm was triggered, and (2) he was required to undergo a physical pat-down to resolve the false ATR software threat alarm at his right groin and that no other options were available to clear ATR software threat alarms.

50. Muir informed TSA that, due to his congenital disorder and current medical

1  condition, being touched at the right groin could potentially endanger his life and he

2  ordered TSA not to touch his right groin and he informed TSA that physical contact at his

3  
4  right groin would result in immediate and extreme physical pain for him.

5  51. TSA moved Muir to a private area under TSA control for additional interrogation.

6  52. TSA informed Muir that a physical screening of his right groin was required.

7  53. Muir refused TSA a physical screening of his right groin due to the extreme physical
8  
9  pain that would result from being physically touched at his right groin and offered to

10  lower his pants and underwear to show TSA the completely beneath the skin, disability-

11  caused hernia at his right groin.

12  
54. Muir believed this was a reasonable alternative to being physically touched at his
13  
14  right groin because it would have accomplished the goal of completely screening for

15  weapons, explosives, incendiary items and other contraband or security threats.

16  
55. TSA, as a matter of strict policy, consciously and deliberately disregarded Muir's
17  
18  serious medical needs and refused what Muir believed was a reasonable alternative to

19  secure his lawful release from TSA interrogation.

20  
56. Muir was desperate to end the interrogation due to the severe pain and altered mental
21  
22  state he was experiencing due to the symptom manifestations of his physical disability.

23  57. TSA was indifferent to Muir's compromised condition and refused all of Muir's pleas

24  for an alternative to a physical pat-down to resolve the false threat alarm at his right

25  
26  groin.

27  58. Muir was coerced, without due legal process, to choose a punishment in order to

28  secure his lawful release from TSA control.

11

59. Muir was permanently damaged and suffers severe ongoing psychological distress and disturbing physical manifestations as a direct result of being impermissibly singled out and coerced to make the unconstitutional, unlawful and unethical choice to, while experiencing the debilitating effects of a painful medical emergency, make a guaranteed-to-lose choice and, without due legal process, decide his own punishment in order to secure his lawful release from TSA control so that he could regain the freedom to properly attend to his serious medical needs.

60. Muir made claims regarding the August 9, 2018 and August, 12, 2018 incidents with TSA Passenger Support, Department of Homeland Security Office for Civil Rights and Civil Liberties, DHS TRIP Program and Congressman Greg Stanton's office and was unable to achieve redress through any of those avenues.

## CLAIMS FOR RELIEF - UNITED STATES – FEDERAL TORT CLAIMS ACT -

### TSA Claim No. 2019101363533 – Arizona – August 9, 2018

61. Muir filed TSA Claim No. 2019101363533 on September 16, 2019 based on the negligent and wrongful acts of TSA that occurred at IWA on August 9, 2018.

62. TSA denied Claim No. 2019101363533 on May 28, 2020 via certified mail No. 7016 1970 0000 5247 7406.

### COUNT 1 – Arizona – Personal Injury – Negligence – Failure to Warn

63. Muir was required by law (49 U.S.C. §§ 46301, 46503, 49 C.F.R. § 1540.109) to follow TSA instructions and not interfere with TSA personnel when in TSA control and separated from his security-screened and cleared property.

64. A reasonable person would agree with Muir in his belief that; (1) Muir was not free to

leave the checkpoint without TSA authorization, (2) TSA's deliberate indifference towards Muir's serious medical needs while Muir was under TSA control and prohibited from acting on his own behalf is "repugnant to the conscience of mankind", (3) the intentional application of physical pressure to the exact site of Muir's serious and extremely painful medical emergency during a required "pat-down", by non-medically-trained TSA personnel wielding the power of the State, after Muir had clearly informed TSA that any contact at the site of his serious medical emergency was guaranteed to cause extreme physical pain and could endanger his life, could not be considered anything other than a punishment to Muir or anyone else so similarly-situated, and (4) TSA personnel strictly adhering to official TSA policy regarding the security checkpoint administrative search process could in no way be considered assault, battery or false imprisonment.

65. The Court stated in *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 199 - 200 (1989):

> "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."

> "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."

> "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."

13

66. TSA control of Muir during the checkpoint screening process satisfies the "deprivation of liberty" threshold triggering the protections of the Due Process Clause as a reasonable person would agree with Muir in his belief that he was not free to act on his own behalf to unilaterally end the screening process due to serious health and safety reasons once his congenital disability and corresponding medical emergency, which he had rightfully expected to keep private, was revealed as a false threat at his right groin requiring a physical pat-down to resolve, but was instead required by law and coerced by TSA, in a negligent and incompetent abuse of State power, to obey TSA personnel against his will and to choose a punishment, without due legal process, in order to secure his lawful release from TSA control.

67. TSA had a *DeShaney* "Special Relationship" affirmative duty of reasonable care to keep Muir safe from the unreasonable risk of unnecessary harm while Muir was in TSA control because of the difference in power created between Muir and TSA during the mandatory checkpoint security screening process.

68. Judge Posner stated in *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982):

> "We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."

69. A reasonable person would agree with Muir in his belief that TSA had certain knowledge that false ATR software threat alarms led to intrusive and unnecessary pat-downs and a reasonable person would also agree with Muir in his belief that TSA failing

14

to warn Muir that L3's proprietary ATR software could reveal his hidden congenital disability and his private marital and religious choices regarding his disability (and that he could not and would not know if he had been impermissibly singled out until after he had already begun the process and that he would have no way to terminate the process once it had begun, even if completing the process posed a threat to his life because of a disability-caused medical emergency) is exactly the type of "Snake Pit" that Judge Posner described.

70. A reasonable person would agree with Muir in his belief that TSA knew or should have known that; (1) hidden physical disabilities could be revealed by its advanced passenger screening technology, (2) disability is a natural part of human existence and millions of people suffer from disabilities, including people who exercise their right to travel by air, (3) Muir was within his statutory right to travel by air because his disability was a danger only to him, (4) a male groin hernia is medically common, and (5) TSA is bound by Rehabilitation Act Section 504, codified as 29 U.S.C. § 794.

