E-FILED
Wednesday, 02 December, 2020  11:48:09 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL GIBSON MUIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:20-cv-01280** |
| | ) | |
| UNITED STATES TRANSPORTATION | ) | |
| SECURITY ADMINISTRATION; DAVID P. | ) | |
| PEKOSKE, Administrator, United States | ) | |
| Transportation Security Administration, in his | ) | |
| individual capacity; L3HARRIS | ) | |
| TECHNOLOGIES, INC., a Delaware for-profit | ) | |
| corporation; ALLEGIANT AIR, LLC, a Nevada | ) | |
| company; CHAD F. WOLF, Secretary, United | ) | |
| States Department of Homeland Security, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT L3HARRIS**

**TECHNOLOGIES, INC.'S MOTION TO DISMISS & BRIEF IN SUPPORT**

Plaintiff Michael Gibson Muir ("Muir"), pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully moves the Court to deny Defendant L3Harris Technologies, Inc. ("L3")'s motion to dismiss pursuant to Rule 12(b)(6). In support of this motion, Muir relies on the following brief and incorporated memorandum of points and authorities.

Muir's First Amended Complaint ("FAC") against Defendant L3 must survive for several reasons. *First*, Muir is a *pro se* plaintiff and his pleadings must be construed liberally and be held to a lower standard than those of an attorney. *Second,* Muir did not engage in claim splitting. Instead, he had two claims as evidenced by his two "right to sue" letters from Defendant United States. *Third*, Muir's claims are not time barred because the statute of limitations has not yet run because of the Discovery Rule requirement for Muir to have a reasonable belief that misconduct occurred and no reasonable person could believe that strict adherence to the TSA SOP by all TSA personnel on August 9 and August 12, 2018 could be construed as actionable misconduct until, at the earliest, June 6, 2019. *Fourth,* the ruling from the District of Arizona Court striking Muir's SAC was actually beneficial for Muir and adverse for L3. *Fifth,* res judicata does not apply to Muir's FAC. *Sixth,* L3 is not entitled to immunity from suit for negligence under the Safety Act. *Seventh,* L3 is part of a common enterprise with Allegiant and the United States, has a special relationship duty to Muir and Muir has stated a claim upon which relief can be granted.

## INTRODUCTION

L3's assertion that "This entire exercise has been conducted at L3's expense" (Docket No. 37, pg. 13) is in clear opposition to the facts which establish that this entire "exercise" has actually been conducted at Muir's long-term expense due directly to L3's reckless, negligent and unreasonable conduct and the only just outcome is for L3 to be held responsible for its behavior. The survival of Plaintiff Muir's *pro se* FAC claims against L3 is a straightforward matter of facts and rules and Muir's inartful pleading with regards to his "basis for adding defendants and expanding the scope and nature of his claims" doesn't change the relevant facts or the applicable rules. Muir's FAC is timely, has not been previously decided on the merits and the procedural history of this case demonstrates Muir's continued following of the rules and orders of the Court,

as well as his good faith conduct to only press claims which have merit. L3's breach of the public trust and invasion of Muir's privacy cannot be tolerated in a civilized society and L3 is liable to Muir for its proprietary ATR software's dehumanization of Muir and the violation of his well-established constitutional rights when he was under State control and unable to act in his own best interest.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient factual allegations to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. In determining whether a complaint states a plausible claim for relief, a court must draw on its own judicial experience and common sense. *Id.* at 679.

## ARGUMENT

### I.    Muir's Claims Are Not Barred

Muir's claims against L3 are not barred because Muir did not engage in claim splitting, but instead had two separate claims and Muir's claims have not yet been decided on the merits because Muir was denied leave to amend by the District of Arizona Court due to procedural violations as a result of his appearing pro se and the statute of limitations has not yet run because of the Discovery Rule requirement that Muir have a reasonable belief that a duty to him had been breached.

