**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| MICHAEL GIBSON MUIR, | ) | |
| | ) | 1:20-cv-01280 |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | District Judge: |
| UNITED STATES TRANSPORTATION | ) | Hon. Billy Joe McDade |
| SECURITY ADMINISTRATION; DAVID | ) | |
| P. PEKOSKI; L3HARRIS TECHNOLOGIES, | ) | |
| INC.; ALLEGIANT AIR, LLC; CHAD E. | ) | Magistrate Judge: |
| WOLF, Secretary, United States Department | ) | Jonathan E. Hawley |
| of Homeland Security. | ) | |
| | ) | |
| *Defendants*. | ) | |

**L3HARRIS TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3"), by and through its attorneys, ADLER MURPHY & McQUILLEN LLP, and in further support of its Motion to Dismiss Plaintiff's First Amended Complaint states as follows:

**INTRODUCTION**

Plaintiff's Response in Opposition to L3's Motion to Dismiss ("Response") fails to address the fatal flaws in his pleadings, the untimeliness of his purported claims, or his inability to state a valid claim against L3. Plaintiff improperly clings to the belief that his claim splitting was justified based on his need to exhaust administrative remedies for injuries allegedly caused by the United States Transportation Security Administration ("TSA). He sounds off on national security policies and expresses his own personal opinions on how L3's federally certified technology should have operated. There is no merit to any of Plaintiff's arguments. For the reasons that follow, the Court should grant L3's Motion to Dismiss.

1

## ARGUMENT

In his 20-page Response, Plaintiff argues several issues which warrant a reply.[1] L3 will reply to the issues raised in turn and without restating arguments previously made.

### Plaintiff's Pro Se Status

Plaintiff argues his pro se pleadings must be liberally construed and are not held to the same standard as those prepared by an attorney. Response (Doc. #42), pg. 4. It is true that pro se complaints are not held to the same "stringent standards" expected of pleadings drafted by attorneys. *Wilson v. Civil Town of Clayton*, 839 F.2d 375, 378 (7th Cir. 1988). However, "it is also well established that pro se litigants are not excused from compliance with procedural rules." *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (citing *McNeil v. United States,* 508 U.S. 106, 113 (1993) (the Supreme Court has "never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel")). Here, there is no excusing Plaintiff's violation of the rule against claim splitting, and no amount of leniency can overcome Plaintiff's inability to state a valid claim against L3.

### Claim Splitting

Plaintiff maintains he did not engage in claim splitting because he filed two separate claims under the Federal Tort Claims Act ("FTCA") against the TSA. "This is clearly not claim splitting," Plaintiff argues, "as the separate incidents occurred on different dates, in different states and involved different TSA personnel." Response, pg. 5.

Plaintiff is mistaken. Consistent with the Restatement (Second) of Judgments, the critical inquiry in a claim-spitting analysis is whether the facts underlying the claims combine to form a

---

[1] Plaintiff's Response exceeds 15 pages in length, yet he failed to submit a certificate of compliance in accordance with the Court's local rules. See L.R. 7.1(B)(4)(c). This is consistent with Plaintiff's track record of violations in the Arizona District Court.

"convenient trial unit." *River Park v. City of Highland Park*, 184 Ill. 2d 290, 311-12 (1998). Such is the case here, as Plaintiff's common FTCA claims must be brought within a single lawsuit. This is why Plaintiff was unable to split those same substantive claims against L3.

In Illinois, different claims are considered the same if they arise from a "single group of operative facts," regardless of whether they assert different theories of relief. *Chicago Title Land Trust Co. v. Potash Corp. of Sask. Sales Ltd.*, 664 F.3d 1075, 1079-80 (7th Cir. 2011). This determination requires application of a "transactional" test under which claims can be considered part of the same cause of action even if there is no "substantial overlap of evidence." *Id.* The overriding consideration is whether the claims arise from a single transaction or a "series of connected transactions." *Huon v. Johnson & Bell, Ltd.*, 757 F.3d 556, 558 (7th Cir. 2014). Whether claims arise from a "series of connected transactions" is to be determined "pragmatically," considering the time, space, and origin of the transactions, and whether the underlying facts form a "convenient trial unit." *Id.*

In *Huon*, for example, an attorney brought two lawsuits against his old firm relating to separate events taking place over the course of five years. He argued his suits involved separate claims, because the first suit was based on specific employment decisions made in 2006 and 2007, while the second suit was based on a series of allegedly discriminatory actions occurring between 2003 and 2008. *Id.* The Court of Appeals disagreed with the plaintiff and held the claims arose from the same "series of transactions." The court noted that "several allegations [were] identical" and the plaintiff "maintained in both suits that the defendants' conduct resulted from the same sort of discriminatory motives—intentional discrimination based on race and national origin." It was deserving of little weight that the conduct alleged in the two suits did not occur

contemporaneously, as the Illinois transactional test emphasizes pragmatism, and the suits shared a similar group of operative facts which formed a "convenient trial unit." *Id*. at 558-59.