71. TSA breached its duty to Muir when it negligently and incompetently exposed Muir to the unreasonable risk of unnecessary harm when TSA failed to warn Muir that TSA had knowingly created the unavoidable situation at TSA checkpoints where; (1) Muir's reasonable expectation of privacy regarding his hidden congenital physical disability could, through no fault of his own, be violated, (2) Muir's private marital and religious choices regarding his disability, which he rightfully intended to keep private, could be revealed by advanced technology, (3) Muir could be singled out as compared to other similarly–situated travelers because of his private marital and religious choices regarding

15

1  his congenital disability, (4) Muir could not lawfully unilaterally end the screening

2  process for any reason, including a serious medical emergency, once the process had

3
   begun, and (5) Muir would be required to resolve all ATR software threat alarms with a
4
5  physical pat-down, regardless of the reason for the alarm, even if the reason was a

6  congenital physical disability and the private marital and religious choices regarding that

7  disability that Muir had rightfully expected to keep private.

8
   72. TSA negligently abused State power and affirmatively placed Muir in a worse
9
10 position than he would have been (Muir was presumed to be a security threat based solely

11 on the threat alarm at his right groin, which was based solely on unlawful discrimination

12
   due to his physical disability and his private marital and religious choices regarding his
13
14 disability, and Muir was forced to choose a punishment without due legal process) had he

15 not, without warning, come into mandatory contact with TSA advanced technology

16
   screening procedures while in State custody.
17
18 73. TSA did not have discretion in deciding whether or not to warn Muir of a known

19 danger it created and that Muir could not avoid while in TSA control because matters of

20 safety are not subject to 28 U.S.C. § 2680(a) discretionary function exception.

21
22 74. TSA conduct is the direct cause of Muir's injuries and they could not have happened

23 but for TSA conduct and the unreasonable risk of arbitrary, unjustifiable, unnecessary,

24 foreseeable and preventable harm TSA created in failing to warn Muir of a known danger

25
   it created and that Muir could not unilaterally avoid without punishment.
26
27 75. Muir was severely and permanently damaged beyond the bounds of human decency

28 because of TSA conduct. TSA abused State power and violated; (1) Muir's right to

marital privacy, (2) Muir's right to religious freedom, (3) Muir's well-established right to due legal process, (4) Muir's well-established right to have his serious medical needs addressed when he was prohibited by law from acting on his own behalf, and (5) Muir's sanity. TSA conduct instigated creation of the menacing psychological presence Muir now knows as "The Shadow" and caused Muir to suffer from involuntary movements, panic attacks, psychological pain, groin pain, physical pain, overwhelming anxiety and persistent mental anguish from being coerced, without due legal process, to choose his own punishment in order to regain the freedom to attend to his serious medical needs by securing his lawful release from the TSA "Snake Pit", which is where a significant part of Muir's psyche now resides in limbo, compelled to endlessly replay and second-guess the guaranteed-to-lose-choice he was coerced to make against his free will and in violation of the Great Charter.

## **COUNT 2 – Arizona – Negligent Infliction of Emotional Distress**

76. TSA conduct was extreme and outrageous when it recklessly disregarded the certain knowledge that failing to warn Muir that TSA had created the situation and conditions where; (1) Muir's hidden congenital disability that he rightfully intended to keep private could be revealed by its advanced screening technology, (2) Muir's beneath the skin human tissue congenital disability could be falsely identified as a foreign object on the surface of his skin which would require a physical pat-down to resolve, (3) false threat alarms were common and led directly to required physical pat-downs to resolve the alarms, whether false or not, and (4) there was no threat alarm physical pat-down exception for medical emergencies during the checkpoint screening process, would result

in severe psychological injury and severe emotional distress for Muir when he suffered from an unpredictable and uncontrollable disability-caused medical emergency that presented in a way (groin hernia) that affects approximately 25% of the male population and he had no way to end the screening process without being punished without due legal process.

77. TSA checkpoint purgatory, where Muir cannot know if TSA will impermissibly single him out and discriminate against him because of his disability and his private marital and religious choices regarding that disability until after his passenger screening data image has been processed by L3's proprietary ATR software, is a "Snake Pit" for Muir that has no exit without punishment and punishment without due legal process is a violation of Muir's well-established rights.

78. A reasonable person would agree with Muir that TSA failing to warn Muir of a strict policy that (1) fails to recognize the medical emergencies of interstate travelers to whom TSA had a DeShaney "Special Relationship" duty of reasonable care towards, and (2) cannot be altered, is negligent and incompetent.

79. TSA did not have discretion in deciding whether or not to warn Muir of a known danger it created because matters of safety are not subject to 28 U.S.C. § 2680(a) discretionary function exception.

80. TSA violated Muir's well-established rights when it (1) failed to warn Muir that TSA would, as a matter of strict policy with regards to the resolution of threat alarms, consciously disregard the serious medical emergency of a person in TSA physical control and who was prohibited from acting on his own behalf, and (2) consciously disregarded

18

Muir's serious medical needs while Muir was in TSA control.

81. Muir was psychologically and emotionally damaged as a direct result of TSA conduct and incompetent violations of U.S. Constitution Amendment V and VIII are not protected by sovereign immunity and TSA is liable to Muir for his psychological injuries.

## CLAIMS FOR RELIEF - UNITED STATES – FEDERAL TORT CLAIMS ACT –

### TSA Claim No. 2019091962941 – Illinois – August 12, 2018

82. Muir filed TSA Claim No. 2019091962941 on September 5, 2019 based on the negligent and wrongful acts of TSA that occurred at PIA on August 12, 2018.

83. TSA denied Claim No. 2019091962941 on May 28, 2020 via certified mail No. 7016 1970 0000 5247 7376.

### COUNT 3 – Illinois - Personal Injury – Negligence – Failure to Warn

84. Muir was required by law to follow TSA instructions and not interfere with TSA personnel when in TSA control and separated from his security-screened and cleared property.

85. A reasonable person would agree with Muir in his belief that he was not free to leave the checkpoint without TSA authorization.

86. TSA control of Muir during the checkpoint screening process satisfies the Due Process Clause "deprivation of liberty" threshold as a reasonable person would agree with Muir in his belief that he was not free to act on his own behalf to unilaterally end the screening once his congenital disability was revealed as a false threat at his right groin requiring a physical pat-down to resolve, but was instead required by law to obey TSA personnel against his will.