### A.    Muir's *Pro Se* Status

Plaintiff Muir's inartful *pro se* pleadings must be liberally construed as Muir is not an attorney and his pleadings cannot be held to the same standard as an attorney. Despite his best efforts, apparently Muir does not know which facts must be stated and which can be understood to be implied because they are undisputed and or commonly known or understood and just because Muir failed to properly plead certain facts does not mean they don't exist or that the rules governing Muir's claim don't exist or control the action. Muir pleaded thoughtfully and carefully and did his best to not burden the Court with any unnecessary details as he reasonably believed that a compliant should contain only a short statement putting the Defendants on notice of a claim and Muir believed he would get a final opportunity to cure any defects in his pleadings in order to avoid dismissal under Rule 12(b)(6).

Also, Muir is not forcing Defendants to move to dismiss his claims under Rule 12 and Defendants must have an understanding that at some point the Court will allow Muir the chance to cure any defects in his pleadings before they are dismissed, so the idea that Muir is amending his pleadings through motion practice is an inaccurate description of the process that is clearly narrowing the issues and giving all parties the opportunity to present their cases. As the District of Arizona Court noted in its August 14, 2020 order (2:19-cv-05887-DGC, Docket No. 28, pg. 4): "Defendant could have precluded a dismissal without prejudice in this case by answering the complaint or filing a Rule 56 motion." (See *Am. Soccer*, 187 F.3d at 1112: "[I]f the defendant has not served an answer or a motion for summary judgment, the plaintiff may voluntarily dismiss the suit without interference from the district court. This does not prejudice defendants. If defendants 'desire to prevent plaintiffs from invoking their unfettered right to dismiss actions under rule 41(1)(a) they may do so by taking the simple step of filing an answer'").

4

Muir has also faced disadvantages as a direct result of his *pro se* status. He was denied leave to file electronically in the District of Arizona solely because he was appearing pro se. This proved to be a not insignificant obstacle during the litigation because of conditions presented by the public health emergency of 2020 in both Arizona and Illinois. Muir also had at least three District of Arizona pro se clinic volunteer attorney appointments canceled because of either a conflict of interest or the public health crisis, leaving him completely on his own to navigate the complex legal issues involved in this case.

**B.      Muir Did Not Engage in Claim Splitting**

Muir filed two FTCA claims with TSA - one claim for the August 9, 2018 incident at IWA in Arizona and a separate claim for the August 12, 2018 incident at PIA in Illinois. This is clearly not claim splitting as the separate incidents occurred on different dates, in different states and involved different TSA personnel. TSA accepted both claims, assigned the claims two separate claim numbers and denied the claims, after an almost six month investigation, in two separate "right to sue" letters.

**1.      Arizona**

Muir filed TSA Claim No. 2019101363533 on September 16, 2019 based on the negligent and wrongful acts of TSA that occurred at IWA on August 9, 2018. TSA denied Claim No. 2019101363533 on May 28, 2020 via a "right to sue" letter sent certified mail No. 7016 1970 0000 5247 7406.

Muir's claim was denied by TSA on May 28, 2020, eight days after the District of Arizona Court's May 20, 2020 order directing L3 to respond to Muir's AZ FAC by June 5, 2020. Muir's June 24, 2020 SAC in response to L3's June 5, 2020 motion to dismiss was thus his first

opportunity to, under FRCP Rule 15(a)(2) and Rule 19(a)(1)(A), join Defendant United States in this action based on the written permission of Defendant United States.

### 2.      Illinois

Muir filed TSA Claim No. 2019091962941 on September 5, 2019 based on the negligent and wrongful acts of TSA that occurred at PIA on August 12, 2018. TSA denied Claim No. 2019091962941 on May 28, 2020 via a "right to sue" letter sent certified mail No. 7016 1970 0000 5247 7376.

Muir was forced by L3's removal of his Superior Court of Maricopa County lawsuit to the District of Arizona to add his Illinois claims to 2:19-cv-05887 because of FRCP Rule 19, but the Central District of Illinois has subject matter jurisdiction and is the proper venue for this lawsuit because Muir has the right to sue Defendant United States in the Central District of Illinois, Muir resides in the Central District of Illinois and the August 12, 2018 incident occurred in the Central District of Illinois.