Here, like in *Huon*, it is deserving of little weight that the Phoenix and Peoria Occurrences took place on different dates and in different states. The occurrences allegedly took place only three days apart, Plaintiff's allegations with respect to both are largely identical, and Plaintiff makes no effort to differentiate between them in stating his purported causes of action. Similar to the plaintiff's allegations in *Huon*, Plaintiff maintains here that L3 was negligent for the same reasons in Phoenix and Peoria. Namely, he alleges in both instances that he was "permanently damaged" and suffers "severe ongoing psychological distress" and "disturbing physical manifestations" as a direct result of being "impermissibly singled-out" and "coerced to act against his will in order to secure his lawful release from TSA control." See Plaintiff's First Amended Complaint ("FAC") (Doc. #12) at ¶¶35, 61. Hence, the two occurrences clearly share the same group of operative facts and form a convenient trial unit, which is why Plaintiff has endeavored to allege them as part of the same suit.

Plaintiff nonetheless argues he was justified in "holding back" his allegations of the Peoria Occurrence until he exhausted his administrative remedies against the TSA. Response, pg. 6. As the Seventh Circuit has repeatedly held, the requirement to exhaust administrative remedies is "no excuse for claim-splitting." *Barr v. Board of Trustees*, 796 F.3d 837, 840 (7th Cir. 2015). A claimant who is waiting for a right-to-sue letter on new claims that are factually linked to an existing suit should ask the court to stay the case until the right-to-sue letter arrives. *Id*.

Here, Plaintiff simply needed to file a single action against L3 raising the Phoenix and Peoria Occurrences and then request a stay of the proceedings until he received his right-to-sue

letter from the TSA. By instead "holding back" one set of allegations and then swapping them back and forth as he changed venues, Plaintiff violated the fundamental rule against claim splitting.

### Statute of Limitations

In Illinois, the statute of limitations does not begin to run until the plaintiff knew or reasonably should have known he or she was wrongfully injured. At that point, the burden is on the plaintiff to inquire further as to the existence of a cause of action. *Halperin v. Halperin*, 750 F.3d 668, 671 (7th Cir. 2014). Here, Plaintiff was allegedly injured on August 9 and 12, 2018. He alleges he was severely and instantly traumatized such that his purported causes of action accrued immediately. As such, Plaintiff's claims against L3 in the FAC, filed on September 8, 2020, are untimely for the reasons set out in L3's Motion to Dismiss. See Doc. #37, pgs. 11-13.

In response, Plaintiff maintains his claims are timely because he had no way of discovering his injuries until June 6, 2019, when he passed through L3's airport security screening equipment and boarded a flight without any incident. He claims that before June 6, 2019, "no reasonable person could believe that strict adherence to the TSA [procedures] by all TSA personnel… could be construed as actionable misconduct…" Response, pg. 7.

Aside from being implausible, Plaintiff's reliance on the so-called "discovery rule" is at odds with his core allegations. In the FAC, Plaintiff alleges that before both occurrences, he informed the TSA he was experiencing a serious medical emergency; that no one had ever touched him at his right groin during such an emergency; that being touched at his right groin would result in extreme physical pain and could endanger his life; and that he *ordered* the TSA not to touch him. FAC, ¶¶32, 52. Plaintiff claims he suffered "irreparable psychological harm beyond the bounds of human decency" such that he was effectively denied his right to travel between the several states by air. *Id*. ¶¶6-7.

5

In an about face, Plaintiff now claims he was oblivious to his injuries until nearly one year later when he passed through L3's screening equipment "without triggering a false threat alarm at his right groin…" Plaintiff claims he was "symptomatic" at the time, but his "internal organs unpredictably stayed up inside his body cavity…" Response, pg. 7. Plaintiff next claims he "actually repressed the memory… because he felt, incorrectly, that having a physical disability condemned him to a life of pain and misery as determined by the Creator." Response, pg. 8. This is clearly inconsistent with Plaintiff's allegations in the FAC that he was immediately traumatized and began suffering severe psychological distress with disturbing physical manifestations.