19

87. TSA had a *DeShaney* "Special Relationship" affirmative duty of reasonable care to keep Muir safe from the unreasonable risk of unnecessary harm while Muir was in TSA control because of the difference in power created between Muir and TSA during the mandatory checkpoint screening process.

88. A reasonable person would agree with Muir in his belief that TSA knew or should have known that; (1) hidden physical disabilities could be revealed by its advanced passenger screening technology, (2) disability is a natural part of human existence and millions of people suffer from disabilities, including people who exercise their right to travel by air, (3) Muir was within his statutory right to travel by air because his disability was a danger only to him, (4) a male groin hernia could in no way be considered rare, and (5) TSA is bound by Rehabilitation Act Section 504, codified as 29 U.S.C. § 794(a).

89. TSA breached its duty to Muir when it negligently and incompetently exposed Muir to the unreasonable risk of unnecessary, foreseeable and preventable harm when TSA failed to warn Muir that TSA had knowingly created the unavoidable situation at TSA checkpoints where; (1) Muir's reasonable expectation of privacy regarding his hidden congenital physical disability could, through no fault of his own, be violated, (2) Muir's private marital and religious choices regarding his disability, which he rightfully intended to keep private, could be revealed by advanced technology, (3) Muir could be singled out as compared to other similarly–situated travelers because of his private marital and religious choices regarding his congenital disability, (4) Muir could not lawfully unilaterally end the screening process for any reason, including a serious medical emergency, once the process had begun, and (5) Muir would be required to resolve all

20

ATR software threat alarms with a physical pat-down, regardless of the reason for the alarm, even if the reason was a congenital physical disability and the private marital and religious choices regarding that disability that Muir had rightfully expected to keep private.

90. TSA abused State power and affirmatively placed Muir in a worse position than he would have been (Muir was presumed to be a security threat based solely on the threat alarm at his right groin, which was based solely on unlawful discrimination due to his physical disability and his private marital and religious choices regarding that disability, and Muir was coerced, without due legal process, to choose a punishment) had he not, without warning, come into mandatory contact with TSA advanced technology and screening procedures while in State custody.

91. TSA did not have discretion in deciding whether or not to warn Muir of a known danger it created and that Muir could not avoid because matters of safety are not subject to 28 U.S.C. § 2680(a) discretionary function exception.

92. TSA conduct is the direct cause of Muir's injuries and they could not have happened but for TSA conduct and the unreasonable risk of unjustifiable and unnecessary harm TSA created in failing to warn Muir of a known danger it created and that Muir could not unilaterally avoid without punishment.

93. Muir was severely and permanently damaged beyond the bounds of human decency because of TSA conduct. TSA violated Muir's private relationship with the Creator, violated Muir's right to marital privacy, instigated creation of "The Shadow", and caused Muir to suffer from involuntary movements, panic attacks, psychological pain, groin

pain, physical pain, overwhelming anxiety and persistent mental anguish from having been coerced to choose without due legal process, his own ex-judicial punishment when he had followed all TSA instructions and done absolutely nothing wrong.

94. Facts show that but for TSA's negligence in failing to warn Muir of a known "state created danger" TSA created and Muir could not unilaterally avoid that Muir's personal injury would not have occurred and he would not have suffered this great and lasting psychological harm because if Muir would have be warned about the known safety risks that TSA advanced passenger screening technology posed to him and others like him in the protected class, he wouldn't have gone anywhere near a TSA checkpoint.

95. Muir suffered great psychological harm and severe and lasting emotional distress directly because of TSA's negligent conduct.

### COUNT 4 – Illinois – Negligent Infliction of Emotional Distress

96. Muir was required by law to follow TSA instructions when in TSA control and separated from his security-screened and cleared property.

97. Therefore, TSA had an affirmative duty of reasonable care to keep Muir safe from the unreasonable risk of unnecessary harm while Muir was in physical control of TSA.

98. TSA violated its duty of reasonable care when it failed to warn Muir of a known danger TSA had created and that Muir could not avoid once he was in TSA control.

99. TSA's failure to warn Muir led directly to his severe emotional trauma and lasting emotional distress to the point of ongoing physical manifestations that consistently result in an involuntary tightening of his throat, shortness and shallowness of his breath, nausea, a need to close his eyes and turn his head quickly to the left and involuntary muscle

tightening.

100. TSA conduct was the proximate cause of Muir's emotional distress as it could not have occurred but for TSA's incompetent and negligent actions in failing to warn Muir of the known safety risk that his hidden physical disability could, through no fault of his own, be exposed by advanced technology during the checkpoint security screening process.

101. TSA "purgatory" was a "zone of danger" where the realization that Muir had to, without due legal process, choose his own punishment in order to secure his lawful release from TSA control so he could attend to his serious medical needs directly caused Muir's unnecessary mental anguish and it was a clear violation of his well-established rights going back over eight hundred years.

## COUNT 5 – Illinois – Hate Crime – 720 ILCS 5/12-7.1(a) - Disorderly Conduct - 720 ILCS 5/26-1(a)(1)

102. TSA committed hate crime when, by reason of the actual physical disability of Muir, regardless of the existence of any other motivating factor or factors, TSA committed disorderly conduct when; (1) TSA knowingly breached its duty of reasonable care when it failed to warn Muir of a known danger it created (that Muir could be impermissibly singled out because of his private marital and religious choices regarding his disability through TSA's use of advanced screening technology) that Muir could not avoid, which directly led to Muir unknowingly entering the TSA checkpoint "Snake Pit", which directly led to an unavoidable breach of the peace and Muir being greatly disturbed by both the public revelation of his private physical disability and his private martial and

religious choices regarding that disability which he had rightfully intended to keep private, and the prospect of having to, without due legal process, choose a punishment in order to secure lawful release from TSA control and regain his freedom to attend to his serious medical emergency, and (2) TSA conduct satisfied 775 ILCS 5/1-102(Q) when TSA singled out Muir because of Muir's determinable physical disability at his right groin, and knowingly disregarded Muir's serious medical needs in violation of his well-established rights while he was under TSA control, which deeply disturbed Muir and directly and immediately resulted in a breach of the peace and Muir's unnecessary mental anguish over being impermissibly singled out for his private marital and religious choice regarding his congenital disability.