Muir had a clear basis for "holding back" his August 12, 2018 allegations from his February 12, 2020 AZ First Amended Complaint as Muir could not bring his claims against Defendant United States until, at the earliest, March 17, 2020 (based on the rule that allows Muir to file his FTCA suit, if no agency decision has been reached, after six months of giving the agency proper notice of the claims, which in this case was September 16, 2019). Muir was ordered by the District of Arizona Court on February 21, 2020 to respond to L3's motion to dismiss by March 13, 2020, even though he had already filed his response on February 12, 2020 in the form of his AZ FAC. Therefore, Muir was unable to amend his AZ FAC according to FRCP Rule 15 and Rule 19 because he did not yet have written permission of his right to sue

Defendant United States. Muir received the "right to sue" letter dated May 28, 2020 for the August 12, 2018 incident and added his Illinois claims in his AZ SAC on June 24, 2020.

### C.    Statute of Limitations Has Not Yet Run Under the Discovery Rule

This case is not about what any of the parties did. It's about what they failed to do. And Muir couldn't know what the parties didn't tell him or failed to do until he discovered it for himself and therefore the relevant date for determining the statute of limitations in this case is June 6, 2019. The Discovery Rule requires Muir to have a reasonable belief that misconduct occurred and no reasonable person could believe that strict adherence to the TSA SOP by all TSA personnel on August 9 and August 12, 2018 could be construed as actionable misconduct until, at the earliest, June 6, 2019, when Muir again passed through the threat assessment process, only this time without triggering a false threat alarm at his right groin because while he was indeed symptomatic at the time of his June 6, 2019 AIT scan, his internal organs unpredictably stayed inside his body cavity instead of slipping through his inguinal canal and into his right scrotum when he put his "hands up" for the scan, as they did in August 2018.

The night and day difference between his AIT scans in 2018 and 2019 is what triggered Muir's obligation to inquire whether a legal duty to him had been breached in 2018 and the statute of limitations does not begin to run until Muir could have reasonably learned about the cause of action (failure to give proper notice of the threat assessment process, failure to warn of known State-created dangers Muir could not unilaterally avoid and failure to program the proprietary ATR software to function within the parameters of the law) and that did not happen until June 6, 2019.

Also, Muir took no action until August 2019. He didn't reference the experience. In fact, he actually repressed the memory of it because he felt, incorrectly, that having a physical disability condemned him to a life of pain and misery as determined by the Creator. He contacted no parties, made no claims and contacted no attorneys until after August 2019 because he had no reason to believe a legal duty to him had been breached until, at the earliest, June 6, 2019.

### D.     District of Arizona Ruling Was In Muir's Favor

L3 contends that the District of Arizona Court's July 23, 2020 ruling was critical and Muir agrees. The Court's August 14, 2020 ruling is also very important to the case. The Court's decision speaks volumes by both what it doesn't say and by adding the weight of the opinion of the Honorable Judge David G. Campbell, a constitutional law professor, indicating that Muir's Fourth and Fifth Amendment Bivens claims against Defendant David P. Pekoske and Muir's negligence claims against all Defendants are not without merit. Nothing in the ruling can be construed to be against Muir's ability to move the Court for leave to amend based on the proper filing of a motion with regards to the proper basis for filing his SAC according to the FRCP.

### 1.     Muir's SAC Was Improperly Filed, Not Meritless

The District of Arizona Court ruled on July 23, 2020 that Muir's SAC was improperly filed. L3's insistence in misquoting the Court to imply that *all* of Muir's SAC claims were without merit, when in fact the Court held that only Muir's Eighth Amendment Bivens claim and Hate Crime claim were without merit, is misleading. The Court held: "the second amended complaint adds two new defendants – the TSA and its Administrator - and asserts claims that clearly are without merit. *See* Doc. 23 at 23-43 (alleging violations of the Eighth Amendment and Illinois criminal statutes)." (See 2:19-cv-05887-DGC Doc. 24, pg. 2). The Court's decision

to explicitly state the two claims in Muir's SAC that "clearly are without merit" implies that Muir's other claims are <u>not</u> without merit or else the Court would have no need to mention specific claims that are without merit and the Court directed the Clerk to strike the SAC because it was improperly filed, not because it was without merit.