In sum, a reasonable person who allegedly experienced a traumatic and life-endangering event at the hands of state actors, despite warning them of the consequences and *ordering* them to refrain would suspect the availability of legal recourse and would investigate the same. Even if the Court determines that Plaintiff has stated a valid cause of action against L3 (he has not), the cause of action accrued immediately after the Peoria Occurrence, on August 12, 2018, the last day of the alleged continuing violation. See *Devbrow v. Kalu*, 705 F.3d 765, 770 (7th Cir. 2013) (applying the continuing violation doctrine to delay the trigger date for the limitations period until the last day of the alleged injury).

### The Arizona District Court's Ruling

Plaintiff inexplicably argues that the Arizona District Court ruled in his favor by striking his amended allegations and claims relating to the Peoria Occurrence and denying him leave to file the same. Response, pgs. 8-10. According to Plaintiff, the Arizona District Court implied that his original claims relating to the Phoenix Occurrence were meritorious and "in no way" precluded him from moving for leave to file the amendments. *Id.* at 9. Plaintiff further argues that his amended allegations and claims relating to the Peoria Occurrence were stricken for trivial

6

procedural violations. Plaintiff thought it "made no sense" to comply with the Arizona District Court's local rules requiring him to provide an annotated version of his amended pleading, and he "thought it was ridiculous" that he needed to seek L3's permission to file the same. *Id*. at 10.

A review of the Arizona District Court's Order belies Plaintiff's distorted summary of the ruling. See L3's Motion to Dismiss, Exhibit C (Doc. #37-3). Beyond striking the amended complaint for procedural violations, the Arizona District Court took the additional step of denying Plaintiff leave to file his amendments despite the Ninth Circuit's policy of favoring them with "extreme liberality." This is all that matters for present purposes.

Pursuant to *Arrigo v. Link*, 836 F.3d 787, 799 (7th Cir. 2016), the Arizona District Court's ruling barred Plaintiff from refiling *the portion of his complaint that was excluded from the Arizona action*. Plaintiff has failed to respond with any arguments that that would negate this application of *Arrigo*. Because his original complaint in this Court consisted of the pleadings he was barred from filing, it operated as a procedural nullity which did nothing to preserve Plaintiff's claims within the applicable limitations period.

**Res Judicata**

In arguing the doctrine of res judicata does not apply, Plaintiff concedes that the Arizona District Court's Order had a preclusive effect on his right to file in Illinois. He argues, however, that the preclusive effect was limited to his claims under the Eighth Amendment and Illinois Hate Crime statute, because those were the only claims specifically referenced by the Arizona District Court in denying him leave to file his amended complaint. Response, pg. 11.

As discussed above, despite Plaintiff's narrow view of the Arizona District Court's ruling, *Arrigo* operates to bar him from refiling *the portion of his complaint that was excluded from the*

*Arizona action*. This includes not only the claims that Plaintiff attempted to add, but also the underlying allegations and issues.

The doctrine of collateral estoppel, known as issue preclusion, bars issues that were litigated when (1) the same issue was litigated in the first action; (2) the determination of the issue was essential to the final judgment in the first action; and (3) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. *Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F. 3d 526, 530 (7th Cir. 1997).

Insofar as *Arrigo* holds that the denial of leave to file an amended complaint constitutes a final judgment for purposes of res judicata, the ruling inherently encompasses the doctrine of collateral estoppel. For example, in this case, the portion of Plaintiff's complaint that was excluded from the Arizona action included the additional claims and any underlying *issues* that were essential to the final judgment. Thus, whether framed in the context of res judicata or collateral estoppel, the outcome is the same. In denying Plaintiff leave to amend his complaint, the Arizona District Court barred Plaintiff from adding his allegations of the Peoria Occurrence, and the determination of that *issue* was essential to the final judgment.

## SAFETY Act

Plaintiff argues that L3 is not entitled to immunity under the SAFETY Act because the Qualifying Anti-Terrorism Technology ("QATT") that was certified and designated by the Department of Homeland Security ("DHS") did not include L3's imaging software. Response, pgs. 12-13. He claims the QATT label applies only to the "portal" which "uses" L3's software.

In other words, Plaintiff maintains the DHS approved L3's *hardware* but not its *software*. Thus, according to Plaintiff, by certifying and designating L3's QATT under the SAFETY Act, the DHS intended to protect something other than the software specifically designed to keep our

citizens safe. This reading of the Exhibits describing L3's QATT is both impractical and illogical. The Exhibits plainly state that the Provision<sup>TM</sup> ATD and Provision<sup>TM</sup> 2 are protected "models of Technology" under the SAFETY Act, meaning the products are protected as a whole. See L3's Motion to Dismiss, Exhibit E (Doc. #37-5).