103. 28 U.S.C. § 2680(a) discretionary function exception does not apply to TSA's "Special Relationship" affirmative duty of reasonable care to warn persons in physical control of TSA of; (1) known safety risks created by TSA, and (2) the unnecessary risk of unreasonable harm those known but unavoidable safety risks presented to persons under TSA control.

104. 28 U.S.C. § 2680(h) does not include hate crime and disorderly conduct claims as codified in Illinois as 720 ILCS 5/12-7.1(a) and 720 ILCS 5/26-1(a)(1) respectively.

105. A reasonable person would agree with Muir in his belief that the routine execution of an administrative search according to official policy cannot be assault, battery or false imprisonment.

106. A reasonable person would agree with Muir in his belief that being mentally and emotionally disturbed by being impermissibly singled out due to the revelation of a

24

hidden disability and the private marital and religious decision with regards to a congenital disability-caused health emergency has nothing to do with assault, battery or false imprisonment, but it is clearly outrageous, unreasonable and unconstitutional and completely satisfies the definition of unlawful discrimination as stated in 775 ILCS 5/1-102(Q) and is "repugnant to the conscience of mankind" and therefore cannot be tolerated in civilized society.

## CLAIMS FOR RELIEF – L3

## COUNT 6 – Arizona – Personal Injury – Negligence

107. L3 had a "Special Relationship" affirmative duty of reasonable care towards Muir as a result of the power imbalance created between L3 and Muir during the passenger screening data image search by L3's proprietary ATR software.

108. A reasonable person would agree with Muir in his belief that; (1) L3 acted incompetently when it failed to address the problems with its ATR software source code and, (2) L3 breached its duty to Muir when it negligently failed to reasonably address its outrageous ATR software false alarm rates.

109. A reasonable person would agree with Muir in his belief that L3 knew or should have known that its proprietary ATR software was directly responsible for an outrageously high percentage of false threat alarms that interfered in the liberty interest of United States citizens at facilities of interstate commerce.

110. L3 abused State power and leveraged its checkpoint security "portal" SAFETY Act certification and position as the monopoly provider for ATR software to TSA in order to coerce travelers into agreeing to invasive and unnecessary pat-downs because it was far

25

1   more cost effective than fixing the ATR software source code to reasonably reduce the

2   known percentage of false threat alarms.

3
    111. L3 directly caused Muir's injuries because it was L3's proprietary ATR software
4
5   that impermissibly singled out Muir as compared to other similarly-situated travelers

6   when it falsely alarmed on Muir's hidden physical disability because of Muir's private

7   marital and religious choices regarding his disability.

8
    112. L3 was in exclusive control of its proprietary ATR software source code.
9

10  113. Facts show that but for L3's negligent conduct in failing to reasonably address its

11  ATR software false threat alarm rate, Muir's injuries would not have occurred because

12
    Muir's descent into TSA "purgatory", where Muir's well-established rights are violated
13

14  and he is coerced into, without due legal process, choosing his own punishment so he can

15  regain the freedom to attend to his serious medical needs, does not occur unless L3's

16
    ATR software falsely alarms on Muir's right groin, impermissibly singling him out
17

18  because of his physical disability and his private marital and religious choices regarding

19  his disability.

20
    114. Muir was damaged beyond the bounds of human decency when he was sentenced to
21

22  permanently relive and question every moment of his time in TSA "purgatory" and this

23  perpetual psychological torture at the hands of "The Shadow" is arbitrary, unnecessary,

24  serves no legitimate government interest and has been wrongful conduct since 1215.

25
    115. The defenses embodied in the SAFETY Act are rooted in sovereign immunity.
26

27  116. Sovereign immunity does not extend to incompetent violations of Muir's well-

28  established rights.

26

117. Therefore, L3 is not entitled to immunity from suit for negligence involving the violation of Muir's well-established rights to; (1) due legal process, (2) freely exercise his liberty interest at a facility of interstate travel, and (3) be free from coercion.

## COUNT 7 – Arizona – Negligent Infliction of Emotional Distress

118. L3's conduct was incompetent, extreme and outrageous when it recklessly disregarded the certain knowledge that; (1) L3's proprietary ATR software was directly responsible for interfering with the liberty interest of United States citizens at facilities of interstate commerce, (2) L3's ATR software false threat alarms were common and led directly to required physical pat-downs to resolve the alarms, whether false or not, (3) millions of people have disabilities, including those who travel by air, and (4) there was no threat alarm physical pat-down exception for medical emergencies during the checkpoint screening process, and that disregarding that knowledge would result in severe psychological injury and severe emotional distress for Muir when he suffered from an unpredictable and uncontrollable disability-caused medical emergency that presented in a way (groin hernia) that affects approximately 25% of the male population and he had no way to end the screening process without being punished without due legal process.

119. Checkpoint "purgatory", where Muir cannot know if L3's proprietary ATR software will impermissibly single him out and discriminate against him because of his disability and his private marital and religious choices regarding that disability until after his passenger screening data image has been processed by L3's proprietary ATR software, is a "Snake Pit" for Muir that has no exit without punishment and punishment without due legal process is a violation of Muir's well-established rights.

120. A reasonable person would agree with Muir in his belief that L3 failing to reasonably address the outrageous percentage of false threat alarms that, on a daily, hourly and minute by minute basis, interfered with and disturbed interstate travelers to whom L3 had a duty of reasonable care towards, is negligent and incompetent.

121. L3 did not have discretion in deciding whether or not to address the source of a known danger it created because matters of safety regarding known state-created dangers are not subject to public policy analysis and are not subject to 28 U.S.C. § 2680(a) discretionary function exception.

122. L3 violated Muir's well-established rights when L3 breached its affirmative duty to Muir and failed to reasonably address a known and fixable problem with its ATR software that Muir could not unilaterally avoid while under State control.

123. Muir was psychologically and emotionally damaged as a direct result of L3's conduct and incompetent violations of U.S. Constitution Amendment V and VIII are not protected by sovereign immunity or defenses rooted in sovereign immunity and L3 is liable to Muir for his psychological injuries.