Also, the Court in no way precluded Muir from filing a proper motion for leave to amend according to the FRCP, or, in its August 14, 2020 order, warned or disciplined Muir in any way or agreed in any way with L3's assertions that Muir acted "in open defiance" of the Court, engaged in an "underhanded strategy" or engaged in "inappropriate forum shopping". The Court also disagreed with L3's claim that it had implicitly converted the Rule 12(b)(6) motion to dismiss into a summary judgment motion. In short, the Court's ruling was favorable for Muir and adverse for L3 because it clarified that Muir's Bivens and negligence claims had merit. Also, Muir finds it hard to understand why L3 would object so strongly to a ruling that was favorable for it and unfavorable for Muir (See 2:19-cv-05887, Doc. 26, filed August 6, 2020).

### a.    District of Arizona Local Rule of Civil Procedure 15.1

District of Arizona LRCiv 15.1 states: "A party who moves for leave to amend a pleading must attach a copy of the proposed amended pleading as an exhibit to the motion, which must indicate in what respect it differs from the pleading which it amends, by bracketing or striking through the text to be deleted and underlining the text to be added."

Muir violated this rule and his SAC was ruled improperly filed as a result. Muir thought it made no sense to underline so many pages of text because his SAC added new defendants and his Illinois claims and because his February 12, 2020 FAC was accepted by the Court without conforming to Local Rule 15.1.

9

**b.    FRCP Rule 15(a)(2)**

Muir didn't want to file an unnecessary motion for leave to amend when FRCP Rule 19 <u>required</u> that Muir join Defendant United States and Defendant United States had given Muir written permission to sue. Muir believed that "required" meant required and that the Court would have disciplined him for failing to follow the clearly stated rules as he was ordered.

**i.    Written Consent From Defendant**

Muir is a pro se plaintiff and thought it ridiculous to assume that he must get written permission from Defendant L3 in order to add Defendant United States when Muir already had written permission to sue Defendant United States and Muir accuses L3 of being in a common enterprise with Defendant United States.

The "basis for adding defendants and expanding the scope and nature of his claims" is the "right to sue" letter issued by TSA on May 28, 2020.

**c.    FRCP Rule 19**

Muir stated in his 2:19-cv-05887 March 13, 2020 filing on page 3, footnote 2 that there were still remaining "defendants yet to be joined under Federal Rule of Civil Procedure 19 (a)(1)(A) due to the mandatory FTCA waiting period set forth in 28 U.S.C. § 2675(a)." Muir followed the rules and believes that a proper motion made in the District of Arizona that clearly stated the basis for adding the United States and David P. Pekoske as defendants based on his "right to sue" letter for the August 12, 2018 incident in Illinois would have been granted because it conformed with FRCP and because the case was removed to federal court by L3, it could be filed nowhere else.

E.       Res Judicata Is Not Applicable

Muir was denied leave to amend because of a local rules violation regarding the underlining of the text in his SAC that was different from his FAC and a misunderstanding with regards to seemingly contradictory interpretations of the FRCP. This was due to his pro se status and his good faith belief that he was following the rules. The issue of Res Judicata is moot with regards to the Central District of Illinois FAC because Muir did not include the Eighth Amendment or Hate Crime claims in his Central District of Illinois FAC, which were the only claims the District of Arizona Court held were without merit. This is further evidence that Muir accepted the rulings of the District of Arizona Court and pressed only claims with merit.

1.       Muir's Eighth Amendment and Hate Crime Claims

The Arizona District Court ruled that Muir's Eighth Amendment Bivens claim and Illinois Hate Crime claim were without merit. Muir raises them in the instant case only to demonstrate a legislative intent to allow money damages for discrimination and that the deliberate indifference to serious medical needs is unconstitutional. Muir did not press these claims after the District of Arizona Court's ruling. Muir now believes that he cannot include a Carlson Eighth Amendment Bivens claim because he was never adjudicated guilty of a crime or an Illinois Hate Crime claim because the "person" who committed the crime was, in the instant case, a proprietary algorithm artificial intelligence.

If L3's proprietary ATR software was a living TSO instead of an artificial intelligence doing the job of a living person, it would be guilty of hate crime in Illinois for what it did to Muir during the threat assessment process on August 12, 2018.

11

49 U.S.C. § 44901(l)(1)(A)(i) states: "The term… "advanced imaging technology"… means a device used in the screening of passengers that creates a visual image of an individual showing the <u>surface of the skin</u> and revealing other objects <u>on</u> the body."