Plaintiff next argues that L3's QATT was "deployed directly due to privacy concerns," and not due to an "act of terrorism." Response, pgs. 13-14. To suggest that L3's QATT was developed and deployed to address privacy concerns rather than national security concerns is to ignore that Congress passed the SAFETY Act in recognition of the vital role played by technology **in defending against terrorist threats**. *See* Alison M. Levin, *The Safety Act of 2003: Implications for the Government Contractor Defense*, 34 Pub. Cont. L.J. 175, 176 (2004).

Plaintiff's third argument is that L3 is not entitled to SAFETY Act immunity for injunctive relief, and that he is entitled to his "scans" from the subject occurrences. This argument bears repeating only to note that the availability of preliminary injunctive relief turns on Plaintiff's likelihood of success on the merits. *City of Chicago v. Barr*, 961 F.3d 882, 893 (7th Cir. 2020). As L3 established in its Motion to Dismiss, it exercised no control over the QATT after it was sold to the TSA, and L3 has never been in possession of Plaintiff's "scans."

Plaintiff's fourth and final argument regarding the SAFETY Act is that L3's QATT is used by the TSA as part of a "non-negotiable" part of Plaintiff's "contract of carriage" with Allegiant Air, LLC ("Allegiant"). Plaintiff argues that this effectively voids the SAFETY Act certification and designation because, according to Plaintiff, contracts for carriage cannot provide immunity from negligence suits. Despite Plaintiff's nonsensical argument, L3 was not a party to Plaintiff's contract with Allegiant, and Plaintiff's contract of carriage has no impact on the immunity granted to L3 under the SAFETY Act.

### Plaintiff's Failure to State a Valid Cause of Action

Plaintiff has failed to identify any duties allegedly owed or breached by L3. He is further unable to establish that L3's actions were the proximate cause of his alleged injuries, because the FAC makes it clear that his alleged injuries were purportedly caused by the TSA. To address these deficiencies, Plaintiff theorizes that L3 was the leader of a "common enterprise" or an "association-in-fact enterprise" with the TSA and Allegiant Air, LLC ("Allegiant"). He claims they functioned with a "common purpose in exercising dominion over control of access to the airport sterile area." Response, pg. 17. As a result, Plaintiff claims his "special relationship" with the "common enterprise" meant the actions of each member were one in the same. *Id*. at 19.

Plaintiff's "common enterprise" theory is novel but meritless. In Illinois, to establish the existence of a joint venture or common enterprise, a plaintiff must show that the defendants shared a community of interest in the objects or purposes of their undertaking and had an equal right to direct and govern the other's conduct. *Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co.*, 29 Ill. App. 3d 819, 823 (1975). Most important is a showing that the defendants in fact intended to enter such an enterprise. *Holstein v. Grossman*, 246 Ill. App. 3d 719, 737 (1993).

Here, Plaintiff has alleged nothing to show the existence of a common enterprise or joint venture between L3, the TSA, and Allegiant. His commentary on corporate responsibility and the balancing of our national security interests does nothing to establish a valid claim against L3. Thus, after considering all of Plaintiff's arguments, it remains that Plaintiff's claims are procedurally barred, L3 has immunity under the SAFETY Act, and there is no set of facts under which Plaintiff can state a valid claim against L3.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Defendant, L3HARRIS TECHNOLOGIES, INC., respectfully requests that this Court dismiss Plaintiff's Complaint in its entirety with prejudice, and for such further relief as the Court may deem just.


Dated: December 17, 2020                    Respectfully submitted,

                                            ADLER MURPHY & McQUILLEN LLP

                                            */s/ Richard C. Harris*
                                            One of the Attorneys for Defendant,
                                            L3HARRIS TECHNOLOGIES, INC.


Michael G. McQuillen
Christopher J. Raistrick
Richard C. Harris
ADLER MURPHY & McQUILLEN LLP
20 S. Clark Street, Suite 2500
Chicago, Illinois 60603
Telephone: (312) 345-0700
Facsimile: (312) 345-9860
mmcquillen@amm-law.com
craistrick@amm-law.com
rharris@amm-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2020, I electronically transmitted the attached document to

the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic

Filing to all CM/ECF registrants.

With a copy sent via U.S. Mail and email to:

Michael Gibson Muir
19 Inglewood Ln
Bloomington, IL 61704
blaxwan@yahoo.com
*Plaintiff Pro se*

*/s/  Richard C. Harris*