## **COUNT 8 – Illinois - Personal Injury – Negligence**

124. Muir was required by law to have his passenger screening data image searched by L3's proprietary ATR software.

125. A reasonable person would agree with Muir in his belief that he was not free to avoid contact with L3's software.

126. L3 had a *DeShaney* "Special Relationship" affirmative duty of reasonable care to keep Muir safe from the unreasonable risk of unnecessary harm while Muir's passenger

28

screening data image was being searched by L3's software because of the difference in power created between Muir and L3 during the mandatory image search.

127. A reasonable person would agree with Muir in his belief that L3 knew or should have known that; (1) hidden physical disabilities could be revealed by its advanced technology, (2) disability is a natural part of human existence and millions of people suffer from disabilities, including people who exercise their right to travel by air, (3) Muir was within his statutory right to travel by air because his disability was a danger only to him, (4) a male groin hernia is medically common, and (5) L3 is bound by the United States Constitution and the well-established rights found in common law going back to the Great Charter and that there can be no rulemaking which would override those well-established rights, especially the right to due legal process.

128. L3 breached its duty to Muir when it negligently and incompetently exposed Muir to the unreasonable risk of unnecessary, foreseeable and preventable harm when L3 failed to reasonably address the known problems with its proprietary ATR software that L3 knew or should have known could; (1) violate Muir's reasonable expectation of privacy regarding his hidden congenital physical disability, (2) violate Muir's private marital and religious choices regarding his disability, (3) single out Muir as compared to other similarly–situated travelers because of his private marital and religious choices regarding his congenital disability, and (4) require Muir to resolve all ATR software threat alarms with a physical pat-down, regardless of the reason for the alarm, even if the reason was a congenital physical disability and the private marital and religious choices regarding that disability that Muir had rightfully expected to keep private.

129. L3 abused State power and affirmatively placed Muir in a worse position than he would have been (Muir was presumed to be a security threat based solely on the threat alarm at his right groin, which was based solely on unlawful discrimination due to his physical disability and his private marital and religious choices regarding that disability, and Muir was coerced, without due legal process, to choose a punishment) had he not, without warning, come into mandatory contact with L3's proprietary ATR software while in State custody.

130. L3 did not have discretion in deciding whether or not to reasonably address a known danger it created and that Muir could not avoid because matters of safety are not subject to 28 U.S.C. § 2680(a) discretionary function exception.

131. L3 conduct is the direct cause of Muir's injuries and they could not have happened but for L3 conduct and the unreasonable risk of unjustifiable and unnecessary harm L3 created in failing to competently and reasonably address a known danger it created and that Muir could not unilaterally avoid.

132. Muir was severely and permanently damaged beyond the bounds of human decency because of L3's conduct. L3 violated Muir's private relationship with the Creator, violated Muir's right to marital privacy, instigated creation of "The Shadow", and caused Muir to suffer from involuntary movements, panic attacks, psychological pain, groin pain, physical pain, overwhelming anxiety and persistent mental anguish from having been coerced to choose without due legal process, his own ex-judicial punishment when he had followed all instructions and done absolutely nothing wrong.

133. Facts show that but for L3's negligence in failing to reasonably address the known

"state created danger" L3 created and Muir could not unilaterally avoid that Muir's personal injury would not have occurred and he would not have suffered this great and lasting psychological harm because if L3 would have reasonably addressed the known, persistent, quantifiable problems of its proprietary ATR software, Muir wouldn't have been impermissibly singled out and damaged.

134. Muir suffered great psychological harm and severe and lasting emotional distress with painful physical manifestations directly because of L3's negligent and incompetent conduct.

## COUNT 9 – Illinois – Negligent Infliction of Emotional Distress

135. L3 had a duty of reasonable care to keep Muir safe from the unreasonable risk of unnecessary harm while Muir's passenger screening data image was searched by L3's proprietary ATR software.

136. L3 violated its duty of reasonable care when it failed to reasonably address the known problems with its proprietary ATR software that Muir could not unilaterally avoid while in State custody.

137. L3's failure to reasonably address known problems with its ATR software source code which was under its sole control, led directly to Muir's severe emotional trauma and lasting emotional distress to the point of ongoing physical manifestations that consistently result in an involuntary tightening of his throat, shortness and shallowness of his breath, nausea, a need to close his eyes and turn his head quickly to the left and involuntary muscle tightening.

138. L3's conduct was the proximate cause of Muir's emotional distress as it could not

31

have occurred but for L3's incompetent and negligent actions in breaching its affirmative duty and failing to address known problems and safety risks with its proprietary ATR software.

139. L3 created a "zone of danger" where the realization that Muir had to, without due legal process, choose his own punishment in order to secure his lawful release from TSA control so he could attend to his serious medical needs directly caused Muir's unnecessary mental anguish and it was a clear violation of his well-established rights going back over eight hundred years.

## COUNT 10 - Illinois - Hate Crime – 720 ILCS 5/12-7.1(a) - Disorderly Conduct - 720 ILCS 5/26-1(a)(1)

140. L3 committed hate crime at PIA on August 12, 2018, when, by reason of the actual physical disability of Muir, regardless of the existence of any other motivating factor or factors, L3 committed disorderly conduct when L3 negligently and incompetently breached its *DeShaney* "Special Relationship" affirmative duty of reasonable care to Muir when it failed to take reasonable steps to modify its proprietary ATR software source code to reduce the outrageous and unreasonable false threat alarm rate that L3 knew was directly responsible for interfering with the liberty interests of United States citizens at facilities of interstate travel, which deeply intimidated and disturbed Muir and directly and immediately resulted in a breach of the peace and Muir's unnecessary mental anguish at being singled out as compared to other similarly-situated travelers and coerced to, without due legal process, choose his own punishment because of the revelation of his hidden physical disability and his private marital and religious decision regarding that

32

disability, which he had rightfully intended to keep private.