L3's proprietary ATR software A.I. violated federal law when it searched the visual image of Muir that showed private health information regarding Muir's human tissue congenital disability beneath the surface of the skin. This breach of trust and invasion of privacy using advanced technology led directly to the discrimination against Muir and cannot be tolerated.

720 ILCS 5/12-7.1 states: "A person commits hate crime when, by reason of the actual or perceived… physical… disability of another individual or group of individuals, regardless of the existence of any other motivating factor or factors, he or she commits… disorderly conduct as… defined in Section… 26-1… of this Code." 720 ILCS 5/26-1 states: "A person commits disorderly conduct when he or she knowingly: Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace."

L3's proprietary ATR software committed hate crime against Muir when, by reason of the actual physical disability of Muir, regardless of the existence of any other motivating factor or factors, the ATR software committed disorderly conduct by unreasonably and unlawfully searching Muir's private health information regarding a human tissue disability underneath his skin and generated a false threat alarm which disturbed Muir and provoked a breach of the peace.

This violation of Muir's reasonable expectation of privacy and the deliberate indifference to Muir's serious medical needs was the result of the dehumanization of Muir by L3's ATR software because it is an artificial intelligence incapable of understanding that it is incapable of feeling empathy or understanding human emotion and feelings.

## II.     L3 is Not Entitled to Immunity From Suit for Negligence

### A.     L3 is Liable to Muir for His Injuries

L3 has DHS Safety Act Certification and Designation for its millimeter wave portals (the Provision ATD and Provision 2), but that certification and designation for its "technology" does not extend to its proprietary ATR software running on the portal. To hold L3 liable for damages on the basis that its defective ATR software invaded Muir's privacy would not deal any kind of blow to our Nation's anti-terrorism defense apparatus, but would instead highlight the already known weaknesses of the artificial intelligence automatic target recognition computer vision algorithm and confirm the DHS' own position that new approaches are needed in the A.I. ATR software field.

L3 is not entitled to immunity from suit for at least three reasons. *First*, L3's proprietary ATR software is not "QATT" because DHS does not include "software" in its definition of the approved "Technology". *Second*, ATR software was deployed in direct response to privacy concerns raised in *EPIC v. DHS* (2011), not a designated "act of terrorism" as is required to trigger "SAFETY Act" protections. *Third*, L3 is not entitled to immunity from suit when there is no risk of "loss" to the seller and therefore Muir's claims for injunctive relief fall outside of any "SAFETY Act" protections L3 could claim.

### 1.     L3's Proprietary ATR Software is Not "QATT"

L3 did not receive "QATT" Certification or Designation from DHS for its proprietary ATR software. With regards to L3's "QATT", DHS states: "The Technology is a security portal that uses millimeter-wave scanning technology to produce three-dimensional images of subjects to detect threat objects, if present, on scanned subjects… Also included in the Technology are

the following support services: training, installation, maintenance services, manuals and technical documents." (Doc. 37, pg. 5, Exhibit A).

L3's proprietary ATR software is not "QATT" for at least two reasons. First, DHS states that the Certified "Technology" is a "portal" (not the separate proprietary algorithm that analyzes the data image produced by the "portal"). Second, ATR software is specifically not listed in "Also included" section. Therefore, L3's proprietary ATR software, which is a separate technology and separate security product sold to DHS in separate cycles, is not "included" in the Certified "Technology". DHS also states (emphasis added): "The Technology *uses* Automatic Target Detection ("ATD") software, a software solution that analyzes scanned data and highlights threats and anomalies" DHS describes L3's proprietary ATR software as a "solution". "Solution" does not equate to inclusion, but relates instead to the Congressional privacy requirement that the "use" of ATR software fulfills. The word "uses" is not equivalent to "includes". The fact that L3's portal *uses* L3's proprietary ATR software does not mean that DHS "QATT" Certification of one product (a "portal"), extends to another related but separate product (proprietary ATR software running on that portal due solely to privacy concerns).

## 2. ATR Software Was Deployed Directly Due to Privacy Concerns

The use of ATR software to replace a TSA agent during the search of passenger data images was required by Congress as a result of *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. July 15, 2011).