141. A reasonable person would agree with Muir in his belief that L3 acted incompetently in; (1) L3's failure to address its certain knowledge of the outrageously high level of false alarms its proprietary ATR software generated and (2) L3's disregard of the certain knowledge that its proprietary ATR software interfered with United States citizens' liberty at a facility of interstate commerce by leveraging the power of the State and L3's ATR software product monopoly-provider position to coerce travelers into consenting to unnecessary and invasive physical pat-downs in order to resolve false threat alarms created by L3's proprietary ATR software.

142. A reasonable person would agree with Muir in his belief that L3's incompetent actions are in violation of Muir's well-established right to due legal process and that this incompetence is disorderly and that constant false threat alarms literally alarm the public and provoke a nearly-constant breach of the peace.

143. Mr. Justice Harlan stated in *Katz v. United States*, 389 U.S. 347, 361 (1967) that:

> "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."

144. The "Reasonable Expectation of Privacy" Test – The "Katz" test is applicable.

145. Muir exhibited an actual expectation of privacy in wanting to keep his physical disability private.

146. Therefore, the first prong of the "Katz" test is satisfied.

33

1  147. Society recognized that Muir's expectation of privacy with regards to his private

2  health information was "reasonable" as lawmakers have recognized "Full face

3
4  photographic images and any comparable images" as "Protected Health Information" in

5  laws including "HIPAA" and "HITECH" (and in Illinois, in "BIPA") and the U.S.

6  Supreme Court has recognized that the right to marital privacy, the right to the free

7  exercise of religion and the right to be free from coercion are well-established rights

8
9  beyond debate.

10  148. Therefore, the second prong of the "Katz" test is satisfied.

11  149. Both prongs of the "Katz" test are satisfied, therefore, Muir had a reasonable

12
13  expectation of privacy with regards to keeping his congenital disability and his private

14  marital and religious decision regarding that disability private.

15  150. The "Boyle" Test - *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988) is

16  applicable.

17
18  151. Airport checkpoint security screening is a uniquely federal interest. Therefore, the

19  first prong of the "Boyle Test" is satisfied.

20  152. There is no significant conflict between relevant federal statute, federal code, TSA

21
22  policy and Illinois state law (federal code includes 18 U.S.C. §249, which acknowledges

23  hate crime with regards to disability at facilities of interstate commerce). Therefore, the

24  second prong of the "Boyle Test" is not satisfied.

25
26  153. Both prongs of the "Boyle Test" are not satisfied as required to displace state law,

27  therefore, Illinois state law is not displaced.

28  154. The government contractor defense embodied in the SAFETY Act is rooted in

34

United States sovereign immunity, which does not extend to incompetent violations of well-established rights.

155. L3 violated Muir's well-established right to; (1) due legal process, (2) freely exercise his liberty interest to freely travel between the several states, and (3) be free from coercion.

156. Therefore, L3 is not entitled to immunity from suit for its disorderly conduct hate crime towards Muir in Illinois at PIA on August 12, 2018 because; (1) L3's conduct in impermissibly singling Muir out because of his physical disability and his private marital and religious choices regarding that disability meets the 775 ILCS 5/1-102(Q) definition of unlawful discrimination, (2) L3 negligently violated Muir's well-established right to due legal process, (3) L3 incompetently deprived Muir of his liberty at a facility of interstate commerce, and (4) L3 negligently and unethically coerced Muir to, without due legal process, choose his own punishment in order to secure his lawful release from TSA control.

## CLAIMS FOR RELIEF – CONSTITUTIONAL TORTS – BIVENS ACTIONS -

## DEFENDANT PEKOSKE IN HIS PERSONAL CAPACITY

## COUNT 11 – United States Constitution – Amendment IV

157. The Court established a right of private action for violations of Fourth Amendment rights by United States officers in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

158. Pekoske is a United States officer and swore an oath to defend the United States Constitution.

159. United States Constitution Amendment IV states in part:

> "The right of the people to be secure in their persons... against unreasonable searches... shall not be violated."

160. Mr. Justice Field stated in *In re Pacific Railway Commission,* 32 F. 241, 250:

> "of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves not merely protection of his person from assault, but exemption of his private affairs... from the inspection and scrutiny of others."

161. The Court stated in *Warden v. Hayden*, 387 U.S. 294, 304 (1967):

> "We have recognized that the principal object of the Fourth Amendment is the protection of privacy"

162. The Court in *Johnson v. United States*, 333 U.S. 10, 14 (1948) stated:

> "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

163. The Court in *Miranda v. Arizona*, 384 U.S. 436, 491 (1966) stated:

> "Where rights secured by the Constitution are involved, there can be no rulemaking or legislation which would abrogate them."

164. The Fourth Amendment prohibition against unreasonable search is a clearly established Constitutional right beyond debate.

165. Arizona Constitution Article II Section 8 states:

> "No person shall be disturbed in his private affairs... without authority of law."

36

166. Muir's desire to keep his hidden disability private satisfies the Katz reasonable expectation of privacy test and he therefore had the reasonable expectation of privacy with regards to his physical disability and his private marital and religious choices regarding that disability.

167. The Court stated in *Boyd v. United States*, 116 U.S. 616, 635 (1886):

> "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

168. Pekoske's incompetent and negligent failure to warn Muir of known safety risks (the known fact that Muir could, through his required exposure to advanced screening technology, and through no fault of his own, be singled out from his similarly-situated cohort of travelers because of his hidden physical disability and his private marital and religious choices regarding that disability) made the search of Muir unreasonable.

169. Pekoske's incompetent and negligent failure to warn Muir that there was no serious medical emergency exception to the ATR software threat alarm resolution physical "pat-down" requirement of the administrative screening process while Muir was unable to act on his own behalf violated the DeShaney "Special Relationship" affirmative duty of reasonable care, violated Muir's well-established right to have his serious medical needs addressed when he is prohibited from acting in his own best interest and therefore made the search of Muir unreasonable.

170. Pekoske's incompetent and negligent conduct in failing to take reasonable steps to address; (1) the known, objectively quantifiable false alarm rate of the ATR software, (2) the known fact that false alarms led to frequent, invasive and unnecessary pat-downs

interfering in the liberty interests of United States citizens at facilities of interstate commerce and, (3) the lack of a serious medical emergency procedure in the mandatory administrative passenger screening process, made the search of Muir unreasonable.