The "SAFETY Act" system of risk management is not triggered unless the technology deployed was in response to an "act of terrorism". L3 is not entitled to any defenses embodied in the "SAFETY Act" because its proprietary ATR software was deployed directly due to privacy

concerns, which is exactly the issue in the instant case, not a designated "act of terrorism" as is required by the statute.

**3.      L3 is Not Entitled to "SAFETY Act" Defenses for Injunctive Relief**

L3 is not entitled to immunity from Muir's claim for injunctive relief requiring L3 to return his private health information to him in the form of his August 9 and August 12, 2018 AIT scans because it falls outside the "SAFETY Act" risk management system.

**B.      Contracts For Immunity From Negligence Suits Are Null and Void**

It is settled law that since the inception of contracts of carriage, all contracts for immunity from negligence suits regarding the contract of carriage are null and void. L3's Safety Act Certification and Designation for its millimeter wave portal is a contract between DHS and L3. L3's portal and ATR software are used by TSA as a non-negotiable part of Muir's contract of carriage with Allegiant. L3 is part of a common enterprise with Allegiant and TSA which controls access to the airport sterile area. Because L3's technology is used during the State controlled airplane boarding process, L3 is part of the contract of carriage and therefore its immunity for suits based on negligence are null and void and L3 is liable to Muir for his injuries.

**III.   Muir Has Stated a Claim Upon Which Relief Can Be Granted**

**A.      L3's Duty to Muir**

L3 has a special relationship duty to Muir based on its common enterprise with Allegiant and TSA regarding the TSA Checkpoint and the special relationship duty nexus created by the inclusion of a State-sponsored custodial interrogation within the common carrier airplane boarding process at a facility of interstate commerce. L3 occupied a position of trust, confidence,

reliance, influence and superiority and the massive difference in power between L3 and Muir establishes a relationship that cannot include a profit motive. But L3 included a profit motive as monopoly supplier of the proprietary ATR software and this unreasonable poisoning of the special relationship led directly to Muir's injuries and is a major issue in this case because of its impact on the ability of individuals with disabilities to travel through facilities of interstate commerce without facing discrimination solely because of their disabilities.

### 1.   TSA Checkpoint Special Relationship Duty Nexus

The affirmative act of restraint of Muir's locomotion and his ability to act in his own best interest during the threat assessment process triggers an affirmative duty for the principals of the common enterprise to protect Muir from the foreseeable risk of unreasonable and unnecessary harm. And while securing the nation's transportation systems is clearly a very important public interest, the only exception to the public duty rule is the special relationship, and the custodial interrogation setting of the threat assessment process requires the special relationship created by that situation take priority with regards to an affirmative duty to protect and disclose important information regarding the threat assessment process that is not open and obvious. This means that L3 had a shared fiduciary duty to Muir to program its proprietary ATR software to function within the parameters of United States law and to reveal all important information regarding the advanced technology components of the threat assessment process so that Muir could have the opportunity to exercise his right to avoid them by choosing not to fly. Muir cannot avoid what he is fraudulently prevented from knowing by the principals in the common enterprise that controls the TSA checkpoint and access to the airport sterile area and the special relationship duty nexus created by the duty overlap at the checkpoint makes it clear that L3 had a duty to Muir during the screening process.

2.      **Common Enterprise**

L3 was a principal member and self-declared leader of an association-in-fact enterprise because the TSA Checkpoint team is a unit that is not a legal entity but that functions with a common purpose in exercising dominion over control of access to the airport sterile area. The unit has shared employees (TSA Agent scans Muir's boarding pass and makes explicit confirmation of Muir's contract of carriage with Allegiant), shared data (Allegiant shares Muir's contract and ticket information with TSA), shared fiber optics at the airport and a shared goal to secure the sterile area of the airport.

Within the context of a special relationship, total disclosure of important information is not discretionary. L3 should have thought twice about what its decision to inject a competing interest into the special relationship meant and what its duty to Muir and his protected class of travelers with disabilities fully entailed during the threat assessment process.