171. Muir, like Bivens, is a private citizen with a liberty interest who was damaged by administrative branch overreach.

172. Pekoske, like FBN officers in *Bivens*, is a domestic federal officer enforcing the law.

## COUNT 12 – United States Constitution – Amendment V

173. The Court established a right of private action for violations of Fifth Amendment rights by United States officers in *Davis v. Passman, 442 U.S. 228 (1979)*.

174. United States Constitution Amendment V states in part:

> "No person shall… be deprived of life, liberty, or property, without due process of law."

175. Arizona Constitution Article II Section 4 states:

> "No person shall be deprived of life, liberty, or property without due process of law."

176. Constitution of the State of Illinois, Article I Section I states:

> "All men are by nature free and independent and have certain inherent and inalienable rights among which are life, liberty and the pursuit of happiness."

177. Constitution of the State of Illinois, Article I, Section II states:

> "No person shall be deprived of life, liberty or property without due process of law."

178. The Court in *Marbury v. Madison*, 5 U.S. 1 Cranch 137 137 (1803) stated in part:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection."

179. The Court stated in *Murray's Lessee v. Hoboken Land & Improvement Co*., 59 U.S. 18 How. 272 (1856):

"But is it "due process of law?" The Constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative, as well as on the executive and judicial, powers of the government, and cannot be so construed as to leave Congress free to make any process "due process of law," by its mere will."

180. The Court held in *Sinking Fund Cases*, 99 U.S. 700 (1878):

"The Fifth Amendment contains restrictions taken, in substance, from Magna Charta. Among them are the provisions that no person shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation. These are restrictions upon legislative as well as executive power. What is due process of law is well understood. It is law in regular course of administration through courts of justice."

181. The Fifth Amendment guarantee against the deprivation of life, liberty or property without due process is a clearly established Constitutional right beyond debate.

182. Muir is an individual with disabilities as defined by 42 U.S.C. § 12102 and is a member of that protected group of individuals and Pekoske is a United States officer sworn to defend the United States Constitution.

183. Congress noted in 29 U.S.C. § 701 that individuals with disabilities constitute one of

the most disadvantaged groups in society and continually encounter various forms of discrimination in such critical areas as, among others, transportation.

184. 29 U.S.C. § 794 states that no individual with a disability shall be subject to discrimination.

185. A reasonable and competent officer would be aware of Congress' well-established view on discrimination against individuals with disabilities and only an incompetent officer would fail to warn travelers with disabilities about the known, state-created safety risks associated with advanced passenger screening technology.

186. Pekoske negligently violated Muir's well-established right to due legal process when he administered an extralegal and extrajudicial process outside of the regular course of administration through the courts of justice when Pekoske incompetently created and or allowed conditions at the TSA checkpoint "Snake Pit" that; (1) violated Muir's well-established right to due legal process by condemning him without the lawful judgment of his peers, and (2) coerced Muir to choose, without due legal process, a guaranteed punishment in order to secure his lawful release from TSA control.

187. Pekoske's security checkpoint administrative process placed Muir under TSA control and denied Muir; (1) the right to be informed of charges, (2) the rights enjoyed by a citizen under arrest, (3) the right to present his facts to a judge, (4) the right to counsel, (5) the right to be judged by his peers, (6) the right to appeal, and (7) the right to be sentenced by a judge.

188. Muir, like Davis, is part of a protected class and the discrimination against him because of his physical disability and his private marital and religious choices regarding

that disability, like the discrimination against Davis because of her gender, furthers no legitimate government interest.

189. Muir, like Davis, is a private citizen damaged by an abuse of power.

190. Pekoske is a powerful United States policymaker, similar in rank to a member of Congress as in *Davis v. Passman, 442 U.S. 228 (1979)*.

### COUNT 13 – United States Constitution - Amendment VIII

191. The Court established a right of private action for violations of Eighth Amendment rights by United States officers in *Carlson v. Green,* 446 U.S. 14 (1980).

192. U.S. Constitution Amendment VIII states:

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

193. International Covenant on Civil and Political Rights Article VII states:

> "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation".

194. "That the United States considers itself bound by the obligation under Article 16 to prevent "cruel, inhuman or degrading treatment or punishment," only insofar as the term "cruel, inhuman or degrading treatment or punishment" means the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." - Cong. Rec. S17486-01 (daily ed., Oct. 27, 1990).

195. The Court held in *Estelle v. Gamble*, 429 U.S. 97, 106 (1976):

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment."

196. The Eighth Amendment guarantee against cruel and unusual punishment is a clearly established Constitutional right beyond debate.

197. A reasonable person would agree with Muir in his belief that Muir suffered cruel, inhuman and degrading treatment at the TSA security checkpoint when; (1) Muir was impermissibly singled out because of his hidden physical disability and his private marital and religious choices regarding his disability, (2) Muir's serious medical needs were deliberately disregarded while he was unable to act on his own behalf, and (3) Muir was coerced to, while suffering from a serious medical emergency and without due legal process, choose his own punishment in order to secure his lawful release from TSA control so that he could regain the freedom to promptly attend to his serious medical needs.

198. A reasonable person would agree with Muir is his belief that the negligent violation of well-established rights dating back eight hundred years is incompetent.

199. A reasonable and competent officer would have known that failing to address, as a strict matter of official policy, the serious medical needs of persons in its physical control was a violation of the Constitution and against every measure of a civilized society and its evolving standards of decency.

200. Pekoske violated Muir's well-established rights when Pekoske negligently and incompetently abused State power and subjected Muir to cruel, inhuman and degrading

42

treatment through an extralegal administrative process that failed to address his serious medical needs and which led to his lasting suffering beyond the bounds of human decency.

201. Muir, similar to Carlson, has a liberty interest, a personal injury claim related to a deliberate indifference to serious medical needs and was a person under the control of front-line federal officers who had a role of trust and authority as they executed an administrative search scheme designed, approved and implemented by a federal officer who also had a role of trust and authority and a duty of reasonable care as in *Carlson v. Green*, 446 U.S. 14 (1980).

## CLAIMS FOR INJUNCTIVE RELIEF – UNITED STATES & PEKOSKE

### COUNT 14 – Rehabilitation Act of 1973 Section 504

202. Rehabilitation Act of 1973 Section 504, codified as 29 U.S.C. § 794 states:

> "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency."