3.      **Violation of the Public Trust in a Common Calling**

National security concerns are also Muir's concerns because he is a citizen of the United States who travels via airplane. Defective coding of the ATR software and an improper motive in the special relationship are matters relevant not only to Muir and this case, but to the entire travelling public. Airplane travel is clearly a common calling and L3 knew or should have known about all relevant transportation and anti-trust law regarding the common calling of public transportation. This includes Congress' intent (since the Act of June 15, 1886) to keep monopoly power from tilting the balance of benefits too far away from the public good and to keep individuals with disabilities free from discrimination during travel and while navigating potential architectural or procedural barriers at facilities of interstate commerce.

L3's reckless decision to inject its corporate profit motive and fiduciary duty to its shareholders into the checkpoint special relationship violates the public trust because society has made its position clear that individuals with disabilities have a right to travel without facing the burden of unwarranted discrimination based solely on their disabilities.

**B.      Breach**

L3 breached its duty to Muir when it failed to reasonably address known problems with its proprietary ATR software. L3 knew or should have known that its software had an outrageous and unreasonable false threat alarm rate and that those false threat alarms led directly to unnecessary and invasive pat-downs that travelers reasonably found objectionable.

Also, L3 knows that the technology in question in this case is millimeter wave technology utilized by its Provision portal, not backscatter x-ray technology, so the ability of backscatter x-rays to reveal matter "underneath and near the surface of the skin" such as medical implants, is irrelevant because the search of Muir's PSDI is limited to an image showing the surface of his skin and objects on his skin.

L3's size and power are only helpful to society when competing with comparable rivals for supremacy in a given market. Once competition is removed, L3's size and power become a proven liability to society and a threat to proper market functioning.

**C.      Proximate Cause**

L3's conduct is the proximate cause of Muir's injuries and they could not have happened without L3's negligence in addressing known problems with its proprietary ATR software and

18

failing to program the A.I. to perform within the parameters of United States law and the well-established Amendments of the United States Constitution.

L3's proprietary ATR software is the critical link in the causal chain that produced Muir's injuries and there is no intervening event in the chain which L3 could not reasonably foresee. The natural and continuous sequence of events that led to Muir's injuries began with L3 encoding Muir's private health information regarding human tissue underneath his skin during the creation of Muir's passenger screening data image. In this case, because L3 is the monopoly provider of the ATR software, the sequence of events continued under L3's control because it was L3's proprietary ATR software that searched Muir's portal-generated PSDI for anomalies and produced a false threat alarm at his right groin that misidentified his human tissue congenital disability beneath his skin as a foreign object on the surface of his skin. The actions of TSA personnel were not an intervening cause because L3 and TSA have a common enterprise and their actions form a highly planned and controlled sequence of events during the threat assessment process of which L3 was acutely aware.

### D.    Muir's Injuries

It is clearly extreme and outrageous that Muir's private health information (his private property which was covered by marital privilege and a reasonable expectation of privacy) was taken from him and then used against him during a State interrogation. Muir was unlawfully coerced into doing something he never would have done and being forced to cross that boundary scrambled his brain beyond repair. "Dr. Irving John Good of Trinity College at Oxford has suggested that the 'ultra-intelligent machine is the last invention that man need make.' Such a supercomputer, Arthur Clarke wrote, 'will force us to think about the purpose and meaning of

human existence. It will compel us to make some far-reaching and perhaps painful decisions, just as thermonuclear weapons have made us face the realities of war and aggression after 5,000 years of pious jabber.'" (*Think, A Biography of the Watsons and IBM,* William Rogers, 1969)

## CONCLUSION

WHEREFORE, for all the reasons discussed herein, Defendant L3 is not entitled to dismissal from this lawsuit pursuant to Rule 12(b)(6) because Plaintiff Muir has established that he has not engaged in claim splitting, that his claims were timely and not barred by res judicata, that L3 does not have immunity from suit for negligence under the Safety Act, that L3 had a special relationship duty to Muir as part of the common enterprise with Defendant Allegiant and Defendant United States (TSA) that existed within a common carrier special relationship nexus, that L3 breached that duty through the defective manufacture of its proprietary ATR software and the defects in the proprietary software were the proximate cause of Muir's injuries and his FAC against L3 must therefore survive.

DATED: this 2nd day of December, 2020

Respectfully submitted,

_____s/Michael Gibson Muir_____
MICHAEL GIBSON MUIR

MICHAEL GIBSON MUIR
19 Inglewood Lane
Bloomington, IL 61704
(712) 309-6121