203. Muir is a qualified individual with a disability because he has a congenital birth defect (Muir's intestine moves through his inguinal canal and into his right scrotum) that has caused him serious problems since at least the age of five and unpredictably presents as a physical impairment that substantially limits his ability to; (1) care for himself, (2) perform manual tasks, (3) eat, (4) stand, (5) learn, (6) concentrate, or (7) work, as well as (8) digest food, (9) expel intestinal gas, (10), move his bowels, and (11) urinate.

43

204. Muir's latest onset of severe symptoms due to his disability began suddenly and unexpectedly in November 2016 (his first intestinal incarceration in thirteen years) and continues to the present day.

205. In retrospect, over the longer timeframe of 2014 thru present day, Muir's disability-related symptoms were in many ways the most severe from November 2016 to December 2018, during which time he suffered no fewer than five potentially life-threatening incidents due to incarceration or partial strangulation of his intestine, one of which (November 8, 2018) culminated in a police-documented first-responder incident at Chandler Gilbert Community College and Muir's withdrawal from his Calculus I class due to his inability to concentrate or work.

206. Muir's debilitating disability-related symptom manifestations limit his major life activities for at least six months at a time, with the longest having lasted approximately two years.

207. Muir's private marital and religious choice regarding his physical disability is a protected factor impermissible to discrimination and the sole reason Muir was singled out and discriminated against.

208. TSA checkpoint security screening is a federal program or activity.

209. TSA is therefore bound by 29 U.S.C. § 794.

210. TSA must therefore immediately stop; (1) impermissibly singling out Muir as compared to other similarly-situated travelers, and (2) unlawfully discriminating against Muir during checkpoint security screening because of his private marital and religious choice regarding his physical disability at his right groin.

**COUNT 15 – Americans with Disabilities Act – 28 C.F.R. Part 36**

211. 42 U.S.C. § 12182 states:

> "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

212. TSA's security checkpoint is "a place of public accommodation".

213. Muir had a statutory right to "the full and equal enjoyment" of TSA's security checkpoint.

214. TSA violated 42 U.S.C. § 12182 when TSA impermissibly discriminated against Muir on the basis of his disability and his private marital and religious choices regarding that disability and unlawfully denied him "the full and equal enjoyment" of TSA's security checkpoint when TSA impermissibly singled him out as compared to other similarly-situated travelers because of his disability and his constitutionally protected private marital and religious decisions regarding that disability.

**CLAIMS FOR INJUNCTIVE RELIEF – UNITED STATES**

**COUNT 16 - Illinois - Hate Crime – 720 ILCS 5/12-7.1(a) - Disorderly Conduct - 720 ILCS 5/26-1(a)(1)**

215. 720 ILCS 5/12-7.1(c) states:

> "Independent of any criminal prosecution... any person suffering... disorderly conduct as defined in paragraph (a)(1) of Section 26-1 of this Code...as a result of a hate crime may bring a civil action for damages, injunction or other appropriate relief. The court may award actual damages, including damages for emotional distress, as well as punitive damages. The court may impose a civil penalty up to $25,000 for each violation of this

45

subsection (c)."

216. Muir suffered disorderly conduct at PIA on August 12, 2018 as a result of TSA's negligence and incompetence.

217. Muir demands injunctive relief requiring TSA to stop impermissibly singling out and discriminating against Muir because of his congenital physical disability and his private marital and religious choices regarding that disability.

218. Muir demands injunctive relief requiring TSA to satisfy the Court that it does not possess Muir's passenger screening data, and if the Court is not satisfied, that TSA return all of Muir's data.

## CLAIMS FOR INJUNCTIVE RELIEF – L3

## COUNT 17 - Illinois - Hate Crime – 720 ILCS 5/12-7.1(a) - Disorderly Conduct - 720 ILCS 5/26-1(a)(1)

219. Muir suffered disorderly conduct at PIA on August 12, 2018 as a result of L3's negligence and incompetence.

220. 720 ILCS 5/12-7.1(c) gives Muir the right to injunctive relief against L3.

221. Muir demands L3 satisfy the Court that his passenger screening data has been properly destroyed in accordance with all applicable laws, regulations and rules.

222. Muir demands, that in the case the Court is not satisfied that Muir's passenger screening data has been destroyed, that L3 return all of Muir's data in unencrypted form.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Muir prays for the following relief:

i.     Injunctive relief requiring TSA and Pekoske to stop impermissibly singling out and discriminating against Muir because of his disability and his private marital and religious choices regarding his disability.

ii.     Injunctive relief requiring TSA and Pekoske to cease all disorderly conduct and stop denying Muir his statutory right to travel between the several states by air.

iii.     Injunctive relief requiring TSA, Pekoske and L3 to satisfy the Court that Muir's passenger screening data images taken at IWA on August 9, 2018 and at PIA on August 12, 2018 have been properly destroyed and not unlawfully and or redundantly and or inadvertently retained or sold or transferred to any party at any time before or after May 4, 2020.

iv.     Injunctive relief requiring, in the case the Court has not been satisfied that Muir's passenger screening data images have been properly destroyed, the return of all of Muir's data, in unencrypted form, taken at IWA on August 9, 2018 and at PIA on August 12, 2018.

v.     $100,000,000.00 in damages for COUNTS 1-2, as originally claimed in TSA Claim No. 2019101363533.

vi.     $100,000,000.00 in damages for COUNTS 3-5, as originally claimed in TSA Claim No. 2019091962941.

vii.     $250,000,000.00 in damages for COUNT 6-10.

viii.     $250,000,000.00 in damages for COUNTS 11-13.

ix.     Punitive damages against L3, in an amount to be determined by a jury, as damages in this case do not interfere with sensitive functions of the executive branch

because L3 no longer controls the ATR software source code used by TSA during passenger screening.

x.    Punitive damages against Pekoske, in an amount to be determined by a jury.

xi.    Cost of the action.

xii.    Any other such relief as the Court deems appropriate.

Dated: this 23rd day of June, 2020

Respectfully submitted,

MICHAEL  GIBSON MUIR